**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

RCM TECHNOLOGIES, INC.,

        **Plaintiffs,**            CIVIL ACTION NUMBER:

        -vs-                   13-6809

LEGION PARTNERS, ET AL,

        **Defendants.**
_____

      Mitchell H. Cohen United States Courthouse
      One John F. Gerry Plaza
      Camden, New Jersey 08101
      November 25, 2013

**B E F O R E**:      **THE HONORABLE ROBERT B. KUGLER**
                  **UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S**:

MORGAN LEWIS & BOCKIUS, LLP
BY: JOHN MCGAHREN, ESQUIRE
    ELIZABETH FAY, ESQUIRE
    JUSTIN DRINKWINE, ESQUIRE
Attorneys for the Plaintiffs

ALSTON & BIRD LLP
BY: CHARLES COX, ESQUIRE
Attorneys for the Defendants

CONRAD O'BRIEN
BY: JOSHUA VOSS, ESQUIRE
ATTORNEYS FOR DEFENDANTS

OLSHAN FROME WOLOSKY, LLP
BY: NICOLE BARNA, ESQUIRE
THOMAS FLEMING, ESQUIRE
JEFFREY UDELL, ESQUIRE
ATTORNEYS FOR DEFENDANTS


Certified as true and correct as required by Title 28,
U.S.C., Section 753.
              /S/ Carl J. Nami

1          THE COURT:  Ready?  Everybody ready?  Let's have

2  appearance of counsel.  Start with the plaintiffs.  Let's go

3  right down the table.

4          MR. MCGAHREN:  John McGahren, Morgan, Lewis and

5  Bockius for the plaintiff RCM Technologies.

6          MS. FAY:  Elizabeth Fay, Morgan, Lewis and Bockius

7  for the plaintiff, RCM Technologies.

8          MR. COX:  Good morning, your Honor.  Charles Cox from

9  Alston and Bird LLP appearing Pro Hac Vice.  Submitted.

10         THE COURT:  Anyone else going to speak today?

11  Defense counsel?

12         MR. VOSS:  Good morning, your Honor.  My name is Josh

13  Voss from Conrad O'Brien P. C.  I'm here on behalf of all

14  defendants.

15         THE COURT:  All right.

16         MR. FLEMING:  Thomas Fleming, from Olshan, Frome

17  Wolosky.  I have a Pro Hac Vice application pending.

18         THE COURT:  All right.

19         MR. UDELL:  Jeffrey Udell also from Olshan, Frome,

20  Wolosky, Pro Hac Vice application pending, your Honor.  Thank

21  you, your Honor.  Good morning.

22         MS. BARNA:  Nicole Barna from Olshan, Frome, Wolosky.

23  For the defense.

24         THE COURT:  All right.  Now, the Pro Hac Vice motions

25  we have for Cox, Fay and Fleming and Udell are all granted.

1    All right?  And before we get into, I guess I want to disclose

2    that Mr. Voss was a law clerk here.

3        Mr. Voss, what years were they?

4        MR. VOSS:  2010, your Honor.

00:01    5        THE COURT:  All right.  Have a seat, everybody.

6        MR. MCGAHREN:  Thank you, your Honor.

7        THE COURT:  Now we have motions for expedited

8    discovery we'll get to.  And the plaintiff is also seeking an

9    Order to Show Cause why a preliminary injunction should not

00:01    10   issue in this matter.  I read the Plaintiff's papers.  The

11   defense counsel submitted today a brief in this matter and I

12   didn't get through the exhibits for defense counsel.  I just

13   didn't have time to get through all this.  But that's the gist

14   of what you're saying.

00:01    15        Let's talk about the Plaintiff's application in this

16   matter.  Who is going to speak?

17        MR. MCGAHREN:  Mr. Cox initially, your Honor.

18        THE COURT:  Okay.  Mr. Cox.  Mr. Cox, is there some

19   reason that you, the plaintiff, didn't submit to me all the

00:02    20   filings that the plaintiff has made with the SEC regarding

21   these matters.  Apparently to defense counsel, there are 19

22   separate filings that you made with the SEC in which you

23   contest much of what the defense has said in their proxy

24   statements.

00:02    25        MR. COX:  Yes, your Honor.  And may it please the

1    court, the issue before you, your Honor, is whether the

2    defendants have spoken truthfully in their proxy submissions.

3    And the issue as to what is in RCM's proxy submissions is

4    irrelevant to that issue.

5           THE COURT:  It doesn't matter that you told them

6    everything that you say the defendants -- that you've told the

7    shareholders everything that you say the defendants should

8    have told them?

9           MR. COX:  No, your Honor.  The reason for that is

10   this is not a 10(b)(5) case.  The type of typical securities

11   case that you might have on your docket.  In other words, the

12   information is in the marketplace and, therefore, buyers and

13   sellers of the securities can make their own informed judgment

14   as to the merits of that.  It's a discipline process in a

15   10(b)(5) context.  In a proxy solicitation context where

16   you're going with one on one to an investor asking them for

17   their vote.  What matters is what the parties say because

18   otherwise you can never theoretically have a 14(a) case

19   because as soon as we filed a complaint, they would say it's

20   already a matter of public record.  It's in this document.  So

21   it's different in the context of disclosure and the obligation

22   is on the defendants in this case to make truthful

23   disclosures.

24          THE COURT:  No question SEC rules and statutes

25   require truthful disclosures and things of that nature.  But

1   you're seeking the equitable remedy from this court.  Right?

2       MR. COX:  Yes, your Honor.  They have gone to the RCM

3   stockholders and made certain representations concerning their

4   nominees' qualifications, conflicts of interest, ownership and

5   securities.  Those are demonstrably false and misleading or

6   they contain omissions.  What's interesting about the papers

7   which we received this morning is they're not really

8   contesting that their statements are false or misleading or

9   omissions.  Their answer seems to be it's all out in the

10  public domain.  And the problem with that is you're requiring

11  --

12      THE COURT:  I think they're contesting your

13  allegations that they're false and misleading and there are

14  omissions.  I mean they point out that they have disclosed

15  that Mr. Vizi is 29 years old.  They have disclosed he owns a

16  thousand shares himself and beneficially owns 1.6 million

17  shares.  They have disclosed the deal with the O'Connell

18  entities.  This is all in your filings, in your attached proxy

19  statement avers.

20      MR. COX:  But, your Honor, you can't -- if you speak,

21  if you choose to speak, you have to speak truthfully and you

22  have to speak fully and you have to speak completely.

23      THE COURT:  What's untruthful about putting the age

24  and the share ownership and the deal he has and their filing

25  about Mr. Vizi.  What's untruthful about that which is at page

1    17 of your exhibit 5?

2         MR. COX:  Sure.  So I'll take those in pieces, your

3    Honor, because I think that really goes to the crux of the

4    matter.  The plaintiffs have, now have conceded in their

5    opposition that Mr. Vizi does not have experience in the

6    industry to which RCM operates.  They admit in their --

7         THE COURT:  Well, do they say anywhere in their proxy

8    statements that he did have industry experience?

9         MR. COX:  They do suggest that, your Honor.

10        THE COURT:  Do they say that anywhere in their proxy

11   disclosures that Mr. Vizi had experience in the relevant

12   industries?

13        MR. COX:  They say it in the context, your Honor, of

14   when they talk about contrasting Mr. Vizi's experience.  They

15   use the words in contrast in relation to a -- the Board member

16   that Mr. Vizi is running against, Mr. Kerr and they make the

17   point that Mr. Kerr has only Board experience at one company,

18   RCM and the inference that they're asking RCM stockholders to

19   draw is that Mr. Vizi somehow has Board experience.

20        THE COURT:  Does it ever say that anywhere in any of

21   his filings that Mr. Vizi has Board experience?  Does it say

22   that explicitly anywhere?

23        MR. COX:  No, your Honor.

24        THE COURT:  Okay.  I didn't think so.

25        MR. COX:  And they concede that he does not have

1    Board experience.  And the reason that their submission is

2    false and misleading is because they -- it's the part they

3    don't test disclosures.  It's when they draw the contrast

4    between Mr. Vizi's experience and an incumbent nominee on the

5    basis of the fact that the incumbent nominee only has Board

6    experience at one company.  So when they come out and say to

7    stockholders elect Vizi, he's wonderful, he's great.  He's got

8    all these great qualities, in contrast RCM's nominee has only

9    Board experience at one.  There is an inference that they're

10   trying to draw.  It's misleading to suggest that Mr. Vizi has

11   Board experience.  That's the inference they're trying to draw

12   out.  That's the part that makes that misleading.

13           THE COURT:  Do you think the law requires that they

14   say Mr. Vizi has no Board experience?  They should say that?

15           MR. COX:  They should say that when they draw a

16   contrast to Mr. Kerr's -- that the reason that you should

17   elect Mr. Vizi is because Mr. Kerr only has Board experience

18   at one company.  If they made the statement -- if they had

19   never made a comparison to Mr. Kerr, then their argument would

20   be here is Vizi's qualification.  They are what they are, and

21   they you would be in the situation which Mr. Fleming and his

22   clients would like you to have which is that this s just a

23   battle over achievement and if that's the case, that's fine.

24   But they've drawn the specific contrast in their papers

25   between Mr. Vizi's qualifications and Mr. Kerr's

1    qualifications and they've done it in a false and misleading

2    way because they are suggesting that Mr. Vizi has Board

3    experience.  That's the first.

4         Now with respect to the stock ownership.  They do say

5    that Mr. Vizi has a thousand shares.  The problem with that

6    is, is that they say that that constitutes substantial skin in

7    the game.

8         THE COURT:  Well, and he beneficially owns 1.6

9    million shares.

10        MR. COX:  But, your Honor, he's specifically

11   disclaimed in his SEC disclosures that beneficial ownership.

12   That's what we point out in -- I'll give you the specific

13   reference here in a second.  It's on page 14 of our brief.

14   It's Exhibit 14 to the Miller Declaration at page 13.

15        Quote:  Each of the reporting persons specifically

16   disclaims beneficial ownership of the common shares reported

17   herein that he or she -- that -- excuse me.  That he or it

18   does not directly own, except to the extent of his or the

19   personal pecuniary interest therein.  And, in other words,

20   he's told, he's told stockholders he's disclaiming that

21   interest.  You can't tell stockholders that you're disclaiming

22   that interest and then claim that it's the count for your

23   substantial skin in the game.

24        THE COURT:  Well, it says Mr. Kiper and Mr. Vizi each

25   disclaims beneficial ownership of the common shares held by

1  each of them.

2           MR. COX:  Each of the members of the group, your

3  Honor.

4           THE COURT:  I don't think that's what it says.  That

00:09    5  paragraph simply talks about Mr. Kiper and Mr. Vizi and no one

6  else.

7           MR. COX:  When you say that paragraph, what are you

8  referring to?

9           THE COURT:  As of the close of the business on March

00:09   10  12, 2013 Mr. Kiper directly owned 22,000 common shares

11  constituting less than one percent of the common shares

12  outstanding and Mr. Vizi directly owned 1,000 common shares

13  constituting less that one percent of the common shares

14  outstanding.  Mr. Kiper and Mr. Vizi each disclaims beneficial

00:10   15  ownership of the common shares held by each other.

16           MR. COX:  They've done that with respect to the

17  entire group, your Honor.

18           THE COURT:  Well, where does it say that?

19           MR. COX:  In the schedule 13.

00:10   20           THE COURT:  Tell me where in Schedule 13.  Because

21  that paragraph doesn't do it.  In the previous page, the last

22  paragraph it says that Mr. Kiper and Mr. Vizi may be deemed to

23  have shared dispositive power with respect to the common

24  shares held by IRS 19, which is 1.3 million shares.

00:11   25           MR. COX:  But, your Honor, with all due respect, the

1   purpose of that Schedule 13D statement is to disclaim

2   beneficial interest of the shares.  And moreover --

3           THE COURT:  Look, I'm just asking where it appears

4   that they disclaim beneficial ownership of the 1.6 million

00:11   5   shares like they disclose that he has control over.

6           MR. COX:  I believe it's in their item five schedule

7   on that page.

8           THE COURT:  In their what?

9           MR. COX:  In their item five disclosure on page 13 of

00:11   10   their schedule 13D5 filing.

11          THE COURT:  Well, which is your page 13?  The actual

12   page of the actual disclosure of the heading page 13?

13          MR. COX:  Whichever is the easiest for you.  I'm

14   using 13 at the bottom or 15 or 21 at the top of the ECF file

00:11   15   which --

16          THE COURT:  Fifteen of 21?  What exhibit number are

17   you in, please?

18          MR. COX:  I'm in the schedule 13D.  Its heading is

19   Document 19-14.

00:12   20          THE COURT:  19-14.  Well the --

21          MR. COX:  Exhibit 12 to the Miller Declaration.

22          THE COURT:  Well, you got -- then the hard copy you

23   gave me is not that.

24          MR. COX:  I actually think that you're reading --

00:12   25   we're reading from the same exhibit, your Honor.

1          THE COURT:  Document 19-14 is Exhibit 12 on the

2     hard-bound addition that you gave me.

3          MR. COX:  Yes, your Honor.  That's what I'm reading

4     from.

00:12     5          THE COURT:  You told me Exhibit 14.  Now what page of

6     that are you reading from?

7          MR. COX:  Either 15 of 21 in the upper right hand or

8     page 13 of the document in the center which --

9          THE COURT:  Well, it's 15 of 22 in this copy that I

00:13     10    have.

11         MR. MCGAHREN:  Further up top, your Honor, there's

12    two paginations on that page.  He's looking at the top one, 15

13    to 21.

14         MR. COX:  Right below it says 16 to 22.

00:13     15         THE COURT:  Okay.  Item five, interest and securities

16    is the issuer?  Is that where you are?

17         MR. COX:  I think you and I are reading the same

18    section.  I think, your Honor, I think in some ways you're

19    accentuating the point which is it cannot be the case that Mr.

00:13     20    Vizi has a substantial ownership unless his substantial

21    ownership is based on the beneficial ownership of the

22    securities held by the O'Connell family in the trust, in the

23    foundation.  And if that's the case, your Honor, then the

24    issue is that there's no credible basis to believe that Mr.

00:13     25    Vizi could be an objective Director because he -- for example,

1   if he were on the, a member of the Board and there was a

2   proposal to have a poison pill put in place with a 15 percent

3   threshold, he would have an absolute conflict between his

4   obligations to Legion Partners and the O'Connell trust and his

00:14   5   obligations to RCM stockholders.  So it cannot be the case

6   that he has substantial skin in the game.  If you're going to

7   -- you either have to have substantial skin in the game

8   because he has the O'Connell interest, in which case he has

9   the conflict which is not fairly and fully disclosed, which

00:14   10   precludes him from objectively being able to make decisions on

11   behalf of all of RCM stockholders or he disclaims the

12   beneficial interest which we believe he has done and he has a

13   thousand shares which is markedly less than any other Director

14   of the company.  Our position is it cannot be both and if it's

00:14   15   not fairly disclosed.

16       THE COURT:  Well, how about the conflict?  Do you not

17   think they disclosed that in page 17?

18       MR. COX:  You see, that's the problem, your Honor, is

19   -- they're disclosing partial trips.  There's no question they

00:15   20   have disclosed that they have a -- that Mr. Vizi has a

21   relationship with Legion Partners.  But what they have said is

22   that Mr. Vizi can objectively, can act as a Board member

23   objectively consider alternatives.  He cannot do that if he is

24   attached and wedded to the beneficial ownership of those

00:15   25   shares.  So that's -- the problem is that the stockholders

1   aren't being able -- being told, hey, there's a problem here

2   that's going to preclude him from being able to make certain

3   decisions.  Again, you know, an example would be if the Board

4   were to put in a poison pill that applied to anybody that came

00:15   5   up to 15 percent, or it could apply to a situation if the

6   Board were to consider a sale transaction where it would be

7   advantageous to RCM stockholders and disadvantageous to Mr.

8   Vizi and Legion Partners because of this side arrangement what

9   they haven't disclosed is the fact that he cannot objectively

00:15   10   as a matter of law be able to make a determination that he can

11   be faithful to his duties to Legion Partners and the

12   O'Connell's at the same time he can guarantee that he can be

13   faithful to his duties as to the RCM stockholders.  That's the

14   inherent problem is that you're getting partial insurance

00:16   15   about Mr. Vizi's background and experience when we he was

16   contrasting that to Mr. Kerr's.  You're now getting partial

17   truths where they're suggesting he has the ability to be

18   dispassionate and unconflicted.  That's the problem is you're

19   getting partial disclosures that don't fairly and formally

00:16   20   inform.  They made a decision to speak on that issue, they

21   have to speak completely, fairly, fully and truthfully, your

22   Honor.

23          THE COURT:  Okay.  Keep going.  What else do you want

24   to say?

00:16   25          MR. COX:  Well, your Honor, we have Miss Fay here is

———MILLER - DIRECT - FAY———

1    prepared to put on Mr. Miller the chief financial officer and

2    to authenticate some records and put on some testimony.  Maybe

3    that would be a good point to take that now and then I'll

4    finish up with some concluding comments after you hear that

5    evidence.

6            THE COURT:  Sure.

7            MR. COX:  I want to make sure that if your Honor's

8    view is that Mr. Vizi's claims are beneficial interest of

9    those shares that's going to be something that if we're going

10   to want to make sure the stockholders know, I think Mr.

11   Fleming will not agree that he claims beneficial interest of

12   those shares, but, you know, I've been surprised before.

13   Maybe I'll be surprised again.  Thank you.

14           THE COURT:  Call your witness.

15           MS. FAY:  RCM Technologies calls Kevin Miller.

16           THE COURT:  Mr. Miller, come on up here.  Raise your

17   right hand.

18   (**KEVIN MILLER,** HAVING BEEN DULY SWORN AS A WITNESS TESTIFIED

19   AS FOLLOWS:)

20   (DIRECT EXAMINATION OF MILLER BY MS. FAY)

21           THE COURT:  Would state your full name?

22           THE WITNESS:  Kevin Miller.

23           THE COURT:  Spell your last name, please.

24           THE WITNESS:  M-i-l-l-e-r.

25           THE COURT:  Mr. Miller, have a seat and try to speak

*00:17* (lines 5, 10, 15, 20, 25)

—— MILLER - DIRECT - FAY ——

1    into that microphone so we can all hear you.

2            THE WITNESS:  Sure.

3            MS. FAY:  Your Honor, if I could approach?  We have a

4    binder of the premarked exhibits for the court and for the

5    witness.

6            THE COURT:  Okay.

7            MS. FAY:  And defense counsel has this as well.

8            THE COURT:  Thank you.

9            MS. FAY:  They are cross referenced to the numbers in

10   the Declaration.  Will the Court permit me to examine the

11   witness from the --

12           THE COURT:  Anywhere you want.

13           MS. FAY:  -- counsel table?  Thank you.

14           THE COURT:  Anywhere you like.

15           MS. FAY:  Thank you.

16   Q.  Mr. Miller, how are you employed?

17   A.  I am chief financial officer for RCM Technologies.

18   Q.  And for how long have you been, have you worked for RCM

19   Technologies?

20   A.  Approximately 16 years.

21   Q.  What is the business of RCM?

22   A.  We have three different segments.  One is an information

23   technology segment which performs discrete projects for our

24   clients to discrete project service and IT staffing services.

25   We have an engineer, what we call our engineering segment

──── MILLER - DIRECT - FAY ────

1   which primarily provides project consulting services to the

2   power industry and also to the aerospace industry and then our

3   third segment is a specialty healthcare staffing services.

4   It's primarily staffing of therapists and nurses, and some

5   other lower tech type service providers to schools, hospitals,

6   rehab centers and the like.

7   Q.   Where is RCM's headquarters located?

8   A.   Pennsauken, New Jersey, 2500 McClellan Avenue.

9   Q.   Does the company have other facilities in New Jersey

10  beyond the headquarters?

11  A.   Yes.  We have our largest office in the company is

12  Parsippany, New Jersey.

13  Q.   World wild how many people does RCM employ?

14  A.   We employ approximately 1400 employees and approximately

15  399 consultants.

16  Q.   And what were the firm's total revenues for the last

17  fiscal year?

18  A.   The last fiscal year was a hundred and 45 million.  This

19  year we'll do about a hundred and 67, 68 million in 2013.

20  Q.   And what stock market is the RCM stock traded on.

21  A.   NASDAQ.

22  Q.   When did RCM first become aware of the defendants as

23  shareholders of the company?

24  A.   I don't recall exactly when they became shareholders.  I

25  want to say it was mid, mid 2011 we initially had discussions

MILLER - DIRECT - FAY

1   with them in early 2011 when they expressed an interest in

2   becoming shareholders.  I know their share purchases are, you

3   know, disclosed in their filings I want to say they started

4   buying maybe around August of 2011, but I'm not sure about

5   that.

6   Q.   Did there come a time when the defendants notified RCM

7   that they desired to nominate Mr. Ballou and Mr. Vizi to the

8   Board of Directors?

9   A.   Yes.  Earlier they had asked to put Mr. Vizi on the Board

10  but they didn't actually formally ask for, you know,

11  nomination through filings until I think it was January 2nd of

12  2013 if I'm not mistaken.

13  Q.   Mr. Miller, would you open the book of Plaintiff's

14  exhibits that are in front of you.  I would ask you to turn to

15  the document at tab one which has been marked Plaintiff's

16  Exhibit 1 for identification.  And this was also exhibit

17  number one to the Miller Declaration?

18  A.   Yes, I have it open.

19  Q.   What is this document?

20  A.   This is a document to inform RCM Technologies of the

21  intent of the Legion Group nominating directors at the 2013

22  meeting.  Additionally they noticed their intent to bring

23  forth other proposals as well, such as declassifying the Board

24  in 2014.  And to -- it's here.  To go to a plural voting

25  standard.

—————— MILLER - DIRECT - FAY ——————

1   Q.   Thank you.

2          MS. FAY:  Your Honor, plaintiff moves the admission

3   of exhibit P-1 into evidence.

4          THE COURT:  Any objection?

5          MR. FLEMING:  No objection, your Honor.

6          THE COURT:  P-1 is received.

7   (PLAINTIFF EXHIBIT 1 WAS RECEIVED IN EVIDENCE)

8   By Ms. Fay:

9   Q.   Mr. Miller, let me ask you to turn now to tab 18 to the

10  document that has been marked exhibit P-18 for identification

11  which was also Exhibit 12 to the Miller Declaration.

12  A.   I have it opened.

13  Q.   What is P-18, Mr. Miller?

14  A.   This is schedule 13D that was filed on January 2nd, 2013,

15  as well.

16  Q.   And filed by whom?

17  A.   By Legion Partners and I mean -- I guess it's filed by

18  IRS 19 but --

19  Q.   Filed by the defendants?

20  A.   Filed by the defendants.

21  Q.   And filed with the Securities and Exchange Commission?

22  A.   Yes.

23          MS. FAY:  Plaintiff moves the admission of --

24          THE COURT:  Any objection.

25          MS. FAY:  Eighteen.

—MILLER - DIRECT - FAY—

1          MR. UDELL:  If I could just have one second.  Your

2     Honor, no objection in principle except we do object to the

3     fact that the exhibit is incomplete as they've offered it.

4     The Exhibit entered here as well as the one in his affidavit

5     has schedule 13D as filed by Legion Partners.  The defendants,

6     however, they omit to put two exhibits that were attached to

7     that 13D as a part of this exhibit.  I believe he has a

8     free-standing exhibit later in his affidavit and in his book

9     that has at least one of those exhibits.  So I would say if

10    we're going to put it in, we should put the whole thing in for

11    the sake of completeness.

12          THE COURT:  Is that accurate, sir?  That there are

13    exhibits that are attached to this?

14          THE WITNESS:  I don't know.

15          THE COURT:  You don't know?

16          THE WITNESS:  No.

17          THE COURT:  Miss Fay, is that accurate, that this is

18    incomplete?

19          MS. FAY:  I believe the key exhibit will be the next

20    exhibit that we're offering so that we will have everything.

21          MR. UDELL:  Your Honor, that's part of our problem

22    because he has the next one is a freestanding exhibit without

23    giving any context to the fact that we actually disclosed the

24    exhibit in our 13D.  And, frankly, the witness doesn't know

25    what it is.  I appreciate the opportunity to voir dire him

—————— MILLER - DIRECT - FAY ——————

1   whether he has in his exhibit that he's sworn to under oath

2   here.

3           THE COURT:  Yep.  Well, I'll permit you to voir dire

4   him on P-18.  You want to voir dire him on P-18?

5           MR. UDELL:  Yes.  Do you have a copy, your Honor.

6           THE COURT:  Yes.

7   VOIR DIRE EXAMINATION BY MR. UDELL:

8   Q.   Mr. Miller, good morning.  My name is Jeff Udell.  I

9   represent all the defendants.

10          Do you have a copy of the binder of P-18 in front of

11  you?

12  A.   I do.

13  Q.   Okay.  So if you turn to page 17 of 21, the numbering

14  system at the top.  You see that?

15  A.   P-18 of 21, yes, the signatures?

16  Q.   No.  Page 17 of 21 in exhibit P-18.

17  A.   Yes.

18  Q.   Okay.  And it says, does it not, that there are two

19  exhibits that are attached to that filing?

20  A.   Yes.

21  Q.   And do you know as you sit here today whether indeed

22  those exhibits were attached in the on-line filing that was

23  filed with the Securities and Exchange Commission on about the

24  time that your P-18 was filed?

25  A.   I do not.

*United States District Court*
*Camden. New Jersey*

-------- MILLER - DIRECT - FAY --------

1   Q.   Now prior to swearing under oath to the exhibits that you

2   attached to your affidavit in this case, did you take the time

3   at all to check the Securities filing to see if they were

4   complete or if they were what they are purported to be?

00:27   5   A.   I believe that they were complete.

6   Q.   And what did you base that belief on?

7   A.   I based it on the belief that, you know, that my

8   attorneys told me they were complete.  I had no reason to

9   believe that they were incomplete.

00:27   10   Q.   So you basically were relying on whatever your attorney

11   said without verifying whether these filings were, in fact

12   made.  Is that right?

13   A.   Yeah.  I didn't read through every page of every single

14   filing, no.

00:27   15        MR. Udell:  Your Honor --

16        MS. FAY:  Your Honor, I would point out I believe the

17   defendants have prepared the same SEC filings and they are

18   offering them as well and the court can take judicial notice

19   of the SEC filing.  So, I'm not sure where we're going with

00:27   20   this.  So why it's necessary.

21        THE COURT:  I have no idea where we're going with

22   this.  But I don't understand what the problem is.

23        MR. UDELL:  Your Honor, all I'm saying is the fact

24   we're not going to contest that these filings were made, but I

00:28   25   think in the affidavit it's complete.  If they want to put it

———— MILLER - DIRECT - FAY ————

1    in, we're not going to object to 18 but it should be coupled

2    with the, what he's got as exhibit 19 in his affidavit and 19

3    in I guess the book as well which is one of the exhibits to

4    that Securities filing.  Frankly the investment advisory

00:28    5    agreement between Legion Partners and --

6         MS. FAY:  The witness is going to identify that piece

7    of the filing as a separate exhibit and explain that it was

8    filed by the defendants with the SEC.

9         THE COURT:  Doesn't seem to be any dispute that P-19

00:28    10   is filed, was part of P-18.  Correct?

11        MR. UDELL:  Correct, your Honor.  As long as they're

12   going to introduce P-19 now as long as -- and they can both

13   come in together, we're not going to object.

14        THE COURT:  Is there anything else that gets attached

00:28    15   to P-18 besides 19?

16        MR. UDELL:  Frankly, there was.  Actually there's

17   another Exhibit 99.2.  If you look on page 17 of 21.

18        THE COURT:  Yeah, I see it.  That's why I'm asking

19   the question.

00:29    20        MR. UDELL:  Yes.

21        THE COURT:  Are you moving that in also?  Is it

22   relevant to any of the issues in this case?

23        MR. UDELL:  It's not relevant, your Honor.

24        THE COURT:  All right.  P-18 and P-19 have been

00:29    25   received in evidence.

—— MILLER - DIRECT - FAY ——

1   (PLAINTIFF EXHIBITS 18 & 19 WERE RECEIVED IN EVIDENCE)

2        MS. FAY:  Thank you.

3   By Ms. Fay:

4   Q.   Mr. Miller, in P-18 I would ask that you turn to the page

00:29   5   at the very top right hand corner, says page 12 of 21.  And at

6   the bottom of the page it says eleven.  But it is item two,

7   Identity and Background.

8   A.   Yes.

9   Q.   What type of information is disclosed in the item two

00:29   10   section of the 13(b) filing?

11   A.   On this discloses all the various parties that are

12   involved in what I call the Legion Group.

13   Q.   What is the relationship between M20 and IRS19?

14   A.   M20 is a general partner of our IRS19.

00:30   15   Q.   And what is the relationship between Mr. O'Connell and

16   the M20 and the O'Connell family trust and the Lionetti and

17   O'Connell Family Foundation?

18   A.   Well, it's my understanding that these various entities

19   are basically supplying the money for IRS19.

00:30   20   Q.   And it's disclosed that Mr. McConnell controls and

21   directs the activities of the foundation, the trust and the

22   M20?

23   A.   I believe so, yes.

24   Q.   What is the relationship between Christopher Kiper,

00:31   25   Bradley Vizi and Legion Partners?

─── MILLER - DIRECT - FAY ───

1    A.   As I understand it, they are principals and part owners

2    of Legion Partners, Mr. Vizi and Mr. Kiper.

3    Q.   And what is the relationship between Legion Partners and

4    the various O'Connell entities we talked about, IRS Partners,

5    M20, the family foundation and the trust?

6    A.   My understanding is that Legion Partners, you know,

7    represents their interests in whatever investments that they

8    make and my understanding is the only investment that they

9    made is in RCM Technologies but I don't know that to be a

10   fact.

11   Q.   Let me ask you now to turn to exhibit P-19 that's at tab

12   19 in the book which has been admitted into evidence.  And

13   what is P-19?

14   A.   That is the investment advisory agreement between Legion

15   Partners and the client which is IRS19 as I understand it.

16   Q.   And drawing your attention to page one of the exhibit.

17   What services is Legion stated to be providing to the client

18   through this arrangement?

19   A.   Investment advisory services.

20   Q.   Are there specific provisions in this agreement regarding

21   RCM stock?

22   A.   Yes.  There's a provision in Section One that essentially

23   prevents Mr. Kiper or Mr. Vizi from purchasing any additional

24   shares in RCM for themselves personally.

25   Q.   All right.  And turning your attention to the very last

--- MILLER - DIRECT - FAY ---

1  page of the exhibit which in the very top right hand corner,

2  says page five of six?  What does the agreement provide with

3  respect to compensation to Legion as the investment advisor

4  from the client?

00:33   5  A.   As I understand it, Legion is paid by the client which is

6  IRS partners Leonetti, O'Connell division M2O and to Mr.

7  O'Connell and Mrs. O'Connell irrevocable trust.  They pay two

8  percent per annum daily average of the current market value of

9  the stock purchase and then there is a -- and that's what they

00:33  10  call the management fee.  And they also get a performance

11  based fee where once there is a liquidity of that, that event,

12  that anything returned less than 10 percent is --

13          MR. UDELL:  Objection.

14  A.   They get zero percent of that.  Any return in excess of

00:34  15  10 percent they get 20 percent of the gain.

16          MR. UDELL:  I'll withdraw it.

17          THE COURT:  Okay.

18  Q.   Mr. Miller, would you now please turn to Tab 11 to

19  Plaintiff's Exhibit 11 for identification is the book,

00:34  20  Exhibit 5 to the Miller Declaration.  What is P-11, sir?

21  A.   It's a schedule 14A filed by the Legion group.

22  Q.   Is this also called the definitive proxy statement?

23  A.   Yes.

24  Q.   And when was this filed with the SEC?

00:34  25  A.   October 30th, 2013.

————— MILLER - DIRECT - FAY —————

1          MS. FAY:  Plaintiff moves the admission of exhibit --

2          THE COURT:  Any objection to eleven?

3          MR. UDELL:  No, your Honor.

4          THE COURT:  P-11 is received in evidence.

5   (PLAINTIFF EXHIBIT 11 WAS RECEIVED IN EVIDENCE)

6   Q.   Mr. Miller, would you turn to the page in P-11 that at

7   the very top right hand corner says, it says Page 20 of 63.

8   At the bottom of the text of this page it says 15 but at the

9   top right hand corner it's 20 of 63.

10  A.   Yes, 20 of 63, Page 15.

11  Q.   And I direct your attention to the italicized bolded

12  heading in the middle of the page that reads:  Our nominees

13  with the experience, qualifications and objectivity necessary

14  to fully explore available opportunities to unlock values of

15  stockholders.  Did I read that correctly?

16  A.   Yes, you did.

17  Q.   Is that a true statement?

18  A.   I do not think it's a statement.

19          MR. UDELL:  Objection, your Honor.  He's going to

20  give his factual knowledge that it's not a true statement that

21  the nominees have asserted they have the experience,

22  qualifications and objectivity necessary to be able to explore

23  opportunities.

24          THE COURT:  He's going to give his opinion in

25  contravention to your opinion, your filing's opinion.

—— MILLER - DIRECT - FAY ——

1    Apparently that's where we're going.

2         MR. UDELL:  Okay, I guess we object to the relevance

3    of his opinion on whether it's true or not.  How is that --

4    respectfully, your Honor, we submit that it's not relevant as

5    factual in any way what, what his personal opinion is or

6    anyone's as to whether that's a true or false statement.

7         THE COURT:  Counsel.

8         MS. FAY:  Your Honor, I would say that the statement

9    by the defendants in their filing is not a statement of

10   opinion.  It's a statement of factual, a factual statement

11   that they are making to the shareholders and the witness had

12   said he believes that it's untrue and he's going to state the

13   facts that show its lack of truth.

14        THE COURT:  I'll permit the answer.  I'm not sure how

15   important it's going to be, but I'll permit the answer.

16   A.  Well, certainly with Mr. Vizi, he's never been on a

17   public board.  He's never worked for a public company.  He's

18   never been on a committee of a public company.  He's never

19   executed any operational strategies or, you know, been a

20   member of a public company or a Director of a public company.

21   I certainly don't think he's objective, given the fact that

22   his major source of income or at least his firm's major source

23   of income will come from a liquidity event.  That may or may

24   not be good for all shareholders or the majority of the

25   shareholders, but we could all dream up quite a few scenarios

─ MILLER - DIRECT - FAY ─

1  where he wouldn't be objective at all and there would be quite

2  a different types of initiatives that the Board may

3  contemplate or where he wouldn't be the least bit objective.

4  If I move on to Mr. Ballou.  Mr. Ballou I don't think is

5  objective.  Six months prior to him retiring from CDI, he

6  attempted a hostile takeover of RCM and offered, and offered a

7  price to RCM at the time and was not able to get that

8  transaction closed in six months, later and six months later

9  he was going from CDI after making that offer.  Additionally,

10  while he was CEO of CDI, they were subject to some pretty

11  significant fines from various Government agencies.  Our

12  company works with a lot of either Government contractors or

13  government agencies as well and none of this is disclosed to

14  my knowledge in this document here.

15       THE COURT:  Why does Mr. Ballou's role and the

16  possible hostile takeover of RCM before now mean he doesn't

17  have experience, qualifications or objectivity?

18       THE WITNESS:  Well I didn't say that Mr. Ballou

19  didn't have experience or qualifications.  What I question is

20  objectivity.  But more importantly --

21       THE COURT:  Why does that make him not objective?

22       THE WITNESS:  He tried to buy the company.

23       THE COURT:  What's --

24       THE WITNESS:  Two years later he's coming back and

25  wants to be on the Board.

─────MILLER - DIRECT - FAY─────

1    THE COURT:  What's wrong with trying to buy the

2  company?

3    THE WITNESS:  There's nothing that's wrong with

4  trying to buy the company.  It was within his right.  He tried

00:40   5  to buy the company, failed.  A couple years later he now wants

6  to be on the Board.

7    THE COURT:  How does that make him not objective?

8    THE WITNESS:  In my opinion it does not make him

9  objective and I think the more --

00:40   10    THE COURT:  Why would you think he doesn't have the

11  interest of the shareholders in mind as a Board member?

12  Because of his prior efforts to take over the company?

13    THE WITNESS:  I cannot tell you whether he has the

14  interest of the Board -- of the company in mind, but what I

00:40   15  can tell you is that is a glaring omission that should have

16  been disclosed.

17    THE COURT:  That wasn't the question you were asked.

18  You were asked to focus on experience, qualifications and

19  objectivity, whether that's truthful.  That's why I'm asking

00:40   20  about objectivity.

21    THE WITNESS:  And I'm telling you my opinion is he's

22  not objective.

23    THE COURT:  Okay.  Continue.

24    THE WITNESS:  He was fired six months after he tried

00:40   25  to take control of the company.  So ...

─────────── MILLER - DIRECT - FAY ───────────

1          THE COURT:  Okay.  Fine.  Go ahead.

2    By Ms.Fay:

3    Q.  Mr. Miller, let me move on and ask you to turn to Tab 14

4    which is Plaintiff's Exhibit 14 for identification and --

00:41   5          THE COURT:  Are you moving 14 into evidence?

6          MS. FAY:  I will be moving --

7          THE COURT:  Any objection?

8          MR. FLEMING:  I'm sorry.

9          THE COURT:  Any objections?

00:41  10          MR. UDELL:  I'm sorry.  It's plaintiff 14 formally

11   Exhibit 8 from Miller.

12          MS. FAY:  Yeah.

13          MR. UDELL:  I have no objection.  But -- no

14   objection.

00:41  15          THE COURT:  All right, 14 is received in evidence.

16   You may proceed.

17   (PLAINTIFF EXHIBIT 14 WAS RECEIVED IN EVIDENCE)

18   By Ms. Fay:

19   Q.  Mr. Miller, are you with me at P-14?

00:41  20   A.  Yes.

21   Q.  And what is P-14?

22   A.  This is a supplemental proxy statement, Schedule 14A.

23   Q.  Filed by the defendants?

24   A.  Filed by the defendants, yes.

00:41  25   Q.  Let me ask you to turn to the page that is labeled in the

––––MILLER - DIRECT - FAY––––

1   top right hand corner, page five of eight?

2   A.   Yes.

3   Q.   And in the third paragraph down I draw your attention to

4   the sentence that reads:  We believe Mr. Vizi a founder of

5   Legion Partners will bring relevant experience as an investor

6   with regard to capital allocation, corporate governance and

7   executive compensation.  Do you see that?

8   A.   Yes.

9   Q.   Does that statement cure the deficiencies in the

10   definitive proxy that you identified as a failure to describe

11   Mr. Vizi's lack of public company experience?

12          MR. UDELL:  Objection to that question.

13          MR. LIEPE:  The basis for the objection, sir.

14          THE COURT:  Isn't that a legal conclusion that I have

15   to draw?  Isn't that the point of this?  So why do I care what

16   his opinion is on whether or not that meets the requirements

17   of the law?

18          MS. FAY:  I didn't -- I'm sorry, your Honor.  I

19   didn't intend to ask him his opinion.

20          THE COURT:  That's what you are asking him.  You're

21   asking him whether it cures something.

22          MS. FAY:  May I rephrase the question, sir?

23          THE COURT:  Please.

24          MS. FAY:  Thank you.

25   Q.   Mr. Miller, in any supplement to the deficiency proxy

— MILLER - DIRECT - FAY —

1  statement, has the defendants disclosed Mr. Vizi's lack of

2  public company experience?

3  A.   They have not.

4  Q.   Thank you.  Let me ask you to turn back to the definitive

00:43  5  proxy statement, P-11 and specifically to the page that has at

6  the top right that says page 20 of 63.  And in the first

7  paragraph.  Are you with me, Mr. Miller?  I'm sorry.

8  A.   I'm moving in that direction.  Twenty of 63.  Correct?

9  Yes, 20 of 63.

00:44  10  Q.   Okay.  In the middle of the first paragraph there reads a

11  sentence:  If the nominees are elected, certain members of

12  your Board, in parens Mr. Vizi, would have significant quote:

13  Skin in the game close quote which would promote significantly

14  greater accountability to all stockholders.  Did I read that

00:44  15  correctly?

16  A.   Yes.

17  Q.   Is that a correct statement?

18  A.   I do not believe it's correct.

19  Q.   In what respect is it not true?

00:44  20  A.   Well, he owns 1000 shares.  He owns 1000 shares and he

21  also has an agreement that may or may not align his interest

22  with the rest of the shareholders depending on the situation

23  that he's in.

24  Q.   Are you -- I'm sorry.  Are you referring to the

00:45  25  investment advisory agreement?

—MILLER - DIRECT - FAY—

**1**   A.   Yes.

**2**   Q.   Have the defendants supplemented their proxy statement to

**3**   correct this statement?

**4**   A.   I do not believe they have.

00:45   **5**   Q.   Now, continuing in the exhibit P-11, the defendant's

**6**   definitive proxy statement.  Would you turn, please, to the

**7**   page at the top right says page 15 of 63.  And it is headed

**8**   reasons for our solicitation?

**9**   A.   Yes, ma'am.

00:45   **10**   Q.   And the last sentence of the first paragraph states:  Our

**11**   nominees are committed to exercising their independent

**12**   judgment in all matters before the Board.  Do you see that?

**13**   A.   Yes.

**14**   Q.   Is that a true statement?

00:46   **15**   A.   I don't see how they could possibly exercise independent

**16**   judgment in all matters before the Board.  So, no, it's not

**17**   true.

**18**   Q.   Okay.  And what is the basis for your view?

**19**   A.   Well, we've already discussed Mr. Ballou and also we've

00:46   **20**   discussed Mr. Vizi and his, you know, his employment with

**21**   Legion Partners and the agreement that Legion Partners has

**22**   with IRS19.

**23**   Q.   Okay.  Have the defendants supplemented this definitive

**24**   proxy statement to correct the statement that their nominees

00:46   **25**   are committed to exercising their independent judgment in all

─────── MILLER - DIRECT - FAY ───────

 1 | matters?

 2 | A.   I do not believe they have.

 3 | Q.   And again within MP11, the definitive proxy statement.

 4 | Would you turn back to the page that is labeled P-13 of 63 in

00:47  5 | the top right-hand corner.

 6 | A.   Yes.

 7 | Q.   And in the middle of the first bullet point, the sentence

 8 | states, refers to quote:  The Company's poor financial

 9 | performance ill-advised acquisition strategy which has

00:47  10 | resulted in approximately one hundred and fifty million in

11 | write-offs associated with good will and other intangibles.

12 | Do you see that statement?

13 | A.   Yes.

14 | Q.   Is that a true statement?

00:47  15 |          MR. UDELL:  Objection, your Honor.

16 |          THE COURT:  What's basis of your objection?

17 |          MR. UDELL:  I believe that the question, she only

18 | read part of the sentence.  I think for completeness she

19 | should read the whole sentence which is that it's quoting from

00:48  20 | a letter Mr. Vizi sent to the company and it's stating that in

21 | the letter Mr. Vizi stated that the stockholder group

22 | believes, et cetera, et cetera.  Is the question did Mr. Vizi

23 | say that in the letter or is the question did Mr. Vizi believe

24 | that or is the question did the company really have poor

00:48  25 | performance.

———— MILLER - DIRECT - FAY ————

1          THE COURT:  The question posed to the witness is

2     whether or not the company demonstrated poor financial

3     performance ill-advised acquisition strategy which has

4     resulted in approximately one hundred and fifty million

5     dollars in write-offs period.  The question is whether that's

6     accurate.  Whether there was poor financial performance and

7     whether there was ill-advised acquisition strategies and

8     whether that resulted in a hundred and fifty million dollar

9     write-off.  He can answer that.  He is the chief financial

10    officer.

11         THE WITNESS:  Well, I think some of this is either

12    misleading or incomplete would be, you know, my response.

13    When they talk about an ill-advised acquisition strategy, you

14    know, we've never -- Mr. Vizi has not concluded on what that

15    acquisition strategy is.  So I'm not sure how he can conclude

16    that we have an ill-advised acquisition strategy when he

17    doesn't know if we even have an acquisition strategy.  We've

18    made one acquisition in the last four years and two

19    acquisitions in the last five years.  Mr. Vizi refers to a

20    hundred and fifty million dollars in write-offs which I don't

21    believe is the correct number, but it's for the sake of our

22    conversation it's a material accurate number but what he omits

23    from this is that over two thirds of that occurred prior to

24    2002.  And what he omits in this particular paragraph is that

25    the other third happened in 2008 when we -- you know, when

──── MILLER - DIRECT - FAY ────

1  there's basically a complete melt down in the financial

2  markets and good will write-offs were extremely common place.

3  That was in the fourth quarter of 2008.  Many, many, many

4  companies were writing off good will at that time primarily in

00:50   5  my opinion because of depressed stock prices.

6  Q.   Mr. Miller, when was the last time a company took a

7  write-off for good will?

8  A.   The fourth quarter of 2008.  About five years ago.

9  Q.   All right.  Was there something else that you wanted to

00:50   10  say?  I'm afraid I might have interrupted you.

11  A.   Let me just give a quick read to make sure I didn't miss

12  anything.  I think that covers it.

13  Q.   Has the defendants amended their, or supplemented their

14  proxy statement to correct the statement regarding ill-advised

00:51   15  acquisition strategy and good will write-off?

16  A.   I don't believe they have.

17  Q.   And if you would turn one page forward to the page

18  labeled page 15 of 63 at the top right.  And I would direct

19  your attention to the bolded italicized subheading that says:

00:51   20  We are concerned with RCM's poor stock performance.  Do you

21  see that?

22  A.   Yes.

23  Q.   Is it a true statement to say that RCM has had poor stock

24  performance?

00:52   25  A.   I do not believe that's true.

—————————— MILLER - DIRECT - FAY ——————————

1    MR. UDELL:  Objection.

2    THE COURT:  That's his opinion.

3 Q. In what respect is that statement untrue?

4 A. Well, what Mr. Vizi and Legion Partners here have done is

5 try to cherry pick one period of time to try and illustrate

6 their point.  What is interesting is that, you know, the user

7 end pointed December 31st, 2012 yet this document was filed on

8 October 30th, 2013.  Additionally, it's typically in my

9 experience when you're looking at a company's stock

10 performing, you're typically looking at it over one, three and

11 five years.  This isn't not only does it have a cherry picked

12 end date, it's not even a five year -- it's not even an

13 annual, any kind of annual.  I don't recall exactly when in

14 2007, you know, either we hit a high of 999 which a big hedge

15 fund was trying take a big position in our stock, but I'm

16 going to say and I could be off on this, it was maybe June or

17 July.  So, in the middle of the month.  So they're taking a

18 stock price performance over say five years, six months and 13

19 days which to me is, you know, misleading.

20    THE COURT:  Why is that misleading?

21    THE WITNESS:  It's misleading because they're

22 picking, cherry picking dates and they're not even explaining

23 it.

24    THE COURT:  Well, you got to have a start date and an

25 end date.  Right?

─── MILLER - DIRECT - FAY ───

1          THE WITNESS:  I don't see too many stock performance

2    quotes that are five years, six months and 13 days and I don't

3    see this too often.

4          THE COURT:  Is there anything inaccurate in this data

00:53    5    in that paragraph?

6          THE WITNESS:  I think it's misleading, but is it

7    inaccurate?  No, sir.

8          THE COURT:  Okay.  So it is accurate.  It's just --

9    it's not complete.  Is that what you'd say?

00:54   10          THE WITNESS:  I think it's not complete and I think

11    it's omitting, yes, it's not complete because it's omitting

12    other important facts.

13          THE COURT:  Okay.

14    By Ms. Fay:

00:54   15    Q.  As the chief financial officer, what in your view would

16    be an accurate portrayal of the company's stock?

17    A.   Well, I think any portrayal of the company's stock

18    performance should go through today.  Number one.  And I think

19    it's atypical for companies to look at stock performance

00:54   20    greater than five years.  I'm not going to say it never

21    happens, but that's the typical measurement date, five, three

22    and one year.

23    Q.  And what is the five year stock performance?

24    A.   Well, I don't know what it is exactly today, but we

00:55   25    calculated it as of I think November, oh, 16th or 17th.  It

─────── MILLER - DIRECT - FAY ───────

1    was over 600 percent, and if you add in our special cash

2    dividend that we returned to the shareholders, it would be

3    over 800 percent.

4              THE COURT:  From when?

5              THE WITNESS:  From late, you know, from five years

6    ended in November.  So if, you know, November 18, 2013, you

7    know, you would, you would be looking at say November 19th of

8    2008.

9              THE COURT:  Share prices increased by 800 percent in

10   five years.

11             THE WITNESS:  Yes.  Well, I just want to be clear.

12   If we include a dollar special dividend, yes.  If you do not

13   include the dollar special dividend, it's around 600 percent.

14   And, you know, it's a rolling thing, right.  So I'm not sure

15   what it is today if I went five years back, but I'm quite

16   confident it's in the high five hundreds if not higher.

17             THE COURT:  What's the closing price yesterday or

18   last week on the shares?  Do you know?

19             THE WITNESS:  Uh, in the six-fifty range.  It might

20   have been lower than that.  I don't know.  I know that as of

21   this morning it was trading $6.50.

22             THE COURT:  So five years ago it was a dollar?

23             THE WITNESS:  It was under a dollar slightly.

24             THE COURT:  Okay.

25   By Ms. Fay:

*United States District Court*
*Camden, New Jersey*

—MILLER - DIRECT - FAY—

1  Q.  Mr. Miller, have the defendants supplemented their

2  definitive proxy statement to clarify their comments about

3  RCM's stock performance?

4  A.  I do not believe they have.

00:56  5  Q.  P-11, the definitive proxy statement.  Would you turn to

6  the page that is the top right labeled page 12 of 63?

7  A.  Yes.

8  Q.  And directing your attention, please, to the third bullet

9  point down which reads:  On January 25, 2013 Mr. Vizi and

00:57  10  Mr. Koppic had a telephone conversation as a follow-up to the

11  meeting.  However, a day earlier Mr. Vizi reiterated that

12  there was no possibility of a settlement that did not entail

13  meaningful change to the Board's composition.

14      First of all, who is Mr. Kopyt, just for the record

00:57  15  A.  Mr. Kopyt is our chief executive officer of RCM

16  Technologies.

17  Q.  Okay.  Is this statement a fair and complete description

18  of the important aspects of the conversation that Mr. Vizi and

19  Mr. Kopyt had on January 25?

00:57  20      MR. UDELL:  Objection, your Honor.

21      THE COURT:  There's all kinds of objections to this.

22  Let's start with a foundation.  How would he know?

23      MS. FAY:  If I may tie it up.  I have evidence from

24  corporate records that will show.

00:58  25      THE COURT:  Okay.  Let's start there, please.

———— MILLER - DIRECT - FAY ————

1    Q.   Mr. Miller, would you turn to tab two which is

2    plaintiff's Exhibit 2 for identification which was also

3    Exhibit 1 to the Koppic Declaration.  And let me first ask

4    you, are you with me at tab two?

00:58    5    A.   Yes, I am.

6    Q.   Let me first ask you, did -- does this document come from

7    the corporate business files of RCM Technologies?

8    A.   Yes, it did.

9    Q.   And what is P-2?

00:58    10    A.   P-2 is a letter from Mr. Kopyt to Mr. Vizi as a follow-up

11    letter to their meeting of January 24th and their telephone

12    conversation of January 25th.

13    Q.   Okay.  In your role as chief financial officer, have you

14    been in a position to observe Mr. Koppic's regular practice

00:59    15    with respect to following up with shareholders?

16    A.   I often do, yes.

17    Q.   Is it Mr. Koppic's general practice to confirm

18    significant conversations with shareholders in a letter?

19    A.   Certainly one as significant as this.  And if they're

00:59    20    significant?  Yes.

21    Q.   Okay.  Did Mr. Kopyt have you review the drafts of this

22    letter?

23    A.   Yes, I did.

24    Q.   And did he discuss the letter with you?

00:59    25    A.   Yes, he did.

─────────── MILLER - DIRECT - FAY ───────────

1   Q.   And did he report to you regarding his conversation of

2   January 25th with Mr. Vizi?

3   A.   Yes, he did.

4        MS. FAY:   Plaintiff moves the admission of exhibit

00:59   5   P-2 for identification.

6        THE COURT:   Any questions on the exhibit or

7   objections?

8        MR. FLEMING:   Yes.   We object, your Honor.   It's

9   classic hearsay within hearsay.   They're trying improperly to

01:00   10  get the content of what Mr. Kopyt says happened on a telephone

11  conversation in here and this witness is not competent to

12  testify to that.

13       THE COURT:   Well, any statement of Mr. Vizi would not

14  be hearsay.   Correct?

01:00   15       MR. UDELL:   Correct.

16       THE COURT:   And counsel has established this as a

17  business record.   So that eliminates the second level of

18  hearsay.

19       MR. UDELL:   Well, your Honor --

01:00   20       THE COURT:   It does not eliminate the problem of

21  Mr. Kopyt's hearsay.   So if you're trying to point to

22  something that Mr. Vizi says that's in this business record,

23  that's fine.   But what Mr. Kopyt said I can't, unless you can

24  come up with some exception to the hearsay rule, and I'm not

01:00   25  going to permit that.   If you're trying to introduce it for

*United States District Court*
*Camden, New Jersey*

———— MILLER - DIRECT - FAY ————

1   the truth of the matter asserted.  I mean I don't know the

2   purpose of this.

3           MS. FAY:  Well --

4           THE COURT:  Well, we're dealing with, about this

01:00   5   conversation of January 25th, 2013, in which the defendants

6   claim in this filing that Vizi reiterated there was no

7   possibility of a settlement that did not entail a meaningful

8   change to the Board's composition.  Is that the purpose of

9   this?

01:01   10           MS. FAY:  No.  The -- it is what -- first of all, I

11   agree with your Honor, we're asking that the document be

12   admitted as a business record.  Within this business record is

13   a reported recollection of Mr. Kopyt appears on page two where

14   he says to Mr. Vizi you indicate that your group may be

01:01   15   potentially interested the acquisition of RCM.  This is the

16   key part of an exploration of Mr. Vizi's conversation with Mr.

17   Kopyt that is we contend omitted from the definitive proxy

18   statement.

19           THE COURT:  I'm completely lost now.  The purpose of

01:02   20   introducing this letter into evidence is to demonstrate that

21   Mr. Vizi had expressed some interest in taking over the

22   company?

23           MS. FAY:  Yes, sir.

24           THE COURT:  What's that got to do with bullet .3 on

01:02   25   page 12 of 63?

——— MILLER - DIRECT - FAY ———

1      MS. FAY:  Okay.  Well, the -- our point is, your

2  Honor, that the description in the proxy statement of this

3  January 25th telephone call just as they had a telephone call

4  and there was no possibility of settlement.  It's a material

5  omission we contend under the Securities Law for the

6  defendants to not have disclosed in describing that

7  conversation that Mr. Vizi expressed in that conversation an

8  interest in acquiring his control of RCM.  And that is an

9  important point for shareholders to know and it's something

10  that the defendants have not disclosed anywhere.

11      MR. UDELL:  Your Honor, whether Mr. Vizi in fact said

12  that.

13      THE COURT:  Forget that for a minute.  In any of your

14  disclosures, do you say that Vizi had ever expressed an

15  interest to Kopyt in taking over the company.

16      MR. UDELL:  We deny and disclaim that, Judge.

17      THE COURT:  Okay.  Fine.  All right.  I'm still not

18  sure what that's got to do with bullet .3.  But they don't

19  contest that they've never disclosed to the SEC about the

20  shareholders that Mr. Vizi expressed an interest in taking

21  over to the company because they say it never happened.

22      MR. UDELL:  Your Honor, if I may follow up on that,

23  your Honor.  In fact, it's on the very next page of the

24  exhibit that you're looking at.

25      THE COURT:  Which exhibit?

—————————— MILLER - DIRECT - FAY ——————————

1          MR. UDELL:  Thirteen -- I'm sorry.  Thirteen of

2     sixty-three.  I forget what their numbering is.

3          THE COURT:  Yeah.

4          MR. UDELL:  Thirteen of 63 they -- and this is our

5     proxy material.

6          THE COURT:  Right.

7          MR. UDELL:  We talked about a February 4th letter

8     that Mr. Vizi responds to the very letter that they're trying

9     to offer in evidence now.  The January 31st letter and we say

10    that, in that letter Mr. Vizi corrected Kopyt's misimpressions

11    surrounding the intent of the stockholder group.

12         THE COURT:  No, I understand that you contest that

13    Vizi ever expressed an interest.

14         MR. UDELL:  Right.

15         THE COURT:  In taking over the company.  That's not

16    the issue.  The issue is whether or not, as I understand it

17    was ever disclosed that he had, and clearly it was never

18    disclosed that he had this interest because he never had the

19    interest.

20         MR. UDELL:  True.

21         THE COURT:  So I don't know why we're going through

22    all these letters.  They say that they never disclosed that

23    they had any interest in it.

24         MR. UDELL:  Exactly.

25         MS. FAY:  Well --

—————— MILLER - DIRECT - FAY ——————

1          THE COURT:  So that's material omission is they

2     failed to disclose.  Well, they did fail to disclose.

3          MS. FAY:  But Mr. Kopyt's letter, P-2, contains his

4     recorded recollection.

01:05     5          THE COURT:  I don't think that's --

6          MS. FAY:  Rule 403, five exception to hearsay was in

7     this business record in which he says Vizi said to me I have

8     an interest or my group has an interest, potential interest in

9     acquiring RCM.  That's a material fact.  They have failed to

01:05    10    disclose it.

11          THE COURT:  They admit they failed to disclose it.

12          MS. FAY:  They dispute the way it was ever said but

13    frankly we don't think they have any evidence to support that.

14          THE COURT:  Well, whether they have evidence or not,

01:05    15    they dispute that they didn't disclose it, and I don't think

16    it's a recorded recollection.  I don't think you establish the

17    foundation for that anyway.  But it doesn't matter because

18    there's no dispute here.  The defendants never disclosed to

19    shareholders they had any interest in acquiring the company.

01:05    20          MS. FAY:  But if they had an interest which we say

21    they didn't disclose it, that is a clear violation of the law.

22    That's the point.

23          THE COURT:  Okay.  I understand that.

24          MS. FAY:  May we have P-2 admitted as a business

01:06    25    record?

—MILLER - DIRECT - FAY—

1      MR. UDELL:  We object to the hearsay within hearsay.

2  The purpose they're trying to offer it is objected.  I mean

3  they're trying, your Honor, to -- a statement of a defendant

4  is one thing, we understand, but whether he said it or not,

01:06    5  were Mr. Kopyt to come in on the witness stand and say, Judge,

6  I spoke to Vizi on the phone.  He said X, Y and, Z.  There's

7  no objection there.  But what they're trying to do is backdoor

8  by saying, well, Kopyt wrote a letter saying this and Kopyt's

9  not here.  That is -- whether Vizi said it or not is hearsay

01:06   10  in this letter and it doesn't survive.

11      THE COURT:  No.  Well Vizi's statement is not hearsay

12  because he's a party and they've established this is a

13  business record.  So I'm going to overrule your objection.

14  The portion of the letter which states what Vizi said is

01:07   15  admissible.  Whether it's to be credited is a different story,

16  but it's admissible.

17  By Ms. Fay:

18  Q.  Mr. Miller, I'm taking you back to exhibit P-11, the

19  defendant's definitive proxy statement and would ask that you

01:07   20  turn to the page which is labeled 14 of 63 at the top

21  right-hand corner.

22  A.  Yes.

23  Q.  And drawing your attention to the fourth bullet point.

24  Is there a comment here from the defendants about efforts

01:07   25  between the company and the tenant to resolve this proxy

───────── MILLER - DIRECT - FAY ─────────

1    dispute?

2    A.   Yes.   There's what Mr. -- well, what this document says

3    is as discussed above.   We believe that the company's

4    characterization of our settlement discussions, the proxy

5    materials that insisted that the company delay implementation

6    of the classification of the Board until the 2014 annual

7    meeting is inaccurate.   We were amenable to the implementation

8    of the declassification proposal at the 2013 annual meeting if

9    the company in turn agreed that all directives would stand for

10   reelection to serve one year terms at the 2014 annual meeting.

11   Not just the stockholders' group's common nominees.   We note

12   that while the company has agreed to declassify the Board at

13   the 2013 annual meeting, only two directors' seats.   And blah,

14   blah, blah.   The rest of it is not inaccurate.

15   Q.   Is that an accurate statement?

16   A.   No.   It's completely false.

17   Q.   All right.   Would you explain why?

18   A.   Because I had extensive conversations with Mr. Vizi about

19   the declassification of the Board.   In fact, the whole

20   settlement discussions broke down over this issue.   This is

21   the main reason why we did not reach a settlement and this is

22   an extremely important point because I had multiple

23   conversations with shareholders that they wanted us to settle

24   this and to avoid a costly and distracting proxy contest.   Mr.

25   Vizi and I can only presume his group because I'm presuming

—— MILLER - DIRECT - FAY ——

01:09

01:10

01:10

01:10

01:11

 1   that he represents Legion Partners insisted emphatically in
 2   multiple occasions that they would not settle unless we
 3   declassified the Board in 2014 so that their nominees that as
 4   part of our settlement discussions we were going to put on the
 5   Board in 2013 would stand for three years and would not have
 6   to stand for election in 2016.  And this is important on two
 7   levels.  One is it's not -- on three levels.  One, it's just
 8   patently false and untrue.  Two, our major shareholders wanted
 9   this thing settled and it broke down over this.  And, three,
10   these are the guys that purport to be the champions of
11   corporate governance.  Yet it was so important for them to
12   have the Board declassified in 2014 so their two hand picked
13   nominees could stand on the Board for three years.  We
14   insisted on declassifying in 2013 as part of a settlement
15   agreement that would include a standstill so we when we get to
16   2015, all six members would stand for reelection after the
17   standstill and if we had disagreements at that time, they
18   would be free to run wherever they want and we would be free
19   to run whoever we want.  But, you know, they were obviously
20   too embarrassed to tell the truth, so they came up with this
21   cockamamy story about that they were amenable to
22   declassifying, you know, and having everybody run in 2014.
23   Had that been offered to us, I can tell you that I would have
24   accepted it and we would have a settlement, but it was never
25   offered.  And it's just a complete fabrication to make them

─────MILLER - DIRECT - FAY─────

1   look better.

2   Q.   Have the defendants supplemented their proxy statement

3   to --

4   A.   No.

1:11   5   Q.   -- correct their statement about the settlement

6   negotiation?

7   A.   No.  And in the first preliminary proxy they didn't even

8   have this story.  They said that we adopted their proposal.

9   Which was also a complete lie.

1:11   10   Q.   Okay.  Let me move onto a different topic now and ask you

11   to turn back to -- all right.  So that P-18 which has been

12   admitted in evidence and which is the defendant's 13D filing

13   of January 2, 2013.

14   A.   Uh-huh.

1:11   15   Q.   In your role as a chief financial officer, are you aware

16   of the threshold at which shareholders are required to make in

17   a 13D filing?

18   A.   Generally I believe it's five percent.

19   Q.   Are shareholders to file for 13D as required to disclose

1:12   20   their plans and proposals with respect to extraordinary

21   corporate transactions such as mergers, training, changing of

22   control, substantial fields of access?

23   A.   That's my understanding.

24   Q.   Did defendants disclose that in their 13D the fact that

1:13   25   they were potentially interested in exploring an acquisition

─────── MILLER - DIRECT - FAY ───────

1   of RCM?

2   A.    They did not.

3         MR. UDELL:  Objection to the form of that question.

4         THE COURT:  What's wrong with the form?

5         MR. UDELL:  It presumed that they had an interest in

6   acquiring RCM which as your Honor pointed out in the record

7   they disclaim to having for the purpose.  You know, that they

8   point out that you beat your wife.

9         THE COURT:  It's a simple question whether or not in

10  any of the filings that anyone ever said that they wanted to

11  acquire the company.  The answer to this witness is no.  I

12  don't think you dispute that.

13  Q.    Did the defendants disclose in their 13D filing that

14  their nominees for the Board would seek to have a strategic

15  alternative and proposal for enhancing stockholder value?

16  A.    I don't believe they did.

17  Q.    Let me ask you now to turn to Tab 16 which is plaintiff's

18  Exhibit 16 for identification.  And it was also Exhibit 10 to

19  the Miller Declaration.

20  A.    Legion Partners presentation?

21  Q.    Yeah.  What is this document, Mr. Miller?

22  A.    This was filed, you know, with the SEC so -- and I

23  believe it was presented to ISS which is Institutional

24  Shareholders Services which is a proxy advisory firm.

25  Q.    Okay.  I believe you start out by saying that this is a

—————————— MILLER - DIRECT - FAY ——————————

1  Legion Partners presentation to shareholders?

2  A.  Well, it's the presentation is actually two ISS who is a

3  proxy.  You know, it's available to some shareholders that

4  bother to go and find it but it's, the primary purpose of this

5  is a presentation to ISS.

6  Q.  I understand your -- I misspoke.  Thank you.  What is the

7  date of this document?

8  A.  November 12, 2013.

9         MS. FAY:  Plaintiffs move the admission exhibit P-16.

10        MR. UDELL:  May I have one moment, Judge?

11        THE COURT:  Sure.

12             (Brief pause)

13        MR. UDELL:  Your Honor, no objection.  Just may I

14  just have one voir dire question of the witness.

15        THE COURT:  Sure.

16  By Mr. Udell:

17  Q.  Mr. Miller, plaintiff's 16, the ISS presentation?

18  A.  Yes.

19  Q.  This was attached as an exhibit to one of the defendant's

20  14A proxy disclosure filings with the SEC.  Is that correct?

21  A.  I'm not sure what it was filed as an attachment to.  I

22  can't tell you that it wasn't.

23  Q.  Well, you said a moment ago that your understanding was

24  that investors would be able to find this document.

25  A.  If they went out and tried to find it, they could have,

──────────── MILLER - DIRECT - FAY ────────────

1   yes.

2   Q.   And that's because it was attached to a security filing

3   of the defendants?

4   A.   Yes.

01:16   5          MS. FAY:  We're stipulating that it was filed with

6   the SEC attachment.

7          MR. UDELL:  Okay.  Thank you.  No objection.

8          THE COURT:  It's admitted into evidence.

9   (PLAINTIFF EXHIBIT 16 WAS RECEIVED IN EVIDENCE)

01:16   10          MR. UDELL:  Thank you.

11   By Ms. Fay:

12   Q.   Mr. Miller, would you turn to the page that has, let's

13   see, the right-hand side from the ECF filing.  It says page

14   five of 23.  The page itself is number four and it's headed:

01:16   15   Our nominees Will Seek To?

16   A.   Yes.

17   Q.   Okay.  And the third bullet point says review strategical

18   alternatives.  Correct?

19   A.   Yes.

01:17   20   Q.   And I'd also like to address your attention to the

21   footnote which has an asterisk and the last sentence of that

22   reads:  It is our hope, however, that it's doubtful to vote to

23   elect our nominees and for our independent chair and proposal

24   at the 2013 annual meeting, then the Board will give serious

01:17   25   consideration to ideas, plans or proposals for enhancing

─────── MILLER - DIRECT - FAY ───────

1   stockholder value that the nominees may recommend to the full

2   Board.  Did I read that correctly?

3   A.   Correct.

4           MS. FAY:  Your Honor, before I finish up with Mr.

5   Miller, I have just a few other exhibits that I think we can

6   enter by stipulation.

7           THE COURT:  Sure.

8           MS. FAY:  That would save us some time with the

9   witness.  So I'll identify those for counsel.  This would be

10   exhibit P-12 which was Exhibit 6 to the Miller Declaration.

11   Defendant's soliciting material under Rule 14(8)(12) filed

12   with the SEC on or about October 31, 2013.

13           MR. UDELL:  No objection.

14           THE COURT:  P-12 is in evidence.

15   (PLAINTIFF EXHIBIT 12 WAS RECEIVED IN EVIDENCE)

16           MS. FAY:  Exhibit P-13 which was also Exhibit 7 to

17   the Miller Declaration.  Defendant's definitive additional

18   materials filed with the SEC on or about November 7, 2013.

19           MR. UDELL:  No objection.

20           THE COURT:  It's in evidence.

21   (PLAINTIFF EXHIBIT 13 WAS RECEIVED IN EVIDENCE)

22           MS. FAY:  P-20 which was also Exhibit 14 to the

23   Miller Declaration, Defendant's Schedule 13D filed with the

24   SEC on or about March 23, 2013.

25           MR. UDELL:  No objection.

─────────── MILLER - DIRECT - FAY ───────────

1          THE COURT:  In evidence.

2   (PLAINTIFF EXHIBIT 20 WAS RECEIVED IN EVIDENCE)

3          MS. FAY:  P-21 which was Exhibit 15 to the Miller

4   Declaration, defendant's Schedule 13D filed with the SEC on or

5   about November 21, 2013.

6          MR. UDELL:  No objection.

7          THE COURT:  In evidence.

8   (PLAINTIFF EXHIBIT 21 WAS RECEIVED IN EVIDENCE)

9          MS. FAY:  P-22, which was Exhibit 16 to the Miller

10  Declaration.  Classic Vacation Group Definitive Additional

11  Material filed with the SEC on or about February 25, 2002.

12         MR. UDELL:  May I have one moment, your Honor?  I

13  apologize.

14         THE COURT:  Sure.

15                 (Brief pause)

16         MR. UDELL:  No objection.

17         THE COURT:  Twenty-two is received in evidence.

18  (PLAINTIFF EXHIBIT 22 WAS RECEIVED IN EVIDENCE)

19         MS. FAY:  All right.  The witness refers to ISF, one

20  of the proxy advisory services and there are reports from

21  three proxy advisory services that I think we can admit by

22  stipulation.  They are P-24, the Glass Lewis report.

23         MR. UDELL:  No objection.

24         THE COURT:  In evidence.

25  (PLAINTIFF EXHIBIT 24 WAS RECEIVED IN EVIDENCE)

*United States District Court*
*Camden, New Jersey*

—————————— MILLER - DIRECT - FAY ——————————

1        MS. FAY:  P-25, the Egan Jones report.

2        MR. UDELL:  No objection.

3        THE COURT:  In evidence.

4    (PLAINTIFF EXHIBIT 25 WAS RECEIVED IN EVIDENCE)

01:20    5        MS. FAY:  And P-26, the ISF proxy report.

6        MR. UDELL:  No objection.

7        THE COURT:  In evidence.

8    (PLAINTIFF EXHIBIT 26 WAS RECEIVED IN EVIDENCE)

9        MS. FAY:  Okay.  Thank you.

01:20    10   By Ms. Fay:

11   Q.  Mr. Miller, as's chief financial officer of RCM, have you

12   been involved on a regular basis with the proxy SIFA has

13   brought you here today?

14   A.  Yes.

01:20    15   Q.  Have you spoken to shareholders about the proxy contest?

16   A.  Yes.

17   Q.  Are you aware of the cost being incurred by RCM in this

18   proxy contest?

19   A.  Yes.

01:21    20   Q.  If one or both of Mr. Ballou and Mr. Vizi wins election

21   to the RCM Board and later after the election a court

22   concludes that the Defendant's proxy statement and 13D filings

23   were false and misleading and that the election has to be

24   invalidated, what impact could that have on the company?

01:21    25   A.  Well, it would be significant.  For one, we'd have to

—MILLER - CROSS - UDELL—

1  have another proxy contest which would be very, very

2  expensive.  I suspect we'll spend at least $500,000, you know,

3  on this, on this contest.  So it's very, very expensive.  It's

4  a complete distraction to the management.  I probably spent

01:22  5  over the last two months 90 percent of my time, 80 percent of

6  my time working on this.  And Leon has, and perhaps more

7  importantly it's a tremendous distraction to our employees

8  that, you know, are the day-to-day people that operate the

9  company and help us put up some pretty good results.  And I

01:22  10  also think there's, you know, a potential reputation impact.

11  Certainly some of our shareholders, you know, who don't want

12  the Legion representation on the Board will probably be okay

13  with it, except for the spending of the extra money.  There'll

14  be other shareholders.  You know, this is a very close, this

01:22  15  is expected to be a very close contest and if we have to do it

16  all over again, I don't know what the damage is to the

17  shareholder base, but I presume it would be significant.

18          MS. FAY:  I don't have any other questions for Mr.

19  Miller at this time.

01:23  20          THE COURT:  Cross examine.

21          MR. UDELL:  Thank you, your Honor.  Do I have to do

22  this from counsel table?

23          THE COURT:  Wherever you're comfortable.

24          MR. UDELL:  Thank you, Judge.

01:23  25  (CROSS EXAMINATION OF Mr. MILLER BY MR. UDELL:)

—— MILLER - CROSS - UDELL ——

1   Q.   Mr. Miller, it's your contention that the proxy materials

2   filed by the defendants with the SEC were false and misleading

3   with respect to, among other reasons with respect to their

4   stated qualifications for Mr. Vizi.  Is that right?

01:24   5   A.   Yes.

6   Q.   That's your opinion.  Right?

7   A.   Yes.

8   Q.   And you referred in your direct testimony as one example

9   of a statement that you said was false and misleading a

01:24   10   statement that on page 23 -- I'm sorry, 22 of 64, and

11   Plaintiff's 11 which is the proxy statement.  Strike that.

12   I'm sorry.  It was Page 20 of, I'm sorry, 20 of 63.  On the

13   very, very top numbering where you said, where the statement

14   made by the defendant in their proxy materials.  Our nominees

01:25   15   have the experience, qualification -- qualifications among

16   other things necessary.  Right?

17   A.   Yes.

18   Q.   Now, if you turn to two pages later to 22 of 63, you'll

19   agree with me, would you not, that the defendants themselves

01:25   20   disclosed to the shareholders that Mr. Vizi was age 29.

21   Right?

22   A.   Yes.

23   Q.   And it's not your contention that that was inaccurate.

24   Right?

01:25   25   A.   No.  It's my contention that they didn't disclose many

——— MILLER - CROSS - UDELL ———

1  other things.

2  Q.   The defendants disclosed Mr. Vizi's founding of Legion

3  Partners in 2010 and where he worked from 2007 to 2010.

4  Correct?

5  A.   Yes.

6  Q.   The defendants disclosed where Mr. Vizi worked prior to

7  that from July 2006 to May of 2007 at another firm.  Correct?

8  A.   Yes.

9  Q.   The defendants disclosed that Mr. Vizi received a degree

10  in economics from the Wharton School of the University of

11  Pennsylvania.  Correct?

12  A.   Correct.

13  Q.   And the defendants disclosed that Mr. Vizi has a

14  chartered financial analyst credentials.  Correct?

15  A.   Correct.

16  Q.   And the defendants said that they believe, believe that

17  his significant financial investment experience would make him

18  an asset to the Board.  Correct?

19  A.   Yes.

20  Q.   And they state that immediately after, immediately after

21  they give all of the items of his resume that you just

22  acknowledged they disclosed.  Right?

23  A.   Yes.

24  Q.   Now, you've testified that in your opinion those things

25  which were fully disclosed by the defendants don't amount to

— MILLER - CROSS - UDELL —

1  what you would call significant experience.  Correct?

2  A.  Yes.  And I also stated that I think the average reader

3  would like to see a little bit more in terms of the fact that

4  he's never worked in our industry.  Okay.  He's never been on

5  a public Board.  And he's comparing himself to other people

6  that have been on public Boards, and as our attorney has

7  explained and this is a lot of disclosure that's missing.

8  Q.  The fact that he's never worked in your industry --

9  withdrawn.

10     They don't say that the defendants don't say in here

11  that they have worked in your industry, that he has served on

12  a public Board.  Right?

13  A.  No, they do not.

14  Q.  And you just testified that you think that your

15  shareholder or voter would like to know that information.

16  Right?

17  A.  If he's contrasting himself to someone else, he's only

18  served on one Board.  If, you know, you should say that he's

19  never served on a Board.  Ever.

20  Q.  Now the fact is that in your proxy materials, you,

21  meaning the company, I say you, the company has disclosed that

22  Mr. Vizi, in the company's opinion, has qualifications with

23  exactly those shortcomings that you just identified.  Right?

24  A.  You'd have to point to me to what we're -- you're

25  referring to.

—— MILLER - CROSS - UDELL ——

1  Q.   Okay.

2         MR. UDELL:  May I approach, your Honor?

3         THE COURT:  Sure.

4         MR. UDELL:  Your Honor, I'm showing the witness the

01:29   5  Declaration of Thomas Fleming which itself attaches a number

6  of exhibits publicly filed with the United States Securities

7  and Exchange Commission by both our clients and by the other

8  side, precisely the kind of exhibits that this witness has

9  been testifying about all day and been stipulating into

01:29  10  evidence.

11         THE COURT:  You can proceed.

12         MR. UDELL:  I'm sorry.  And does your Honor have a

13  copy of that?  I'm sorry, your Honor.

14         THE COURT:  I was not able to copy it this morning.

01:29  15         MR. UDELL:  I'm sorry, a -- Mr. Voss.  I'm sorry,

16  your Honor.

17         THE COURT:  Thank you.

18  By Mr. Udell:

19  Q.   Under SEC Rules is it fair to say that a director nominee

01:30  20  is required to report in the proxy filings whether they have

21  prior public company Board experience.  Correct?

22  A.   I would say so.

23  Q.   And so if it's not reported, that means the person does

24  not have that experience.  Is that fair to say?

01:31  25  A.   Yeah.  But that misses the point.  It misses the point.

—— MILLER - CROSS - UDELL ——

1  Q.   Is that fair to say?

2  A.   Yes.

3  Q.   Okay.  Now let me direct your attention now to -- let's

4  go to Exhibit 1 of the Fleming Declaration.  I'll give you a

01:31  5  second to review that item.

6      Is it fair to say that that is a letter filed by your

7  firm, by RCM by way of proxy materials, a letter filed or

8  materials filed with the Securities and Exchange Commission on

9  or about October 30th of 2013?

01:32  10  A.   Yes.

11  Q.   And then I'm going to ask you to --

12      MR. UDELL:  Well, your Honor, we would offer that

13  exhibit.

14      THE COURT:  This is exhibit one?

01:32  15      MR. UDELL:  Yes, Exhibit 1 to the Fleming, call it

16  defendant's one.

17      THE COURT:  Any objections?

18      MS. FAY:  No.  We're willing to stipulate to the

19  admissibility of the SEC filing.

01:32  20      THE COURT:  Thank you.

21      MR. UDELL:  You know, at this point then, your Honor,

22  we would offer as exhibits, each of the exhibits one through

23  18 of -- I'm sorry.  May I have a moment, your Honor?

24      Yeah, we would offer each of the exhibits one through

01:32  25  30 rather of the Fleming, of the Fleming Declaration and we

————— MILLER - CROSS - UDELL —————

1    could just number them, you know, defendant's Exhibit one

2    through 30.

3            THE COURT:  Any objection?

4            MS. FAY:  No, sir.

01:32   5            THE COURT:  All right, one through 30 will be

6    exhibits D-1 through D-30 will be received in evidence.

7            MR. UDELL:  Thank you.

8    (DEFENDANT EXHIBITS 1 to 30 WERE RECEIVED IN EVIDENCE)

9    By Mr. Udell:

01:33   10   Q.   Okay.  So directing your attention to tab one which is

11   defendant's Exhibit D-1.  That's materials that RCM filed with

12   the SEC.  Right?

13   A.   Yes.

14   Q.   And I'll ask you to turn to page eight of 13.

01:33   15   A.   I'm here.

16   Q.   Okay.  And at the bottom the company discloses to

17   shareholders or advises shareholders that Mr. Vizi is 29 years

18   old with no public company Board or management experience.  Is

19   that right?

01:33   20   A.   It's not our job to take care or your filings.

21   Q.   Is that right, sir?

22   A.   It's not relevant to the whole reason why we're here

23   today.

24   Q.   Sir, can you answer the question yes or no?  Did the

01:33   25   company --

MILLER - CROSS - UDELL

1    A.   We did, we disclosed --

2    Q.   Can you answer the question?  Did the company advise

3    shareholders that Mr. Vizi is 29 years old with no public

4    company Board or management experience?

01:34    5    A.   The ones that bothered to read this letter, yes.  But the

6    ones that just read your proxy and our proxy, no.

7    Q.   So it's your contention that there is a difference in

8    class of shareholders?  Some are only meaning our proxy and

9    those with the R's are not reading yours?  Is that your view?

01:34   10    A.   No.  I think that there is clearly a difference in

11    shareholders in terms of how much they read.  The retail

12    investors probably read the proxy and that's about it.  And

13    there's a fair amount of retail investors.  So, I don't think

14    you or I can guess what shareholders are reading what

01:34   15    materials, but I do think it's very important for the proxies

16    to be accurate and truthful and not have major omissions and

17    you can't point to our letters for your shortcomings.

18         MR. UDELL:  Move to strike, your Honor.

19         THE COURT:  It was nonresponsive.  Is the answer yes,

01:35   20    that the company advise shareholders that Mr. Vizi had no

21    Board experience or management experience?

22         THE WITNESS:  My answer, your Honor, would be that we

23    put into this letter that is directed to our shareholders that

24    he has no experience, yes, sir.  Yes, your Honor.

01:35   25         THE COURT:  Sir, what's the difference between

————— MILLER - CROSS - UDELL —————

1   putting it into a letter and advising the shareholders the way

2   I asked the question.

3           THE WITNESS:  Okay.  Well, the proxies go out to

4   every shareholder that the two parties elect to send it to.

01:35   5   Some of these letters go out to shareholders and some of them,

6   you know, and some are justifiable put in press releases and

7   it's my opinion and I think really a matter of law.  So maybe

8   my opinion doesn't matter that putting things in subsequent

9   filings that don't necessarily go to shareholders do not make

01:35   10   up for the shortcomings in a proxy.

11           THE COURT:  Well, whether they make up for

12   shortcomings or not is not the question.  Does Exhibit 1 go to

13   the shareholders?

14           THE WITNESS:  This one I do believe, yes.

01:36   15           THE COURT:  The answer to my question is then, yes,

16   the shareholders were advised by the company in this filing

17   that Mr. Vizi had no public Board experience.  Right?

18           THE WITNESS:  By RCM, yes.

19           THE COURT:  That's it.  Thank you.  Next question.

01:36   20           MR. UDELL:  Thank you, judge.

21   By Mr. Udell:

22   Q.  Can you please turn to exhibit two, D-2 at page eight.

23   And by the way, that is another filing by the company which

24   attaches a press release that's published by the company that

01:36   25   goes out over the internet and also to the SEC.  Correct?

*United States District Court*
*Camden, New Jersey*

---
MILLER - CROSS - UDELL
---

1    A.   Correct.

2    Q.   And yet again the company discloses that Mr. Vizi is 29

3    and in the company's view has no company Board management

4    experience.  Is that correct?

01:37    5    A.   That is correct.

6    Q.   Take a look at Exhibit 3 which is yet another public

7    filing by the company.  And if you look at page five of eight.

8    Last line on the bottom of that page.

9         Is it fair to say that this is yet another public

01:37    10   disclosure and press release filed by the company with the SEC

11   and disseminated to public by a press release?

12   A.   Yes.

13   Q.   And yet again the company put forth its view that Mr.

14   Vizi is 29 years of age with no public company Board or

01:37    15   management experience.  Is that correct?

16   A.   Yeah, we say he doesn't have appropriate qualification

17   and experience.  Yes.  Yes.

18   Q.   Okay.  And, sir, just to save all of our time, do you

19   have any reason to disagree with me if I told you that they

01:38    20   made the same -- the company made the same assertion about Mr.

21   Vizi at least five additional times in exhibits 5, 7, 8, 9 and

22   10 which are all other public filings of the company?

23   A.   I don't know.  I don't have any reason not to believe

24   you, but, you know, without reading it myself, I couldn't tell

01:38    25   you.  I haven't looked at these exhibits.

———— MILLER - CROSS - UDELL ————

1   Q.  So would it be fair to say that any investor who read any

2   of these materials would full well understand the company's

3   view that Mr. Vizi is not qualified by virtue of his age and

4   lack of public company Board experience?  Is that fair?

01:38   5   A.  Any investors had inaction by Vizi, yes, I would agree

6   with that.

7   Q.  Now, you also testified about Mr. Ballou's

8   qualifications.  Correct?

9   A.  Correct.

01:39   10   Q.  And you said that he could not be, in your personal view,

11   objective in contrast to the claim made by the defendants and

12   their proxy because of his prior tenure at CDI?

13   A.  Yes.  Well, it's not just his tenure at CDI, but what he

14   did at CDI in his last six months there.

01:39   15   Q.  And specifically that CDI attempted to takeover RCM.  Is

16   that correct?

17   A.  Ballou as a representative of CDI tried to takeover, yes.

18   Q.  I want to follow up on exactly that.  You say Ballou as a

19   representative.  Was Ballou acting in a personal capacity when

01:40   20   he, as you say, tried to takeover RCM?

21   A.  I don't believe so.

22   Q.  It would have been CDI, correct?

23   A.  Yes.

24   Q.  So, you understand that Mr. Ballou is no longer

01:40   25   affiliated with CDI, correct?

—————— MILLER - CROSS - UDELL ——————

1   A.   I am aware of that.

2   Q.   Yet you still contend that that would pose a conflict to,

3   notwithstanding the fact that he has no affiliation whatsoever

4   with that company?  Is that your testimony?

01:40   5   A.   Mr. Ballou six months prior to being terminated from CDI

6   tried to takeover our company and failed.  It is my opinion

7   that that would influence him today.  That is my opinion.

8   Q.   Let me ask you to turn now --

9        MR. UDELL:  Oh, withdrawn.

01:41   10   Q.   Let me direct your attention now to Plaintiff's

11   Exhibit 11 at page 15 of 63?  And that's the portion of

12   defendant's proxy materials that say that the defendants, they

13   say they are concerned with RCM's poor stock performance.

14   Right?

01:42   15   A.   I'm sorry.  What is exhibit?

16   Q.   I'm sorry --

17        THE COURT:  Exhibit 11.

18   Q.   Eleven.

19        THE COURT:  No, not --

01:42   20        THE WITNESS:  Oh, okay.

21   Q.   Sorry.  From your first book?

22   A.   Sorry.  P-11.  Okay.  Page?

23        THE COURT:  Page 15 of 63.

24        MR. UDELL:  Yes.

01:42   25        THE COURT:  The paragraph about stock performance.

───── MILLER - CROSS - UDELL ─────

1    Is the last paragraph?

2            THE WITNESS:  Yes, I'm here.

3            THE COURT:  Okay.

4    By Mr. Udell:

01:42   5    Q.  So your contention is that that paragraph is false and

6    misleading?

7            THE COURT:  No, he never said it was false.  He said

8    everything in that paragraph is true.

9    Q.  Oh, I'm sorry.  The header we're concerned with the stock

01:42   10   performance.  You say that the -- withdrawn.

11       You say that the facts alleged in that paragraph are

12   all true.  Right?

13   A.  Yes.

14   Q.  But you said it was misleading to conclude that there was

01:43   15   a problem with the stock, that there was a poor stock

16   performance?

17   A.  Yes.

18   Q.  Okay.  And in your view you said that was misleading

19   because you said that the defendants were cherry picking the

01:43   20   times that they look at what that performance was.  Right?

21   A.  Yes.

22   Q.  Now, is it your contention that the company by contrast

23   doesn't cherry pick and gives a more accurate --

24   A.  You're looking at a five year --

01:43   25           THE COURT:  Finish your question.

—— MILLER - CROSS - UDELL ——

1   Q.   My question is:  Is it your contention that by contrast

2   the company does not cherry pick but gives a more accurate

3   description of stock price performance.  Is that your

4   testimony?

01:43   5   A.   No.

6   Q.   So it is your contention that the company also cherry

7   picks?

8   A.   No, it is not.  My contention is and I said it before, is

9   that the most common bench mark for stock price performance is

01:43   10   one, three and five years.  I've never seen somebody look at

11   five years, six months and 13 days and move it back a year.

12   I've never seen it.  Doesn't mean it's not accurate, but I've

13   never seen it.

14   Q.   Isn't it a fact, sir, that the defendants disclosed full

01:44   15   well precisely what the company's stock performance was before

16   and during the period that they're looking at in their

17   materials?

18   A.   I don't understand your question.

19   Q.   Well, why don't you turn now to exhibit, why don't you

01:44   20   look at Exhibit 7 of -- well, withdrawn.

21        Do you have a copy of your Declaration in this case in

22   front of you?  Probably -- I can give you one if you don't

23   have it.

24   A.   P-10, right?  No.

01:45   25        THE COURT:  No.  Your Declaration that you filed with

—MILLER - CROSS - UDELL—

1   the court.  You have a copy of that.  He doesn't have that.

2          MS. FAY:  No, the witness does not have that in front

3   of him.

4          MR. LIEPE:  No.

01:45   5          MR. MCGAHREN:  Your Honor.

6          MR. UDELL:  Your Honor, may I approach and just show

7   him the Declaration.

8          THE COURT:  Yes.

9   Q.  What I'm showing you, sir, I'll ask you if this is your

01:45   10  signed Declaration.  I'm not showing you the exhibits attached

11  to it which I think you'll otherwise have in your book.  But

12  did you sign that Declaration under oath?

13          MR. LIEPE:  Mark it for identification?

14          MR. UDELL:  Sure.  Mark it as defendant's, whatever

01:45   15  defendant's.  D-31 for identification.

16  (DEFENDANT EXHIBIT 31 WAS MARKED FOR IDENTIFICATION)

17  A.  Yes, this is my signature.

18  Q.  I'm just going to put a sticker on that.  Now, Exhibit 7.

19  Can you at least turn to Exhibit 7 of that Declaration?  Fair

01:46   20  to say that those are additional proxy materials filed by the

21  defendants with the SEC?

22  A.  Where is Exhibit 6?

23  Q.  Oh, I'm sorry.  If you look in your book?

24          THE COURT:  Your book.

01:47   25  Q.  It's marked as P-13 in your book.  Same item.

──────── MILLER - CROSS - UDELL ────────

1  A.   So this is a fight letter from Legion, yes.

2  Q.   Yes.

3        MR. UDELL:  Your Honor, at this point, do one of two

4  things.  I can offer his entire Declaration in evidence which

01:47   5  might just be easiest or we can just do it, you know, one at a

6  time.  Some of the substantive exhibits have already been

7  offered by the plaintiff.  This is one that was an exhibit to

8  his Declaration which they did not discuss and I have some

9  question about it now.

01:47  10        THE COURT:  Well, is there anything in plaintiff's

11  exhibit book that was not in his Declaration?

12        MR. UDELL:  P-13 is in already.

13        MS. FAY:  P-13 was admitted.

14        MR. UDELL:  I'm sorry, your Honor.  So P-13 is

01:48  15  admitted.  I'm sorry.  The dual numbering.

16  By Mr. Udell:

17  Q.   All right.  So now I'm asking you questions about P-13.

18  Let me ask you to turn to page, at the top number, I guess

19  it's five of ten?  And do you see the -- a discussion that's

01:48  20  captioned:  RCM Total stockholder Return versus Russell 2000

21  and Pierstead?  Do you see that?

22  A.   Yes.

23  Q.   And do you see a discussion by the defendants about their

24  methodology for calculating shareholder return at RCM?

01:48  25  A.   It doesn't make it mis -- not misleading.

—— MILLER - CROSS - UDELL ——

1   Q.   Do you see that?

2   A.   Yes.  But I see it.

3   Q.   Then let's turn to the next page.  You see that chart

4   page six of 10?

01:49   5   A.   Uh-hum.

6   Q.   And in that chart the defendants give the history of

7   RCM's stock price performance going back to 2003, October 31.

8   Is that correct?

9   A.   Yes.

01:49   10   Q.   And they note the point at which the company begins to

11   calculate the performance to get to the 700 plus percent

12   number at the very bottom of the stock performance during that

13   whole ten year period.  Isn't that correct?

14   A.   Yes.

01:49   15   Q.   And by contrast -- let me ask you now to turn to the

16   company -- I'm sorry.  To Mr. Fleming's Declaration at

17   Exhibit 2.  Those are proxy materials at the company.

18   Correct?

19   A.   Exhibit 2 in Mr. Fleming's.

01:50   20   Q.   Yeah.

21   A.   Uh-huh.  Okay.

22   Q.   And if you turn to -- I'm sorry.  Exhibit 2 are proxy

23   materials filed by the company.  Correct?

24   A.   It was a press release, yes.

01:50   25   Q.   And the press release talks about a letter that was sent

1   to stockholders.  Right?

2   A.   Yes.

3   Q.   And the company's filing the proxy materials.  Right?

4   A.   Yes.

)1:50   5   Q.   Okay.  And now let me ask you to look at page seven of 14

6   at the top.

7   A.   Uh-hum.

8   Q.   That's a chart that the company filed with respect to the

9   share price performance and analyzed by the company.  Right.

)1:51   10   A.   Yes.

11   Q.   And the company's unlike the defendant's chart, the

12   company's chart is the one that starts in 2008 at the bottom

13   is the lowest price performance of the company in the last ten

14   years going forward.  Right?

)1:51   15   A.   We took a five year chart.

16   Q.   Right.

17   A.   Which is what most companies do, they look at five years.

18   Q.   Right.

19   A.   We showed a five year performance, yes.  The stock was

)1:51   20   low at the beginning and in the last five years, we've had

21   exemplary stock performance.

22   Q.   And is it your contention that that chart is more

23   complete than the chart for 10 years shown by the defendants

24   in Exhibit 13 that we just looked at?

)1:52   25   A.   I think it's a better way of looking at it, yes.

— MILLER - CROSS - UDELL —

1   Q.   Do you think it's more complete to have less information?

2   A.   I'm not sure what complete, more complete means.

3   Q.   Well, your chart shows five years with the stock price

4   going up from its low in 2008?

01:52   5   A.   Well --

6   Q.   And the plaintiff's chart shows ten years and it shows

7   exactly where it fell down from before it started to rise in

8   the smaller of time, window of time selected by the company.

9   Isn't that true?

01:52   10   A.   Your chart shows more time, yes, that's true.  But I also

11   think that what it ignores is what's going on in the

12   information technology business in the last ten years, which

13   is tumultuous, an incredible change.  The information

14   technology business has gone through unbelievable changes.

01:52   15   So, you know, that's great.  You can put a ten year chart in

16   there, but that doesn't change the fact that your statement in

17   your initially filed proxy is misleading and cherry picks a

18   time period.  It doesn't change it.

19   Q.   Well, you say the statement cherry picks a time period

01:53   20   but --

21          THE COURT:  Hold it.  Hold it.  If this continues,

22   we're going to come to an end and you're not going to like

23   what happens.  You have to let him finish.  You're here to

24   answer questions.  He's here to ask questions.  Stop arguing

01:53   25   with the witness.  Just ask questions.

─────── MILLER - CROSS - UDELL ───────

1          We're going to break for lunch for an hour.  We'll see

2    you back at 2:30.  Thank you.

3                MR. UDELL:  Thank you.

4                (The luncheon recess was then taken)

03:11     5                    (Afternoon Session)

6                      (Open Court)

7                THE COURT:  All right, let's get started again.  Mr.

8    Miller is on the stand.  Have a seat, everybody.  Okay.  You

9    may continue.

03:12    10                MR. UDELL:  Thank you, your Honor.

11   By Mr. Udell:

12   Q.   Mr. Miller, can I ask you to turn to Plaintiff's

13   Exhibit 16?  That's the presentation filed by the defendants?

14   You got that in front of you?

03:12    15   A.   P-16?

16   Q.   P-16, yes.  And I ask you to please turn to P-13 of that

17   document, and that's 13 of the document itself.  The number in

18   the lower right hand corner of each page.  It's a slide that

19   says at the top without support -- I'm sorry.  I'm sorry.

03:13    20   Page 12.  The page right before that.

21   A.   Yes.

22   Q.   The slide that says at the top:  RCM's Attempt To Mislead

23   Shareholders.  Do you see that?

24   A.   Yes.

03:13    25   Q.   Take a look at that page for a second?

—— MILLER - CROSS - UDELL ——

1    A.    Yes.

2    Q.    Now the first is this is a page from the proxy materials

3    of the defendants.  Right?

4    A.    I don't think these are the proxy materials.

03:13    5    Q.    These are filed with the SEC as additional proxy

6    materials.  Correct?

7    A.    They were filed with the SEC, yes.

8    Q.    And supplemental proxy materials?  You don't know one way

9    or the other?

03:13    10    A.    No.  I know they didn't go out to shareholders but --

11    Q.    Well, shareholders had access to these materials.  Right?

12    Asked them to go public, right?

13    A.    They want to hunt them down, yes.

14    Q.    Well, the SEC publishes all of these things that are

03:13    15    filed with that agency to the world.  Right?

16    A.    It is available to the world, yes.

17    Q.    And in this slide, this one covers the issue that we --

18    you testified about before regarding the defendant's

19    commentary on the stock price performance of RCM.  Correct?

03:14    20    A.    No, I do not think that.

21    Q.    So this, in your view, this doesn't comment on the stock

22    price performance of RCM?

23    A.    It does comment on the stock performance of RCM, but it

24    does not cure or change what was that original proxy.

03:14    25    Q.    That's not my question.  My question is:  These are

—MILLER - CROSS - UDELL—

1  materials by the defendants filed with the SEC available to

2  the investing public that comments on RCM's stock price

3  performance.  Correct?

4  A.   Correct.

03:14  5  Q.   Okay.  And in this deck what's said among other things is

6  RCM, the company's position regarding how it comes to would

7  use as a 587 percent share price increase during the period

8  examined by the company.  Right?

9  A.   Yes.

03:15  10  Q.   So, the defendants disclose the company's view and then

11  after that, the defendants contrast and explain their view.

12  Right?

13  A.   Their view as of that date, yes.

14  Q.   Okay.  Thank you.  Now let me ask you this.  If the share

03:15  15  price of RCM, let's say goes up five times the amount the

16  price that it's at today, if it goes up five times that, and

17  after going up five times, the O'Connell entities managed

18  Legion's Partners sell their shares, they stand to make a

19  profit like any other shareholder.  Right?

03:16  20  A.   Yes.

21  Q.   And in that scenario, Legion Partners would also make a

22  profit as part of the performance fee from the sale of those

23  shares.  Right?

24  A.   In that scenario, yes.

03:16  25  Q.   Okay.  And obviously Mr. Vizi would make a profit from

MILLER - CROSS - UDELL

1   that profit from Legion.  Right?

2   A.   I suppose so.  I don't know his compensation arrangement

3   but I suppose so, yes.

4   Q.   Well, you say you don't know the compensation

5   arrangement.  Didn't you testify that you read the investment

6   advisory agreement filed by the defendants that explains what

7   his compensation arrangement was?

8   A.   It explains Legion's compensation arrangement.

9   Q.   Okay.  And Mr. Vizi is a manager of Legion?

10  A.   Yes.

11  Q.   Okay.  And would it be fair to say that if the price went

12  up as just described and O'Connell makes money as just

13  described from the sale of those shares, it would be fair to

14  say that is skin in the game?

15  A.   That's not the point.

16  Q.   Wouldn't it be fair to say that in this situation, Mr.

17  Vizi, Legion, I think sensivised to make money when the price

18  of RCM stock goes up.  Isn't that fair?

19  A.   It is incomplete.  I don't know how many times I can say

20  it to you.  It's incomplete.  Yes, I would presume that Mr.

21  Vizi in that scenario would make money, but that doesn't mean

22  that the other shareholders make money A and B, that does not

23  mean that they would be making an appropriate amount of money.

24  Mr. Vizi having -- I'm going to give approximate numbers, is

25  Mr. -- excuse me Mr. Vizi's firm is investing a fair amount of

— MILLER - CROSS - UDELL —

1  money in RCM and they do not get paid until there's a

2  liquidity of this.  And that liquidity event must provide a

3  return over ten percent.  Okay.  And I'm going to presume that

4  Mr. Vizi and Legion do not have an unlimited supply of capital

03:18  5  from Mr. McConnell and that they probably don't get to make

6  another big investment until this liquidity event occurs.  So

7  I believe and I think it's not too big of a stretch that he

8  has an incentive and Legion has an incentive to get that

9  return as quickly as possible.  And that may or may not be

03:19  10  good for other shareholders, none of which is disclosed

11  anywhere.

12  Q.   Well, all of these incentives that you're just describing

13  you gleaned from the investment advisory agreement.  Correct?

14  A.   Yes.

03:19  15  Q.   That's what you got.  Okay.  And you got the investment

16  advisory agreement not from hiring a private investigator to

17  look into these things, but rather from the defendant's own

18  public disclosures.  Is that correct?

19  A.   Yes.

03:19  20  Q.   Now, you also talked earlier about what you say was the

21  defendant misleading and incomplete disclosures about

22  acquisitions, strategy and write-offs at the company.  Right?

23  A.   Yes.

24  Q.   Please turn to Plaintiff's exhibit P-11 which is the

03:20  25  defendant's definitive proxy materials and I ask you to turn

—— MILLER - CROSS - UDELL ——

1   to page 13 of 63?  Are you there?

2   A.   Yes.

3   Q.   Okay.  Now, you were asked questions about, you testified

4   about the sentence in the middle of that first bullet point at

03:20   5   the top of the page where it reads:  Instead Mr. Vizi stated

6   that the stockholder group believes that meaningful change is

7   warranted at the Board level to address the company's poor

8   financial performance, ill-advised acquisition strategy which

9   has resulted in approximately a hundred 50 million dollars in

03:21   10   write-offs associated with good will.  You see that?

11   A.   Yes.

12   Q.   You testified that that was misleading.  Right?

13   A.   Yes.

14   Q.   First of all, isn't it the case that in that very

03:21   15   paragraph, the defendants in their proxy materials are

16   describing what Mr. Vizi said in a letter sent on February 4th

17   by Mr. Vizi to Mr. Kopyt.  Isn't that right?

18   A.   Well, first of all, this isn't the only place that this

19   language is disclosed.  It's in multiple disclosures.

03:22   20   Q.   Answer the question, please.

21   A.   Okay.

22   Q.   Is that --

23   A.   In this particular page, yes.  He's describing a letter

24   that was misleading in the letter and it's misleading here.

03:22   25   Q.   Okay.  So, just preliminarily, it's fair to say that this

─── MILLER - CROSS - UDELL ───

1   accurately describes exactly what he said in the letter.

2   Correct?

3   A.   I don't have the letter in front of me, but I don't have

4   any reason to believe it's inaccurate as it pertains to the

5   letter.

6   Q.   Okay.  And then now it's your contention that in other

7   places you say the defendants were not accurate with respect

8   to their description of say the good will write-offs.  Right?

9   A.   I don't think that I said it was inaccurate.  I think I

10  said it was misleading or incomplete.

11  Q.   Okay.  And it was incomplete because they didn't disclose

12  that there hadn't been write-offs you testified since 2008.

13  Is that why?

14  A.   No.

15  Q.   Why is it that?

16  A.   Okay.  I said that what they did not disclose and I

17  believe they disclosed a wide time period, but the piece that

18  they left out is that over two thirds of it occurred

19  approximately 11 years ago or longer.  So approximately and

20  I'm giving you approximate numbers because I don't know the

21  exact numbers off the top of my head, but approximately of the

22  150, about a hundred occurred in 2002 and prior.  And that the

23  other write-offs that occurred in 2008 of Q4 occurred at the

24  height of, you know, of a financial crisis.  And what they

25  also did not disclose and probably didn't, don't even bother

03:22

03:22

03:23

03:23

03:23

───── MILLER - CROSS - UDELL ─────

1    to determine because it wouldn't serve their purpose is why

2    those write-offs occurred.

3    Q.   Now, let me ask you to turn to page 16 of 63 in the same

4    exhibit?  And fair to say that's yet another statement by the

5    defendants on that this second topic, the same document

6    regarding write-offs and the write-offs of good will and the

7    acquisition strategy?

8    A.   Yes.

9    Q.   And isn't it a fact that in that very summary the

10   defendants say in their materials that they point out and

11   acknowledge the fact that the company's last write-offs

12   occurred in 2008?  Correct?  Paragraph two?  Is that correct?

13   A.   They do, but they leave out a lot of context.  As I've

14   already said.

15   Q.   And let me ask you to look now to --

16        MR. UDELL:  Withdrawn.

17   Q.   Mr. Miller, is it your view that, your personal view that

18   Mr. Vizi has the plan to take control of RCM?

19   A.   My personal view that Legion Partners has a plan to take

20   control of RCM Technologies, yes.

21   Q.   And do you think that this plan will be effectuated when

22   they occupy two of six Board seats?

23   A.   No.  I believe that's step one.

24   Q.   And if they were to have two of six Board seats, that

25   would enable them to have any power to effectuate a vote on

—————— MILLER - CROSS - UDELL ——————

1   any issues or control of the Board.  Isn't that right, sir?

2   A.   Let's take because you asked two questions I think there,

3   right?  Did you want to ask one question or two?

4   Q.   I'll ask one question.  If they have two seats on the

5   Board, do they have any power to control that Board?

6   A.   They do not.

7            MR. UDELL:  No further questions.

8            THE COURT:  Any redirect?

9            MS. FAY:  No, sir.

10           THE COURT:  Thank you, Mr. Miller.  Do you have any

11   other witnesses?

12           MS. FAY:  No, your Honor.

13           THE COURT:  Okay.  Do you have any other evidence you

14   want to introduce?

15           MS. FAY:  No, your Honor.

16           THE COURT:  All right.  So you rest?

17           MR. COX:  Well, subject to your Honor providing a

18   closing argument.

19           THE COURT:  Sure.  I want to see if defense has any

20   evidence or witnesses they want to put on?

21           MR. UDELL:  Your Honor, we're not calling any

22   witnesses, but we would like to offer in evidence, we got

23   three exhibits that already in in the materials.  They were

24   each exhibits to Mr. Miller's Declaration.  In the Miller

25   Declaration they were exhibits nine, eleven and 17.  I believe

─ MILLER - CROSS - UDELL ─

1    plaintiffs have pre-marked them and they're in their book as

2    Plaintiff's exhibits P-15, P-17 and P-23 and they're all again

3    additional proxy materials filed by the parties.

4           THE COURT:  Any objections?

5           MS. FAY:  No objection.

6           THE COURT:  All right, Plaintiff's exhibit 15 is in

7    evidence, Plaintiff's Exhibit 17 is in evidence.  Plaintiff's

8    Exhibit 23 is in evidence.

9    (PLAINTIFF EXHIBITS 15, 17, 23 WERE RECEIVED IN EVIDENCE)

10   anything else from Defendants?

11          MR. UDELL:  No, your Honor.

12          THE COURT:  All right.  Mr. Cox.

13          MR. COX:  Thank you, your Honor.  May it please the

14   court.  You've heard a lot of testimony and seen a number of

15   exhibits this morning and I'm going to try to put some context

16   around it.  Section 14A of the Exchange Act and the proxy

17   solicitation rules require that shareholders be informed of

18   relevant information concerning a nominee's background,

19   business, experiences and it also requires that parties

20   offering in proxies provide full, complete and truthful

21   disclosures.  That's the fundamental starting point of our

22   discussion.  That's the fundamental point of this motion.  The

23   parties go back and forth in this proxy fight.  Where I think

24   we get off the rails collectively and hearing some of this

25   testimony is how this all meshes with what the defendants have

*3:28*

*3:28*

*3:29*

*3:29*

*3:29*

—————— MILLER - CROSS - UDELL ——————

1  done in this case.  And what I want to do is I want to walk

2  through the facts on each of the seven issues that we're

3  asking you to focus on, your Honor, and then I want to talk

4  for a moment about what the defendant's defense is because in

03:30  5  some ways, the defendant's defense is really the issue in this

6  case.  So, the first thing is was there a violation of Section

7  14A.  And there let's take the series of, the series of the

8  seven items that they have talked about today, your Honor.

9      The first one that we spent some time on, you heard

03:30  10  about Mr. Vizi's experience or not experience.  Whether he's a

11  Board member.  Whether he's not a Board member and in the

12  brief they submitted this morning they now concede that Mr.

13  Vizi has no experience in the relevant industries and he has

14  no Board experience.  So, there's no question you're not

03:30  15  making the argument that they disclose that they're conceding

16  that they omitted, they have not included that.  They have

17  omitted that from their proxy and --

18      THE COURT:  So they're conceding that they've never

19  claimed in any of the proxy material that he was a Board

03:31  20  member or he had experience in the relevant industry.

21  Correct?

22      MR. COX:  That's what they are contending.

23      THE COURT:  There's no dispute about that.  That

24  you're contending also that they never disclosed any proxy

03:31  25  materials that he was a Board member or had any experience in

───── MILLER - CROSS - UDELL ─────

1      the relevant industry.

2              MR. COX:  Absolutely, your Honor.  And why does that

3      matter.  And this is the part that I think sort of gets lost

4      in the factual dispute, because we agreed on the facts.  Agree

5      on the fact that Mr. Vizi has no Board experience, has no

6      relevant company experience.  But where we -- exhibit P-13,

7      page -- I know we use different conventions.  So page eight of

8      ten in the top right or little five on the bottom right.

9              THE COURT:  Okay.

10             MR. COX:  In that first -- at the bottom of the first

11     paragraph there it talks about Mr. Vizi being a seasoned

12     investor.  It talks about his experience and his education and

13     all of those things which is what Miss Fay was focusing on in

14     direct.  And the very first sentence of the next paragraph

15     which is why all of this matters, he says in contrast, so

16     that's in contrast to Mr. Vizi's experience, Mr. Kerr has no

17     public company Board experience other than RCM.  What the

18     defendants are doing is they're asking the stockholder who

19     receives this to draw the inference from the preceding

20     paragraph that Mr. Vizi has Board experience and that is just

21     demonstrably false.  They conceded it.  There's no dispute

22     about it.  The factual issue is absolutely clear that Mr. Vizi

23     has no Board experience, and you can't start a paragraph in

24     contrast because what you're signaling to stockholders is that

25     Mr. Vizi has some experience that is different than Mr.

———— MILLER - CROSS - UDELL ————

1    Kerr's.  And that's the reason why we see that this whole

2    issue about Mr. Vizi's Board experience or labelling of Board

3    experience matters.

4         THE COURT:  Well, except you ignore the first part of

03:33   5    the first paragraph when they talk about Mr. Ballou who has

6    all the operating experience at much larger firms and all

7    these other companies he was involved with.

8         MR. COX:  But, your Honor, I'm going to get to Mr.

9    Ballou.  I don't want you to think for a moment we're not

03:33   10    going to get to Mr. Ballou and his operational experience but

11    the point here is you juxtapose in contrast contrasting the

12    Director nominees which include Vizi with Mr. Kerr who has no

13    public company Board experience.  That's what makes the whole

14    issue about Vizi's experience false and misleading because

03:33   15    it's the omission there.  You can't use the word in contrast.

16    So -- and I'm going to get to their defenses after I go

17    through on each of those facts as to why they say, well, you

18    -- I'll just do that now while you're focusing.  So the answer

19    we get to almost every one of these things as we go through

03:34   20    those is almost a concession that they are false and

21    misleading or they've omitted the information.  That's not in

22    dispute.  What they've come back with and you heard it during

23    Mr. Udell's cross-examination and some of your questions this

24    morning, the argument that always seems to get made is, yeah,

03:34   25    but you disclosed it, or it was disclosed by defendants in

— MILLER - CROSS - UDELL —

1  their press releases.  That's the wrong standard, your Honor.

2  The standard isn't whether defendants -- excuse me.  Whether

3  the plaintiffs and RCM have disclosed it.  The issue is

4  whether the defendants have disclosed it.  We talk about that

03:34  5  at pages 17 of 19 of our preliminary injunction and we cite

6  the cases from the Second Circuit, the Fifth Circuit and the

7  District Courts that all point out the fact that it's the

8  person that makes the false and misleading statement that

9  needs to make the corrected disclosure, and we talk about what

03:34  10  that requires.  It doesn't require, it doesn't shift the onus

11  onto RCM to make, correct their false statement.  That's just

12  -- they're asking -- they're inviting you to create legal

13  error, to create a new standard for Securities which basically

14  would inoculate the ability of anybody to bring a Section

03:35  15  14(a) claim and the reason they want to do that is because you

16  could always make the false and misleading statement in a

17  proxy and unless you're the opposing party, then either file

18  the lawsuit or calls it out and says that's false and

19  misleading at which point they would make the argument that

03:35  20  it's all a matter of the public record.  That's not the legal

21  standard.  That's not what Sinesta Hotel says in the Second

22  Circuit.  It's not what Gerhart says in the Fifth Circuit.

23  It's not what all the cases that we cited in pages 17 through

24  19 that talk about when you make a false and misleading

03:35  25  statement or omission.  You need to do a corrective

───── MILLER - CROSS - UDELL ─────

1   disclosure, and a corrective disclosure means you go back and

2   say I said X.  It was inaccurate and here are the true facts.

3   And Mr. Fleming knows that.  That's the same position he

4   argued and was successful on in Lone Star, in the Lone Star

03:35    5   case which we've cited.  So this is not coming as news to

6   defendant's counsel.  They know full well what the legal

7   standard here is.  If you make a false and misleading

8   statement, you got to be -- you have to make the correction,

9   not RCM, not ISS, not any of these proxy advisory services.

03:36   10   It's, it's you that has to make the correction because you

11   have to advise shareholders that there was an inaccurate

12   disclosure.  And the simple solution here is to have -- is to

13   grant the preliminary injunction.  It's not a parade of

14   horribles that will last forever.  It will last until they

03:36   15   provide the correct disclosure.  So the first item we talked

16   about the Vizi -- the reason why this portion is sort of gives

17   lack of Board experience is an omission that is false and

18   misleading because the juxtaposition with Mr. Kerr's

19   experience.  Any stockholder reasonably reading that would

03:36   20   lead to the view that Mr. Vizi had Board experience.  He does

21   not is conceded.

22          Next, the whole issue about whether Mr. Vizi has skin

23   in the game and his conflict.  So, there does not seem to be a

24   factual dispute again here.  There's clear that Mr. Vizi has a

03:37   25   thousand shares.  Plaintiffs say that the defendants agree.

──────── MILLER - CROSS - UDELL ────────

1    There's also, it's also conceded that Mr. Vizi is part of a

2    group, a 13D group held by Mr. O'Connell and his shares.

3    That's not in dispute.  Where the problem is, the problem

4    occurs because Mr. Vizi and the other defendants state in

03:37    5    their proxy materials that Mr. Vizi will be able to

6    objectively evaluate all issues before the Board.  That is an

7    impossibility.  It's an impossibility because he has fiduciary

8    obligations and contractural obligations through Legion

9    Partners to the O'Connell group in such a way that he cannot

03:37    10    possibly in all circumstances provide objectively reasonable

11    counsel as a Board member of RCM.  For example, and I gave you

12    a couple this morning.  If there's a approach for an

13    acquisition that doesn't trigger a gain for Mr. O'Connell and

14    Legion Partners, his clients may be opposed to that action,

03:38    15    when it may be in the best interest of all the stockholders.

16    He cannot make that determination.  Same thing.  If the Board

17    were to consider a poison pill to preclude stockholders from

18    acquiring more than 15 percent shares, he couldn't -- he would

19    be in a conflict position because of his duty of loyalties to

03:38    20    -- and contractural loyalties to Mr. O'Connell and his 13D

21    group as opposed to RCM.  So it is factually untrue that he

22    could both have skin in the game and be objectively able to

23    consider all issues.

24        THE COURT:  How many shares does he need to own to

03:38    25    have skin in the game?

—— MILLER - CROSS - UDELL ——

1          MR. COX:  It's his expression, your Honor.  He's

2   comparing and contrasting to Mr. Kerr who has 56,000 shares.

3   He has a thousand.  It's a $7000 investment that Mr. Vizi has.

4          THE COURT:  How many shares do you need to have skin

03:39   5   in the game?  You say he doesn't have enough skin in the game.

6   What is enough skin in the game?

7          MR. COX:  Your Honor, if I said I don't think he has

8   enough skin in the game, his representation that he has skin

9   in the game.  My comment is when you contrast that to Mr. Kerr

03:39  10   who has 56,000 shares, he either doesn't have skin --

11          THE COURT:  I'm not asking about Mr. Kerr.  You say

12   he doesn't have enough skin in the game.  How much is enough

13   to give him skin in the game.

14          MR. COX:  Your Honor, you're asking me to interpret

03:39  15   their --

16          THE COURT:  I'm asking you to interpret what you just

17   said.  Not what they said, but what you said.

18          MR. COX:  Maybe --

19          THE COURT:  You said he doesn't have -- you say when

03:39  20   he says he has skin in the game, you say he doesn't have

21   enough skin in the game.  What is enough?

22          MR. COX:  Your Honor --

23          THE COURT:  How do I determine that a thousand is not

24   enough skin in the game?

03:39  25          MR. COX:  A thousand could be enough skin in the game

——— MILLER - CROSS - UDELL ———

1  but you can't say a thousand is enough skin in the game for

2  Vizi.  Fifty-six thousand shares is not enough skin in the

3  game for Kerr.

4          THE COURT:  Did they say anywhere that Kerr doesn't

03:40   5  have enough skin in the game?

6          MR. COX:  They say repeatedly that our nominees Vizi

7  in particular have skin in the game.

8          THE COURT:  Do they every say that Kerr doesn't have

9  skin in the game?

03:40   10         MR. COX:  Well, I -- will you get the cite for that?

11  I believe they do, your Honor, but I'll have to have that

12  pulled.  So, while she's getting that, your Honor, let me

13  continue.

14         THE COURT:  Sure.

03:40   15         MR. COX:  So I notice you've been here for a while.

16         THE COURT:  Take all the time you want.  I mean we

17  can come back tomorrow, too.

18         MR. COX:  Thank you, your Honor, because this is

19  important.  I mean what we're trying to do is have a fair

03:40   20  election so that at the end of the day, win, lose or draw for

21  either side, nobody looks back and says that there wasn't a

22  fair election.  That's all we're trying to do here.  And the

23  reason we're trying to do that is we have an opportunity now

24  to make sure that the disclosures are put out by the defendant

03:41   25  are free from the taint that's there now.  Free from the taint

— MILLER - CROSS - UDELL —

1    that -- regarding Mr. Vizi's Board experience, from Mr. Vizi

2    hopeless conflict between his, between his relationship with

3    the O'Connells, or Legion Partner and his ability to

4    objectively evaluate.  It's going back to the item that we

03:41    5    were on.  We were talking about Mr. Ballou's operational

6    experience.  If you're going to tout Mr. Ballou's

7    organizational experience and his expertise as a turnaround

8    artist at the company, you need to talk about, and you can't

9    exclude the portion which he did concerning Global Vocations.

03:41   10    That's a company that he took public just at around 15

11    dollars, four years later, liquidates for 26 cents a share.

12    Again, it's never in their materials.

13         Now, the answer is, we disclosed that -- we disclosed

14    that Ballou is not the, you know, the magical wonder that,

03:42   15    that the defendants would have us believe.  But again the

16    issue isn't what the defendants disclose.  The issue is what

17    -- excuse me.  The issue isn't what plaintiffs disclosed.  The

18    issue is what defendants disclosed.  They did not disclose

19    that Mr. Ballou did not do well at Global Vocations.

03:42   20         Next issue.  There was a fair amount of discussion --

21    do you need a minute, your Honor?

22              THE COURT:  Pardon?

23              MR. COX:  Do you need a minute?

24              THE COURT:  I'm fine.  Thank you.

03:42   25              MR. COX:  Okay.  There was a fair amount of

———— MILLER - CROSS - UDELL ————

1   discussion about Mr. Vizi's statement on January 25.  But I

2   just want to make sure the record is, is what the record is on

3   that.  The factual record and why that's important.  I don't

4   think that defendant's counsel nor I would disagree that if

03:42   5   Mr. Vizi made a statement that he had an interest in

6   controlling, taking control or potentially acquiring control,

7   that that would be a material -- that it would not be a

8   material disclosure that must be made.  I think we all agree

9   on that basic fact.  So what are the facts that are in the

03:43   10   record here before you.  Okay.  Fact number one, you have,

11   fact number one.  On the January 25th.  You had testimony from

12   Mr. Miller as to what was relaid to him concerning Mr. Vizi's

13   intention to make an offer or interest in control of the

14   company.  You have a January 31st letter which you've

03:43   15   introduced into the, which you've introduced into evidence

16   where Mr. Kopyt is writing to Mr. Vizi asking for more details

17   about the offer he made on the 25th.  You have no Vizi

18   counter-declaration on that point.  There is -- Mr. Vizi put a

19   Declaration this morning in his file, in his submission and

03:43   20   there is no statement contradicting the fact that he made

21   that, that he made that statement on January 25th.  You also

22   have Mr. Koppic's Declaration which was submitted as part of

23   the record in connection with our motion where Mr. Koppic

24   provides the sworn Declaration under oath stating that Mr.

03:44   25   Vizi had told him that IRS19 and his group might be

—— MILLER - CROSS - UDELL ——

1   potentially interested, and you have a verified complaint to

2   that effect.  So the factual record before you, your Honor, is

3   that Mr. Vizi made an overture concerning a potential to

4   control.  That is not disclosed.  There's no dispute it's not

03:44   5   disclosed and it should have been disclosed.  That's the

6   fourth item.  Next item.

7            THE COURT:  Well, I'm sorry.  Ballou would be the

8   third item then?

9            MR. COX:  Yes, your Honor.

03:44   10           THE COURT:  Okay.  Thank you.

11           MR. COX:  So now to the question that you asked me a

12   moment ago, your Honor, concerning meaningful stake in the

13   Company?  I would point --

14           THE COURT:  I asked you about skin in the game

03:45   15   actually.

16           MR. COX:  I think I'm going to address that, your

17   Honor.

18           THE COURT:  Okay.

19           MR. COX:  It's, it's exhibit P-15.  Top right, page

03:45   20   five of eight.  The last carrot on the page.  I think that's

21   what you call those things.  The Independent Directors of the

22   Board lack any meaningful ownership in the Company owning less

23   one percent of the outstanding common stock making them

24   unvested stewards of stockholder capital.  And also exhibit

03:45   25   P-13, at page, top five of ten.

─ MILLER - CROSS - UDELL ─

1          MR. UDELL:  I'm sorry.  What is the exhibit?

2          MR. COX:  P-13.

3          MR. UDELL:  Okay.

4          MR. COX:  Page five of ten at the top right column,

5    at the top right of five of ten.  In the first paragraph it

6    talks about collectively the independent directors of the

7    Board own less than one percent of the Company's outstanding

8    stock.  And then the last sentence.  Stockholders deserve

9    invested stewards of stockholder capital, not entrenched

10   directors with no real investment risk at stake who are

11   willing to mislead investors for their own preservation.  So,

12   what defendants are --

13         THE COURT:  Is that true?  Independent directors own

14   less than one percent of the outstanding shares of the stock?

15         MR. COX:  In our submission, directors as a group

16   which include Mr. Kopyt who is not a Director.

17         THE COURT:  Independent directors of the Board own

18   less than one percent of the company's outstanding common

19   stock.  Is that true or false?

20         MR. COX:  I believe --

21         THE COURT:  You're not alleging that's false, are

22   you?

23         MR. COX:  No.  But again, your Honor, the answer is

24   to that, to your question is no, your Honor.  But what we're

25   alleging is it renders Mr.-- it renders the defendant's proxy

─── MILLER - CROSS - UDELL ───

1   false and misleading because they're suggesting that by

2   electing Mr. Ballou who has 5000 shares and Mr. Vizi who owns

3   1000 shares that the concerns they have about the independent

4   directors not having meaningful ownership and, therefore,

5   being unvested stewards, it's false and misleading to suggest

6   that either of those, Mr. Vizi with 1000 shares has less than

7   every single Director has of the company.  And what we put in

8   in our paper, we show the number of shares we put in evidence

9   as to the number of shares.  And 1000 shares, there is no

10  Director of RCM that has less than a thousand shares.  And Mr.

11  Kerr who he's running against has 56,000 shares.  So, the

12  point we're doing is again it's the juxtaposition of what they

13  say, they're telling part of the truth.  They're not telling

14  the full truth.  What Section 14A requires you to do is

15  provide full and complete disclosures.  And when you talk

16  about Mr. Vizi and Mr. Ballou should be elected because they

17  will have meaningful ownership stakes.  That's just not the

18  case.  Mr. Vizi has a thousand shares and Mr. Ballou has 5000

19  shares and Mr. Kerr, who they're running against, has 56,000

20  shares.

21          THE COURT:  Well, okay.  But will you agree with me

22  that the defendants have never said that Mr. Kerr has no skin

23  in the game?

24          MR. COX:  They have never directly said they have no

25  skin in the game.  They have suggested as by calling him an un

——— MILLER - CROSS - UDELL ———

1    --

2         THE COURT:  They're suggesting he doesn't have enough

3    skin in the game to be a good Director.

4         MR. COX:  He's contrast with their 1000 shares and

03:48    5    5000.

6         THE COURT:  They don't say they contrast.  They just

7    say flat out.  He doesn't have enough of an interest to be a

8    good Director.  That's the inference in what they say.

9         MR. COX:  To be fair, your Honor, Mr. Vizi with 1000

03:49    10   shares but you would make that same argument about Mr. Vizi.

11   You can't make --

12        THE COURT:  I'm not making any argument about Mr.

13   Vizi.  I was just trying to follow up on something that you

14   said so I could better understand what you were saying.

03:49    15        MR. COX:  And I appreciate that, your Honor.  I don't

16   want to belabor it.  I think you understand where we're coming

17   from which is you can't -- if you're the defendants -- bang on

18   the plaintiffs' nominees because they don't have a sufficient

19   ownership or as you say, they become unvested stewards of the

03:49    20   company.  At the same time you're running nominees which have

21   1000 shares, that would be Vizi and 5000 shares, that would be

22   Ballou.

23        THE COURT:  You think the shareholders are not

24   sophisticated enough to figure that out?

03:49    25        MR. COX:  The standard for Section 14A, your Honor,

MILLER - CROSS - UDELL

1   is that would be something that would be reasonably important

2   to a shareholder.  The test isn't whether a shareholder could

3   figure it out because -- a shareholder certainly could piece

4   together, read something if they were inclined.  That's not

03:50   5   the standard for section, a Section 14A claim.  The standard

6   for the claim is are you providing information that it would

7   be considered important or -- to a reasonable shareholder

8   deciding to vote, and when you tell, when you tell

9   stockholders that you ought to throw the incumbents out

03:50   10   because they don't have a meaningful interest, they're

11   unvested stewards and you don't disclose that your interest is

12   lower than that.

13          THE COURT:  They do disclose that their interest is

14   lower.  They come right out and say he's got a thousand shares

03:50   15   period.  It's all over their disclosures.

16          MR. COX:  But that's making the point then, he

17   doesn't have potential skin in the game.

18          THE COURT:  Well, it may be, but then do you think

19   that they have to say it to the shareholders, well, since Mr.

03:50   20   Vizi only has a thousand shares, he's probably not a good

21   candidate either.  Did they say that to the shareholders?

22          MR. COX:  I think if you attempt to persuade

23   shareholders that the incumbent nominees are deficient in

24   qualification or vested interest because they have a small

03:51   25   number of shares, i.e. less than one percent of the company,

—— MILLER - CROSS - UDELL ——

1    then in the interest of full and fair disclosure you need to

2    point out our nominees will be unvested stewards.

3              THE COURT:  They do.  They point out their nominee

4    has a thousand shares.

03:51    5              MR. COX:  I guess we're going to agree to disagree,

6    your Honor?  Because what they're not doing is they're not,

7    they're not juxtaposing.  They're not juxtaposing their

8    affirmative statements concerning ours with their ownership

9    statements.  They're in a different area.  Stock performance

03:51   10   was the next issue.  Remember the issue that's out there is

11   the allegation by the defendants that the stock performance

12   has been poor.  And the testimony and the evidence even in

13   response to your Honor's question was it hasn't been poor.

14   Look at the five year run which is a normal period of stock

03:52   15   performance in five years.  That's a good run.  Mr. O'Connell

16   and his group bought their shares in 2011.  They've been

17   beneficiaries of this good run.  They have not been -- they

18   have not suffered a detriment to events that occurred five,

19   ten, 15 years ago.  So, we believe that is false and

03:52   20   misleading.  I think you've seen the evidence both ways on

21   that.

22              Then the final issue I want to talk about in terms of

23   the false and misleading statements concerning this issue

24   about the good will.  Let's make sure again the facts aren't

03:52   25   in dispute.  The fact that Mr. Miller's testified to them and

—MILLER - CROSS - UDELL—

1    it's in the verified complaint as well.  There have been no

2    good will write-offs in five years.  So when you talk about an

3    ill-advised acquisition strategy which leads to a hundred and

4    fifty million dollars in write-offs, you are suggesting to

03:53    5    stockholders of RCM that there is an ongoing and current

6    problem.  You're suggesting there's an ongoing current

7    acquisition strategy.  They produced no evidence of that.  And

8    Mr. Miller testified there's been one acquisition in the last

9    four years.

03:53    10    THE COURT:  Let's assume that that's true.  Let's

11    assume that you can read that as saying that that infers that

12    there's this ongoing acquisition strategy and it's current.

13    There's a current ongoing acquisition strategy.  Let's assume

14    that's true.  Don't they, in other filings, acknowledge that

03:53    15    the write-offs were in the 2000 and 2008 period?

16    MR. COX:  I think you're talking about defendants

17    again so we're coming back to the core issue, what I believe

18    to be the core issue of this dispute which is, can the

19    defendants cure their false and misleading statements.

03:54    20    Because of the point of your doing that, you're making the

21    determinations that they did issue a false and misleading

22    statement.  Can they cure their false and misleading

23    statements by having the plaintiffs, the company --

24    THE COURT:  I'm not talking about the plaintiffs.

03:54    25    I'm talking about what the defendants testified and was cross

———— MILLER - CROSS - UDELL ————

1    examined.  Mr. Miller was cross examined about.  Maybe I

2    misunderstood the exhibit number.

3         MR. UDELL:  Your Honor, it's P-11 at page 16 of 63,

4    which is defendant's proxy.

03:54    5         THE COURT:  Right in the middle of the paragraph.

6    Given the substantial write-offs recorded from 2000 through

7    2008.

8         MR. COX:  Right.  But by suggesting, by suggesting

9    that you have an ill-advised acquisition strategy which has

03:55   10   led to a hundred and fifty million in write-offs, you're

11   suggesting that there are more good will write-offs to come.

12   They're suggesting that there's a strategy, there's

13   acquisition strategy.  There's no evidence, there's no factual

14   basis for the statement that there's acquisition strategy let

03:55   15   alone an ill-advised acquisition strategy let alone an

16   ill-advised strategy that could lead to good will write-offs.

17        THE COURT:  Well, is it true that the only years

18   since 2000 that the company did not make acquisitions, where

19   in 2001, 2002, 2004, 2010 and 2011?

03:55   20        THE WITNESS:  Would I -- and I don't mean to not

21   answer your question, your Honor.  So what I could tell you

22   that I know standing here is that there -- and Mr. Miller

23   confirmed it, there has been one acquisition in this last four

24   years.  So, if we're at the end of 2013, that would be since

03:56   25   the end of 2009 there has been one acquisition.

—MILLER - CROSS - UDELL—

1    THE COURT:  Well, then, if you made acquisitions in

2    2003, five, six, seven, eight, nine, is that not an

3    acquisition strategy of some kind?

4    MR. COX:  Not a present acquisition strategy four

03:56    5    years later.

6    THE COURT:  Isn't there an inference that there's

7    this pattern of acquisitions over the years?

8    MR. COX:  I would suggest just the opposite, your

9    Honor, when you only have one acquisition that lasts years,

03:56    10    it's hard to suggest there's a strategy there.

11    THE COURT:  Well, I don't know.  I mean it's not that

12    big a company.

13    MR. COX:  But in some ways you're absolutely making

14    the point, your Honor, which is the fact that you and I are

03:56    15    having this dialogue and discussion over the issue underscores

16    the fact that a reasonable investor could consider that to be

17    important in deciding whether to vote this yes.  Whether they

18    have an acquisition strategy or not, the fact you read it one

19    way and I read it another way, is absolutely making the point.

03:57    20    It's underscoring the point that the proxy disclosure the

21    defendants put in is misleading.

22    THE COURT:  Well, you have a bit of a different

23    motive to read it your way than I do, frankly.  Right?

24    MR. COX:  I don't ascribe any modesty, your Honor.

03:57    25    It's a fair point, but I'm reading it in the context of trying

─ MILLER - CROSS - UDELL ─

1   to make sure the stockholders get a full and fair informed

2   vote.  If they get a full and fair vote and Mr. Vizi and Mr.

3   Ballou win, they win.  But we aren't going to get to that

4   point if the preliminary injunction isn't granted because what

03:57   5   will happen then is, we're going to continue to go this path.

6   They'll be competing press releases, competing 14A

7   supplemental disclosures.  Its stockholders will not have

8   received --

9          THE COURT:  Not for much longer.

03:57   10          MR. COX:  Right.  But then, your Honor, then we're

11   in, then we're into the part which goes to irreparable harm

12   which is the Courts all over have suggested that and this is

13   the exact type of situation which screams out for injunctive

14   relief and it's why the courts say there is an opportunity

03:58   15   before the jinnee is out of the bottle to correct the

16   disclosures.  That's what we're asking here is issue the

17   corrective disclosure in accordance with the law that we've

18   cited, page 17 through 19 of our brief and then we can have a

19   full and fair vote.  They could have a disclosure out this

03:58   20   afternoon if they wanted, your Honor.

21          THE COURT:  Would your proposed corrective

22   disclosures be anything other than what your client has

23   submitted?

24          MR. COX:  What if you follow the case law that we've

03:58   25   cited, including the cases that Mr. Fleming argued that in

—————— MILLER - CROSS - UDELL ——————

1  Lone Star what they would say is that their disclosures would

2  be something to the effect of on page x of our definitive

3  proxy we said y.  That was inaccurate.  We should have

4  disclosed, we all should have also disclosed the Z.

03:59    5          THE COURT:  But it would be exactly what your client

6  has disclosed, what you're asking them to disclose in their

7  proxy.  Correct?

8          MR. COX:  Yes, your Honor.  And the reason is then

9  the stockholder would understand that the material that they

03:59   10  read and before is, there's not a disagreement over that issue

11  because if a stockholder is sitting there reading, you know,

12  person one says A and person B says it's not A, then how are

13  they going to evaluate that issue.  They can't evaluate that

14  issue when, in fact, one of those statements is true and one

03:59   15  of those statements is false, when they can be provided the

16  true information which is what 14A is designed to do and they

17  can then make a decision.  Good, bad or indifferent they could

18  make that decision.

19          THE COURT:  Okay.

03:59   20          MR. COX:  The point and I'll bring this to a close

21  is, your Honor, they put out proxy materials that are false

22  and misleading and contained omissions and we've walked

23  through some of those today in some detail.  All we're asking

24  for them to do, you to do at this point is to require that the

04:00   25  proxy disclosures they put out be corrected of the areas that

—— MILLER - CROSS - UDELL ——

1    we've discussed and as soon as they do that, there would

2    nobody need for the preliminary injunction.  But unless and

3    until we get to that point, and if there isn't a preliminary

4    injunction granted, then this case is going to go to

5    December Fifth.  There'll be a stockholder vote and there will

6    be stuck all of us litigating a case to either overturn that

7    stockholder vote and we're going to have to then do it -- and

8    then we're going to then take a bunch of discovery, including

9    all of the participants to get their testimony.  What did Mr.

10   Vizi say on the 25th and all of those types of issues and then

11   we're going to be back there arguing whether it was something

12   that would have affected a stockholder.  We'll bring the

13   stockholders to say I wish I had known that the defendants now

14   concede that this was false and what can we do.  We're going

15   to waste a bunch of time when we can get this fixed now, and

16   that's what the purpose of 14A is to do is to make sure that

17   the elections are based on an even playing field.  And what

18   the plaintiffs have done -- excuse me.  The defendants have

19   done here, they have tried to tilt the playing field by

20   shielding, by shielding their disclosures.  And I would point

21   out a number of issues which they've done that.  There's no

22   reason that they cannot and should not correct those and

23   correct those now, would have a full and fair election.  And

24   that's the way to go here as opposed to tying this thing up,

25   asking you to try and unscramble the eggs if it doesn't go the

——— MILLER - CROSS - UDELL ———

1    Company's way on the election and for those reasons we'd ask

2    that the preliminary injunction be granted.  We think it's

3    meritorious.  We've shown that there's a likelihood of success

4    on the merits on some of these disclosures.  We've shown that

04:01   5    there's irreparable harm that will occur under the case law

6    that we've cited in our brief, and I won't belabor it, shows

7    that it's in the public interest to have stockholders vote on

8    an informed basis.  And there's no countervailing burden to

9    the defendants.  The burden to the defense is to put out an

04:02  10    accurate disclosure which they can do in an afternoon.  The

11    burden to the plaintiffs, RCM, is that the stockholders are

12    going to go through this entire process only to have to redo

13    it again including the time, the expense, reputational damage,

14    damage with stockholders that Mr. Miller talked about back and

04:02  15    discussed further in our papers.

16         So for those reasons, respectfully request that you

17    grant the motion for a preliminary injunction which lasts so

18    long until those corrections have been made.

19         THE COURT:  May I assume that you're no longer

04:02  20    seeking relief today on your Section 13D claim?

21         MR. COX:  We are, your Honor.  As part or parcel of

22    the -- it's part and parcel of the false and misleading

23    disclosures that as you saw in their investor presentation

24    they have now acknowledged that they have some undisclosed

04:03  25    plans and intent.  Item four of Section 13D requires the

—————— MILLER - CROSS - UDELL ——————

1   Section 13D schedule contain that information.  That's the

2   easy thing, file a 13D containing that and that wouldn't -- if

3   they file a 13D reflecting what they have in their investor

4   presentation, that would moot the 13D claim.

5          THE COURT:  Which investor presentations are you

6   specifically referring to in the 13D.

7          MR. COX:  What's the number on the one both, that we

8   both -- P-16, your Honor, is the investor presentation they

9   made to ISS on or about November 12th.

10         THE COURT:  And which part of that do you think needs

11  to be amended or corrected or added to?

12         MR. COX:  It's -- it would be five of 23 in the upper

13  right or page four of the presentation.  Our nominees will

14  seat two and they talk about reviewing strategic alternatives

15  and they talk about separating role of chairman and CEO.

16  Those are corporate governance changes.  Thirteen -- Item

17  Four, Section 13D requires you to disclose any plans or

18  proposals.

19         THE COURT:  Okay.  Review strategical alternatives.

20         MR. COX:  Yes, your Honor.

21         THE COURT:  Our nominees will encourage a

22  comprehensive strategic review and carefully consider all

23  capital allocation decisions?

24         MR. COX:  Yes, your Honor.  Those type of things that

25  are required be disclosed under Item Four of Schedule A and

——— MILLER - CROSS - UDELL ———

1    it's not sufficient to say that as I pointed out now and in

2    their papers that just because they have two of six spots if

3    they're elected, they don't have to disclose it.  Section 13

4    requires any five percent stockholder to disclose their plans.

04:05    5    THE COURT:  What is it that you think needs to be

6    added to this?

7    MR. COX:  What I think needs to be added to their

8    schedule 13D form.  Under item four I think they should

9    disclose that if elected, their Director Nominees will seek to

04:05   10    -- will seek -- and here's a list of items.  In their investor

11    presentation.  They need to put that as part of their --

12    THE COURT:  Separate chairman and CEO positions?

13    MR. COX:  Yes, because that involves the corporate

14    governance.

04:05   15    THE COURT:  So these four items under promote

16    corporate governance and prudence.

17    MR. COX:  It would be the -- review strategic

18    alternatives.

19    THE COURT:  Right.

04:05   20    MR. COX:  It would be the, separating the chairman

21    and CEO positions.

22    THE COURT:  Right.

23    MR. COX:  It would be providing shareholders a vote

24    on the current shareholder right.  That's been withdrawn.  It

04:05   25    would be lowering the threshold for shareholder to have the

1  right to call a special meeting.  That's a change that would

2  require a change in byelaws.

3  　　　　　THE COURT:  Right.

4  　　　　　MR. COX:  Providing shareholders to act by written

04:06  5  consent.  Those are all changes to corporate governance that's

6  required by item 13D.  And then on page --

7  　　　　　THE COURT:  Gotcha.

8  　　　　　MR. COX:  -- thirty eight and 39 of the same

9  document.  I guess that's 38 and 39 bottom right pages, they

04:06  10  reiterate this headline is our plan.  The first bullet point

11  talks about corporate governance reform.  It's an item

12  required by item four.  And you can see as you go down this

13  page, again it's some of the strategic review and plans that

14  they have.  Again the fix here is relatively easy.  If they're

04:06  15  willing to tell ISS proxy advisory service these are their

16  plans.  They need to disclose that in Schedule A and comply

17  with the law.

18  　　　　　THE COURT:  Okay.  Thank you.  I understand.  Thank

19  you.

04:07  20  　　　　　MR. COX:  Thank you, your Honor.

21  　　　　　MR. FLEMING:  Your Honor, Thomas Fleming.  May I be

22  heard?

23  　　　　　THE COURT:  Sure.

24  　　　　　MR. FLEMING:  The 13D that was initially filed in

04:07  25  item four disclose that the filing parties in discussions with

—— MILLER - CROSS - UDELL ——

1    the company may include engaging with the company on a review

2    of its strategic alternatives, assessment of its organization,

3    management of its balance sheets in pursuit of other corporate

4    transactions and it may also include any of the actions

5    referred to in what are called paragraphs A through J of item

6    four of schedule B -- schedule 13D.  Those include

7    extraordinary corporate transactions and change of issue with

8    charter byelaws or instruments.  So the opening 13D laid out

9    that it was something that -- I'm sorry.  Exhibit 22, your

10   Honor.  Laid out the Fleming Declaration.  Of my Declaration.

11   Laid out that these were possibilities, and at this point --

12          THE COURT:  Let me find that.  Hold on, please.  You

13   got me at a disadvantage.  You folks know those inside and out

14   and I haven't had that exposure to them that you have.

15          All right, your Exhibit 22.  Where is it now?

16          MR. FLEMING:  Item four, your Honor, on page 11 of 16

17   or page 11.

18          THE COURT:  Gotcha.

19          MR. FLEMING:  And can I point out more, what I think

20   is more important, your Honor.  The --

21          THE COURT:  Hold on.  All right.  Go ahead.

22          MR. FLEMING:  If I could just finish up on that, your

23   Honor.  A more important note.  The 13D form, you know, alerts

24   shareholders to share ownership in general issues.  Once the

25   proxy contest is under way, the participants in the contest

MILLER - CROSS - UDELL

1   are telling shareholders by day, much more specific

2   information and that is what shareholders are typically

3   looking to in a proxy contest.  And in this contest, your

4   Honor, is sort a familiar scenario which you see time and

5   again.  The largest independent shareholder of the company has

6   some disagreements with company performance.  Two nominees, a

7   minority running for two seats on the Board in an attempt to

8   effectuate change versus a management that has been around for

9   quite some time and has a lot of so-called cronies on the

10  Board.  That's the scenario.  And I'd like to address first

11  one of the questions the court has addressed which I think the

12  law has been misstated by opposing counsel which is that the

13  standard is whether or not the supposedly omitted information

14  would significantly alter the total mix of information to

15  shareholders.  And the standard is what information is readily

16  available to them and that does include RCM's own filings on

17  matters such as the qualifications, share price performance

18  and all of these other facts that are really sources of spin

19  from undisputed facts.  And the relevant case, your Honor, is

20  a decision came down a few years ago called Charming Shops

21  versus Crescendo.  And in that case, we had directors who were

22  attacked for conflicts, being unable to serve, et cetera, et

23  cetera, et cetera they have on multiple Boards.  And what the

24  Court, the District Court in Pennsylvania in Philadelphia held

25  was the shareholders have information.  They can make their

——————— MILLER - CROSS - UDELL ———————

1  decision.  They're the investors and nothing has been

2  concealed or hidden from them.  All the conflicts, whatever

3  was at stake was presented through both sides of materials and

4  that's precisely what we have here.

5       If I could review the six or seven matters in dispute.

6  Mr. Vizi I think it's important to note that his biographical

7  disclosures are what are required by the SEC rules and the

8  Third Circuit in General Electric versus Cathcart held that

9  that was a starting place.  If you complied with that, that

10 was presumably sufficient which is exactly what he did.  Under

11 those rules you have to provide your age, your biographical

12 experience at least in the last five to 10 years and any

13 public company representation.  So anyone reading his

14 biography or proxy material would know immediately that he had

15 no industry experience and he had no public Board experience.

16 That was apparent, and the -- that was disclosed by us from

17 the outset and we've never said anything, and there's really

18 no issue about that whatsoever.  And the one phrase that they

19 have now latched onto is in contrast which the court looked at

20 during Mr. Cox's argument.  And if you look at that phrase,

21 they're describing two different nominees versus two different

22 -- two nominees versus two nominees.  Our nominee is Ballou

23 and Vizi versus their nominees and it's contrasting not just

24 experience, but a whole range of things about what they've

25 done on the Board, share ownership and other points.  So it's

——— MILLER - CROSS - UDELL ———

1    not Vizi in contrast to Kerr.  It's Ballou and Vizi and their

2    achievements in contrast to the other two.  And there's really

3    no reason for this Court to be drawn into nitpicking about the

4    two words in contrast.  If you read the paragraphs in their

04:13    5    entirety, it's clear we're contrasting our two to their two.

6    They can do the same thing.  The First Amendment applies, and

7    they have the right to go out and talk about the virtues of

8    their candidates as we do the virtues of ours.

9         The other issue they've raised here which is whether or

04:13    10    not Mr. Vizi has skin in the game.  I think Mr. Miller

11    conceded that he had skin in the game.  If the stock price

12    goes up, the O'Connells sell their shares make a lot of money,

13    Legion and Vizi stands to make a lot money.  That's skin in

14    the game.  They have a share block of 1.6 million shares which

04:13    15    is worth roughly ten million dollars that he's managing.  If

16    the share price goes down, that's not so good for him.  If the

17    share price goes up, that is good for him.  That qualifies as

18    skin in the game.  And, in fact, he's managing the largest

19    single block of shares in this company.  That certainly

04:14    20    qualifies as skin in the game.  As for his ownership of 1000

21    shares?  Again that's a mandatory disclosure.  It's been

22    presented to the shareholders along with the facts about his

23    interest in the shares held by the O'Connell entities.  And

24    the disclaiming beneficial ownership, your Honor, that we

04:14    25    heard about this morning before we got into the testimony?

─── MILLER - CROSS - UDELL ───

1    You're correct.  The disclaimer is between Mr. Vizi and Mr.

2    Kiper as to their shares.  The 13D clearly states that Mr.

3    Vizi and Mr. Kiper under certain circumstances have the power

4    to dispose of the other shares which is what makes them

5    beneficial ownership.  A profit participation is not

6    necessarily beneficial ownership.  Beneficial ownership is the

7    power to dispose of shares or to vote them.  They do have

8    beneficial ownership and they also have a profit participation

9    indirectly through Legion.  In fact, that participation which

10   we heard Mr. Miller talk about is their alternative theory

11   which that there's a conflict.  Well, Mr. Miller conceded that

12   he didn't have to hire a detective or do any great thinking to

13   find the investment advisory agreement.  It was posted on the

14   internet.  Posted this one in January of this year.  There was

15   an earlier one posted January of last year.  The investment

16   advisory agreement is referred to twice in the proxy.  So

17   everybody can see what their interest is.  And the language

18   that they challenge, your Honor, doesn't say they're

19   independent.  They have no conflicts.  It says they're

20   committed to exercising their independent judgment, which is

21   certainly true.  Some, even someone with a conflict can say

22   I'm committed to exercise my independent judgment.  I don't

23   think there's much of a conflict here, and certainly the type

24   of interest that happens all the time on corporate Boards.

25   Shareholders can attest whether someone who has 13 percent

— MILLER - CROSS - UDELL —

1   ownership share or indirect ownership share of the largest

2   block has too many conflicts to serve or whether that's

3   someone who really should be up there because they'll work

4   hard to make sure the share profits goes up.

04:16      5          THE COURT:  Well, should the disclosure of the

6   conflict have been more explicit?

7          MR. FLEMING:  It is, your Honor, because the proxy

8   statement specifically says what their profit participation is

9   and that they only get that out of net gains in the shares.

04:16     10          THE COURT:  Yeah, but shouldn't somebody say what

11   this means?

12          MR. FLEMING:  There is no requirement in the proxy

13   laws to go dwell on what that means.  The shareholders can

14   draw their own conclusion.  And I don't think it creates a

04:16     15   conflict, your Honor.  I think his interests are aligned no

16   different from Mr. Kopyt who owns 500,000 shares, how he's

17   going to make his money on the shares, unless he sells them at

18   some point in time.  We can --

19          THE COURT:  Well, Mr. Legion makes more money

04:16     20   depending on what happens.  Certain things can happen from

21   their profit even greater.  And I think plaintiff's point is

22   if those, some of those things that could happen would drive

23   their profit may not necessarily be in the best interest of

24   the rest of the shareholders.

04:17     25          MR. FLEMING:  Look, I don't know how having the share

——— MILLER - CROSS - UDELL ———

1    price go up wouldn't be in the best interest of the rest of

2    the shareholders.  And that's the only way they make money is

3    if the share price goes up.  And that's how they do it.  There

4    is no requirement that they sell the company in order for them

04:17    5    to liquidate their position.  If the share price doubles,

6    there's no reason why they can't offer the shares in the

7    market and exit the investment at that point or find another

8    investor who wants to buy their shares.  The only way they

9    make money in this is if the share price goes up.  It's hard

04:17    10    to believe that that's something that's adverse to

11    shareholders.  What he's pointed out is that there might be a

12    proposal about a 13D.  I'm sorry.  About a poison pill which

13    would adversely affect them.  And we've said all along that

14    the poison pill should be put to a shareholder vote.  Be even

04:17    15    if there were a conflict about a poison pill, our guys might

16    not vote on that issue.  It's not something that disqualifies

17    them or needs to be disclosed in a proxy.  The shareholders

18    can see what their interests are and make their own judgment

19    about whether they are good or bad.  In any event, your Honor,

04:18    20    whatever has been, the conclusions you want to draw from that,

21    RCM has pounded that drum over and over again and in its own

22    proxy materials and pointed out all this allegedly undisclosed

23    conflict.  The information is out there and people can make

24    what they will of it.

04:18    25    On the subject of Mr. Ballou.  He's a retired corporate

—MILLER - CROSS - UDELL—

1    executive with several decades of experience in the business

2    world.  His biography is also disclosed pursuant to SEC

3    regulations and satisfies the standard of the Third Circuit in

4    General Electric versus Cathcart, and that biography indeed

04:18    5    discloses there was a Global Vacation, and that he was a CEO

6    of CDI.  There is nothing in the SEC regulations or corporate

7    precedent that requires us to disclose the performance of

8    other companies where somebody served.  That's just not

9    required.  And it's certainly something they can offer and

04:19    10    they have.  If they want to think it's important how Global

11    Vacation did in 1998 to 2000, they can offer that.  It's

12    somewhat ironic that there's some new best material when

13    they're saying their own corporate performance in 2000 through

14    2008 is not relevant because of the write-offs then were too

04:19    15    distant or their share price is important because the last

16    five years is what counts.  But people are there.  This

17    information is there for people to absorb and reach their own

18    conclusions about.

19          The goodwill write-off is another point that again is

04:19    20    one where there simply is no misstatement of fact.  You heard

21    Mr. Cox.  He's creating his open spin to what he thinks the

22    ill-advised acquisition strategy means.  The proxy statement

23    says precisely what our client's position is.  What its

24    understanding is.  It's factual.  The company has performed

04:20    25    poorly in one area in a period of time.  It's perfectly

1  appropriate for us to point that out and let shareholders

2  absorb it, if they think it's too remote.  They can ignore it

3  if they think it's important.  They can value it.  And the

4  company can respond, which is something that it has every

5  opportunity to do.

6      Last, on the secret plan.  We heard indirectly Mr.

7  Miller offered this letter of Mr. Kopyt.  Gave an affidavit.

8  Mr. Vizi did indeed give an affidavit annexing his letter.  We

9  found them this morning which Mr. Kopyt left out of his

10  affidavit.  Mr. Vizi's letter disputes the statements that he

11  was planning a secret takeover of the company.  All of this

12  back and forth about the takeover, your Honor, frankly it's

13  remote and irrelevant.  If there is a secret scheme to

14  takeover this company, it's mind boggling that it's in place.

15  They've never done anything to acquire it.  They belittle our

16  client as a 29 year old with no industry experience, then they

17  tell you he's a corporate titan who's getting ready to take

18  this company over.  His investment advisory agreement doesn't

19  provide him any basis or incentive to go acquire a company.

20  Gives him an incentive to increase the value of his current

21  investment not to take over a company.  And more important,

22  Mr. Vizi and Mr. Ballou have absolutely no ability to

23  implement any sort of takeover plan.  They'll have to two

24  seats on the Board.  The company has directors.  We heard that

25  Mr. Ballou at CDI tried to come and takeover the company and

— MILLER - CROSS - UDELL —

1   he got rebuffed.  The company has perfect -- is perfectly able

2   to reject any effort by somebody who wants to take it over if

3   somebody did indeed want to do that.

4        So for all of those reasons, your Honor, there is no

04:21   5   colorable claim and I submit that if the court denies the

6   preliminary injunction, I don't think we'll ever have a trial

7   because we would move for Summary Judgment to dismiss all

8   their claims under the -- on the basis of the documentary

9   record that we've already presented.

04:22   10       On irreparable harm.  I would like to point out that

11   the balance of considerations, actually the balance of

12   hardship as well irreparable harm, that the considerations

13   they're not as presented by RCM.  Any injunction would be a

14   devastating blow.  They would trumpet that to no end and it

04:22   15   would completely determine the outcome of this election.

16       So if this court were to just to say, oh, this could be

17   better read or changed this word or that word, that would

18   effectively determine the outcome of the election.  So an

19   injunction is not something that would help the shareholders.

04:22   20   It is something that would be used to knock Legion Group and

21   its nominees out of the box.

22           THE COURT:  Well, what if I deny the injunction?  Are

23   you telling me you're not going to use that?

24           MR. FLEMING:  Judge, I don't think I'm going to be

04:23   25   able to say anything denying the injunction because it just

—— MILLER - CROSS - UDELL ——

1   says the proxy material is what it is and it's not a

2   conclusion that somebody made a misstatement to shareholders

3   where there's been a showing that shareholders were deceived.

4   And that's really the difference between the two, your Honor.

04:23   5   And that's how it would be used against us.

6           THE COURT:  Now with the injunction not going to get

7   picked up.

8           MR. FLEMING:  I think it would get picked up, but not

9   in the same way as somebody was trying to deceive the

04:23   10  shareholders which is how the grant of an injunction would be

11  spun.  We also, and we cited the cases, your Honor.  I don't

12  think there's any showing here of irreparable harm.  The court

13  could await the outcome of this meeting.  See what the vote

14  is.  See if anybody's elected from the Legion Group's slate.

04:23   15  One person is elected as opposed to two people.  There are a

16  variety of outcomes and the court could easily wade in and

17  grant complete relief after the meeting.  It's done all the

18  time in Delaware.  I just had a case down in Delaware where

19  after a meeting we did discovery.  The court had a trial on

04:24   20  whether or not to reverse the meeting results and it was not

21  the major disruption or an impossibility.  It's something that

22  can be done and the cases that we've cited so state.  And one

23  other thing I'd like to address, your Honor.  We heard about

24  the Lone Star case where I was mentioned.  In Lone Star --

04:24   25          THE COURT:  Don't you just hate that?

—— MILLER - CROSS - UDELL ——

1        MR. FLEMING:  No.  I had a good time with Lone Star.

2   But in Lone Star the misleading statement was a proxy

3   submission from the dissident that stated he had support from

4   several shareholders when, in fact, he did not.  And the state

04:24   5   that you have support is a per se violation of the Antifraud

6   Rules.  You're not allowed to talk about the results of a vote

7   before they take place.  So he said he had support, and what

8   the Court simply did in that was ordered him to file a new

9   proxy that he didn't have support and he did that the next

04:25   10   day.  The whole case moved on.  But it was not a -- it was not

11   a case similar to this where someone was trying to prevent the

12   voting of proxies.  Those are all the points I have, your

13   Honor.  If you have questions, I'd be glad to answer them.

14        THE COURT:  I don't.  Mr. Cox, do you have any

04:25   15   response?  It looks like you do.

16        MR. COX:  I do.  My wife has said I've never been

17   accused of not taking the opportunity to say something.  I

18   will be brief, your Honor.  And I appreciate your patience

19   today.  I'm only going to make just a very few quick points

04:25   20   because I don't want to just keep beating the same back and

21   forth.

22        The first question you have to begin where counsel, Mr.

23   Fleming, began concerning the Exhibit 22 and it was the

24   schedule 13D which I asked you to look and showed that the

04:26   25   company may do A, B, C, D and E.  And just sort of a boiler

—— MILLER - CROSS - UDELL ——

1  plate laundry list of things that they might do.  It's very

2  different than what they've disclosed in their investor

3  presentation to ISS where the headline is:  Our nominees will.

4  So, this isn't a case where they disclose their nominees will.

04:26  5  They put in Exhibit 22:  Their nominees may do things.  Now

6  they've moved beyond that.  They may do some things to:  Now

7  their nominees will.  So the point Mr. Fleming is making is

8  actually supporting our position which is they've originally

9  disclosed they may do some things and now they're disclosing

04:26  10  they do have plans and proposals.  Section 13, Schedule D,

11  item four requires them to come clean and disclose their

12  plans, proposals.

13      Mr. Fleming mentioned about that Mr. Vizi would be

14  committed to representing everybody.  But again that just

04:27  15  cannot be the case, that his interests are not aligned and be

16  able to say that he can objectively represent all of RCM's

17  stockholders.  Mr. Fleming acknowledged there may be a

18  situation with a poison pill or another item that may be

19  adverse to his clients, Legion Partners and the O'Connell

04:27  20  family where he won't be able to objectively evaluate that.

21  So you can't say I'm going to be able to objectively evaluate

22  all issues before the company without providing the carve out

23  which says I intend to objectively evaluate all issues for the

24  company except as they might impact O'Connell and the others

04:27  25  to which I have beneficial ownership.

──────────── MILLER - CROSS - UDELL ────────────

1        THE COURT:  Isn't it enough to say I'll try to

2  objectively represent the interest of all the shareholders?

3        MR. COX:  I don't think that's enough, your Honor,

4  because of the point that you made when speaking with Mr.

04:27    5  Fleming, and that is what you ought to do is you ought to be

6  full, full of complete disclosure say I'm willing to try to be

7  objectively reasonable, however, stockholders should be

8  cautioned and warned that because of my pecuniary interest in

9  the O'Connell investment, I may not be able to.  If they would

04:28   10  have said that?  That's fine.  Stockholders would understand

11  that they not count on Mr. Vizi to be objective

12  unconditionally.  The statement they put in their materials

13  that he's going to be objective unconditionally.  That's just

14  not the case.  He can't.  He's got fiduciary obligations that

04:28   15  make that an impossibility.  The reference to Lone Star was

16  interesting because Mr. Fleming actually made the right point

17  which was if your Honor finds that there were false and

18  misleading statements made by the defendants, then the proper

19  course here which is the proper course that was done in.

04:29   20  Lone Star, the proper course that was done and suggested in

21  Gerhardt by the Fifth Circuit and the Second Circuit by

22  Cinesta Hotels is that they should a corrected disclosure.

23  The people that made the false and misleading statements

24  should issue a corrective disclose.  That is something that

04:29   25  they can do easily.  It's not, it's not outcome determinative.

─── MILLER - CROSS - UDELL ───

1  It's not going to swing the election.  It's going to be

2  putting truthful information.  What his argument seem to be is

3  you should not grant the injunction because if the investors

4  learn the true information, we would lose the election.  If

5  that's their position, even more so to grant the injunction.

6  And with that, your Honor, thank you very much.

7          THE COURT:  All right.  Thank you.  I'm going to need

8  a few minutes to get my thoughts together, but I will be back

9  and I'll give you my decision.  Feel free to talk among

10 yourselves to try to resolve this case, and we'll let you know

11 when I'm ready.  But it will be today.

12         MR. FLEMING:  Thank you, your Honor.

13              (Recess)

14              (Open court)

15         THE DEPUTY COURT CLERK:  All rise.

16         THE COURT:  Thanks.  Have a seat.  All right.  Okay.

17 Let me start out by thanking counsel for the briefing and the

18 argument.  It was really outstanding and I really appreciate

19 it.  So I know you put this together on very short notice, but

20 it was very helpful to me to hear what you had to say and what

21 you wrote about in this.

22         All right.  Let me go through this step by step.  You

23 know, we all know the background of this.  The plaintiff is

24 seeking a preliminary injunction in this matter.  We all know

25 what the law is in the Third Circuit and that is the four

—————————— MILLER - CROSS - UDELL ——————————

1    things that have to be shown are whether the moving party has

2    shown a reasonable probability of success on the merits.

3    Whether the moving party will be irreparably injured by the

4    denial of this relief.  Whether granting preliminary relief

5    will result in even greater harm to the non-moving party.  And

6    then the last but not least, we have to examine the public

7    interest in this case.  Plaintiff makes two claims.  One under

8    Section 14A and another under Section 13.  The Supreme Court

9    has provided the guidance, provide the Courts to look at by

10   defining materiality.  And it says that omitted fact is

11   material if there is a substantial likelihood that a

12   reasonable shareholder would consider it important in deciding

13   how to vote.  It does not require proof of a substantial

14   likelihood that disclosure of the omitted fact would have

15   caused the reasonable investor to change his vote.  But the

16   standard does contemplate as a showing of a substantial

17   likelihood that under all the circumstances, the omitted fact

18   would have assumed actual significance in the deliberations of

19   the reasonable shareholder.  Put another way, there must be a

20   substantial likelihood that the disclosure of the omitted fact

21   would have been viewed by the reasonable investor as having

22   significantly altered the total mix of information made

23   available.  That is TSC Industries versus Northway case, 426

24   U.S. 438, 1976.  And I'm focusing on the Section 14 claim

25   first.  Plaintiff is making certain assertions about the

───── MILLER - CROSS - UDELL ─────

1  filings of the defendants.  The first has to do with Mr.

2  Vizi's experience.  There's no dispute whatsoever that he has

3  never been on a public Board nor has he ever been in the

4  industry, and nor is there any dispute that the defendant

5  never claimed he had.  The question is whether or not the

6  defendant should explicitly explain in its filings that he has

7  not been on the Board and has not been in the industry.  I

8  don't believe that the law requires such an explicit statement

9  of the defendants.  I think the fact that they don't say that

10  he was in any of the filings, and there's a lot of filings and

11  a lot of references to Mr. Vizi's experience that any

12  reasonable shareholder reading would quickly recognize that

13  there's no claim made that he served on a Board or had been

14  involved in the industry before.  The plaintiff makes a

15  statement that in the language that appears in page eight or

16  ten in Plaintiff's Exhibit 13 where in the second paragraph on

17  page eight it says in contrast Mr. Kerr has no public company

18  Board experience other than with RCM.  Plaintiff wants us to

19  believe that that means somehow a negative inference about Mr.

20  Kerr means that Mr. Vizi must in contrast have been a Board

21  member.  That's not how I read it, nor do I think that's a

22  reasonable reading of that clause.  The first paragraph on

23  that page starts with:  Our nominees, plural, bring a wealth

24  of experience in areas RCM's Board is grossly deficient and we

25  believe the credentials of both our candidates are unrivaled

—— MILLER - CROSS - UDELL ——

1    by any of RCM's incumbent Board members.  Then it goes on to

2    talk about Mr. Ballou and then Mr. Vizi.  What clearly this

3    means is that when you hold up the experiences of the

4    defendants' nominees against the experiences of the incumbent

5    Board members, defendant wants people, the shareholders to

6    believe that their nominees aren't much better.  No way in my

7    opinion you can read that to say that Mr. Vizi has Board

8    experience.

9           Let me turn to the question of skin in the game.  Does

10   a thousand shares give him skin in the game?  Perhaps.  Does

11   his arrangement with Legion give him more skin in the game?

12   Surely it does.  I also find that the potential conflict is

13   clearly disclosed.  Plaintiff's Exhibit 11, page 22 of 63.

14   The fee schedule is also clearly disclosed at Plaintiff's

15   exhibit 19, page five of six.  That it is not further and

16   explicitly explained as to the precise situations where the

17   conflict may arise is not required, by my reading of the law.

18   The reasonable investor can read that particularly P-11 at

19   page 22 and understand that there may well be situations in

20   which Mr. Vizi's loyalties may be somewhat divided.  If they

21   want to take that into account when making decisions on this

22   proxy battle, that's up to the reasonable investor.  But I

23   think under the law there's been no omission of a material

24   fact, and there's certainly been no misstatement of material

25   fact.

1       Mr. Ballou's disclosures.  I do not believe the law

2  requires that Mr. -- or the defendants disclose on behalf of

3  Mr. Ballou the performance of any company that he previously

4  worked for.  Of course, the reasonable shareholder can find

05:24   5  this out knowing the names of the companies which were

6  disclosed and do its own research.  But they also do disclose

7  at P-14, page four of eight of the problems with CDI and how

8  it was the subject of an investigation and how it was fined

9  and that the fine was just 4.9 million and Mr. Ballou was

05:24  10  never implicated from the government investigations that led

11  to the fines.  There's nothing about that that's inaccurate or

12  misstated.  There's nothing about that that's misleading.  And

13  I don't believe there's any material omissions being made.

14  There's also raised by the plaintiff the issue of whether the

05:25  15  intentions to acquire control of the company are adequately

16  disclosed.  They are not.  There is no disclosure whatsoever

17  of any intention on the part of the defendants to acquire

18  control of the company.  This all comes from Plaintiff's

19  submission and in this letter to Mr. Vizi from Mr. Kopyt that

05:25  20  was testified to by Mr. Miller and is, indeed, Plaintiff's

21  Exhibit 2 in this case.  However, defendant says that he never

22  told Mr. Kopyt that he had any interest of any of his, groups

23  had any interest in acquiring control of the company.  He

24  backs that up with a letter dated February 4th of 2013 which

05:25  25  is attached to his Declaration.  So you have Mr. Kopyt says,

——— MILLER - CROSS - UDELL ———

1    yes, he did.  Mr. Vizi says no he didn't.  Without both

2    principals to that conversation here it's impossible for me to

3    determine credibility issues.  The burden is on the plaintiff.

4    I don't find that the plaintiff has met the burden of

05:26   5    demonstrating that Mr. Vizi had expressed an interest on

6    behalf of one of his groups to acquire interest, therefore,

7    should have been disclosed later on.

8         As to stock performance.  I think we've established

9    that none of what is said in Plaintiff's Exhibit 13 is false

05:26   10   or inaccurate in any way.  Mr. Miller says it's misleading

11   because it's not complete.  And the plaintiff makes the point

12   of the five year period that was cherry picked and it may be

13   because it's a slightly different five year period than the

14   company, plaintiff itself relies upon.  But when you look at

05:27   15   the rest of the filings, I don't know how it could have been

16   more explicit than that which is found in P-13 at page six of

17   ten which has the ten year return.  And then again in P-16

18   there's a lot of disclosures made by the defendants and you

19   have the ten year, you have a five year return and then at

05:27   20   page 11 you have a ten year return.  At page 13 you have a ten

21   year return.  Explicitly goes through the stock performance on

22   an historical basis.  So I don't find there's anything

23   misleading or there's anything omitted as to stock performance

24   data.

05:27   25        As to good will and acquisition strategy and the

MILLER - CROSS - UDELL

1   write-offs.  I read into the record the disclosures about the

2   years when no acquisitions were made and the years that

3   acquisitions were made.  I also read into the record the

4   disclosure about the defendants of the good will write-offs

5   currently from 2008.  There's nothing inaccurate or misleading

6   about those statements made.  And I don't find there's any

7   omission of material fact.  Consequently, I don't find that

8   plaintiff has demonstrated a reasonable likelihood of success

9   under Section 14 claim.  As to the Section 13 claim.  It seems

10  to come down to defendant's Exhibit 22.  Page 11 of 16 which

11  is the pagination in the upper right hand corner where, under

12  Item Four.  In addition discussions may also include NAD

13  actions referred to.  It goes on and on and compares that with

14  Plaintiff's Exhibit 16.  Page five of 23 in which under the

15  heading the presentation defendants made our nominees will

16  seek to and then there's a bullet point review, Strategical

17  Alternatives and they promote corporate governance,

18  improvements, which means to separate the Chairman and the CEO

19  positions, to lower the threshold for shareholders to have the

20  right to call special meetings.  Provide shareholders -- I'm

21  sorry.  Provide shareholders the right to act by written

22  consent.  The plaintiff seeks an amendment of that to have the

23  defendants state that not only -- no longer is it true that

24  they may do these things but now they're planning to do these

25  things if elected.  Well, I'm frankly at a loss to understand

———— MILLER - CROSS - UDELL ————

1    the difference between may and planning to do it.  If someone

2    is told if a reasonable shareholder is told if you elect me, I

3    may do these things.  I think the reasonable shareholder is

4    put on notice that these things may occur if the person is

5    elected, and that, therefore, there might be a plan.

6    Furthermore, as noted repeatedly by defense counsel, we're

7    only talking about two of the six directors' positions.  So

8    it's not likely that that could happen just as a result of

9    election of the two directors.  Therefore, I don't find the

10   plaintiff has demonstrated probability of success on the

11   merits on that claim either.  I also believe that the law does

12   permit to take into account the disclosures made by the

13   plaintiffs to the shareholders because it adds to the totality

14   mix of information available to the shareholders.  The

15   shareholders have got a lot of information from both sides.

16   It's a very contested election.  They know how both sides

17   feel, and I think they have sufficient information.  There's

18   no material misrepresentations or anything that's inaccurate

19   that need to be corrected for them to make a decision.

20        Now, I'm going to move on to irreparable harm.  I do

21   think plaintiff is likely to show irreparable harm.  The

22   parties cite competing case law but I think the plaintiff has

23   the better of the argument.  Defendants rely on two cases in

24   this District where the courts held, that so long as the court

25   could unscramble the transaction voted on as a result of

—— MILLER - CROSS - UDELL ——

1    defective proxies or void the results of an election and order

2    a new one, there is no irreparable injury.  That's the <u>Wetter</u>

3    <u>W-e-t-t-e-r versus Caesars World</u> case 541 F. Supp, 68 District

4    of New Jersey, 1982.  And <u>Bolger B-o-l-g-e-r versus First</u>

5    <u>State Financial Services</u> 759 F. Supp, 182, District of New

6    Jersey, 1991.  Plaintiff relies on the cases that hold

7    otherwise.  Although several of the plaintiff's cases involve

8    more complicated transactions, the Courts would naturally find

9    very difficult to unscramble such as a merger.  I think the

10   guiding principle of those cases is that curing any defect

11   prior to an election is preferable to the delay and extent

12   attended to voiding the results of an election and ordering

13   another to occur.  In the one case which was the <u>Lone Star</u>

14   <u>Steak House</u> which you are very familiar with, the court noted

15   though although it could undo the damage caused by an illegal

16   proxy by voiding the results of the election, that it was not

17   an adequate alternative where the court could prevent in

18   advance a shareholder vote to be taken on potentially

19   misleading and incomplete information.  And there are other

20   cases relied upon by a defendant which I think are actually

21   better law -- I mean by the plaintiff that I think are better

22   law than the defendant.  So I do find that reason to be

23   persuasive.  I would otherwise find that the plaintiff has

24   shown irreparable injury.  And when you compare the injuries

25   which is the third factor to the plaintiff and the defendant,

─ MILLER - CROSS - UDELL ─

1    the Third Circuit has said I should engage in this balance of

2    the hardships when it's relevant.  I do believe it's relevant.

3    And the Third Circuit in Novarkis Consumer Health Incorporated

4    versus Johnson and Johnson Merck Consumer, 290 F3rd at 578.  I

5    need to balance the relative harm to the parties which is the

6    potential injury to the plaintiff if an injunction does not

7    issue versus the potential injury to the defendant if the

8    injunction is issued.  I do think this balance of hardship

9    favors the plaintiff.  If I were to find that the plaintiff

10   has shown a likelihood of success on its claim and the

11   election goes forward anyway, that the plaintiff may be

12   subject to a change in its Board of Directors based on

13   allegedly false and misleading information.  And I do think

14   that the expense to the plaintiff to undo that is certainly

15   greater than what I assume to be the expense in holding the

16   second election in the case.  Although it's not clear how

17   expensive it would be in the second election.  We had

18   testimony from Mr. Miller that this proxy fight has cost

19   approximately $500,000.  There's no testimony as to an

20   estimate of what another one would cost, but I have to think

21   it would be a lot less because all the disclosures that have

22   been made and there would have to be some relatively minor

23   corrections.

24        I do find the public interest factor favors the

25   plaintiff.  Again quoting from Lone Star at 1150.  The public

——— MILLER - CROSS - UDELL ———

1    interest always lies with the truth.  Assuming the existence

2    of materially misleading information and full disclosure of

3    such information prior to any vote would best serve the

4    shareholder public.

5          Since I do not find a likelihood of success on the

6    merits, I will deny the Plaintiff's application for a

7    preliminary injunction.  I also don't find any need,

8    therefore, to have any expedited discovery in this matter.  It

9    should be pursued in the normal course of events.

10         We'll do an Order.  Anything further?

11             MR. FLEMING:  Nothing, your Honor.

12             THE COURT:  All right.  Thank you, everybody.  I

13   assume I will be seeing you again.

14             MR. MCGAHREN:  Thank you, your Honor.

15             MR. COX:  Thank you, your Honor.

16             MS. FAY:  Thank you, your Honor.

17             (The matter was then concluded)

18

19

20

21

22

23

24

25

**$**

**$500,000** [2] - 57:2, 135:19
**$6.50** [1] - 39:21
**$7000** [1] - 92:3

**/**

**/S** [1] - 1:25

**0**

**08101** [1] - 1:9

**1**

**1** [7] - 17:16, 18:7, 41:3, 62:4, 62:15, 63:8, 65:12
**1,000** [1] - 9:12
**1.3** [1] - 9:24
**1.6** [4] - 5:16, 8:8, 10:4, 115:14
**10** [7] - 25:12, 25:15, 51:18, 66:22, 73:4, 74:23, 114:12
**10(b)(5** [2] - 4:10, 4:15
**1000** [9] - 32:20, 98:3, 98:6, 98:9, 99:4, 99:9, 99:21, 115:20
**11** [12] - 25:18, 25:19, 26:5, 58:11, 68:11, 68:17, 82:19, 112:16, 112:17, 129:13, 131:20, 132:10
**1150** [1] - 135:25
**12** [10] - 9:10, 10:21, 11:1, 18:11, 23:5, 40:6, 43:25, 52:8, 54:15, 76:20
**12th** [1] - 109:9
**13** [24] - 8:14, 9:19, 9:20, 10:9, 10:11, 10:12, 10:14, 11:8, 37:18, 38:2, 54:21, 63:14, 70:11, 74:24, 76:17, 81:1, 110:3, 116:25, 124:10, 127:8, 128:16, 131:9, 131:20, 132:9
**13(b** [1] - 23:10
**13-6809** [1] - 1:5
**13D** [33] - 10:1, 10:18, 18:14, 19:5,

19:7, 19:24, 50:12, 50:17, 50:19, 50:24, 51:13, 54:23, 55:4, 56:22, 91:2, 91:20, 108:20, 108:25, 109:1, 109:2, 109:3, 109:4, 109:6, 109:17, 110:8, 111:6, 111:24, 112:6, 112:8, 112:23, 116:2, 118:12, 123:24
**13D5** [1] - 10:10
**14** [14] - 8:13, 8:14, 11:5, 30:3, 30:4, 30:5, 30:10, 30:15, 30:17, 47:20, 54:22, 74:5, 127:24, 132:9
**14(8)(12** [1] - 54:11
**14a** [2] - 4:18, 89:15
**1400** [1] - 16:14
**14A** [12] - 25:21, 30:22, 52:20, 85:16, 86:7, 98:14, 99:25, 100:5, 105:6, 106:16, 107:16, 127:8
**15** [18] - 10:14, 11:7, 11:9, 11:12, 12:2, 13:5, 26:8, 26:10, 33:7, 36:18, 55:3, 68:11, 68:23, 85:6, 85:9, 91:18, 94:10, 101:19
**150** [1] - 82:22
**16** [13] - 11:14, 15:20, 51:17, 51:18, 52:17, 53:9, 55:9, 76:13, 83:3, 103:3, 112:16, 132:10, 132:14
**16th** [1] - 38:25
**17** [11] - 6:1, 12:17, 20:13, 20:16, 22:17, 84:25, 85:7, 85:9, 89:5, 89:23, 105:18
**17th** [1] - 38:25
**18** [5] - 18:9, 22:1, 23:1, 39:6, 62:23
**182** [1] - 134:5
**19** [12] - 3:21, 9:24, 18:18, 22:2, 22:15, 23:1, 24:12, 89:5, 89:24, 105:18, 129:15
**19-14** [3] - 10:19, 10:20, 11:1
**1976** [1] - 127:24
**1982** [1] - 134:4
**1991** [1] - 134:6
**1998** [1] - 119:11
**19th** [1] - 39:7

**2**

**2** [6] - 41:2, 50:13, 73:17, 73:19, 73:22, 130:21
**20** [9] - 25:15, 26:7, 26:9, 26:10, 32:6, 32:9, 55:2, 58:12
**2000** [6] - 72:20, 102:15, 103:6, 103:18, 119:11, 119:13
**2001** [1] - 103:19
**2002** [4] - 35:24, 55:11, 82:22, 103:19
**2003** [2] - 73:7, 104:2
**2004** [1] - 103:19
**2006** [1] - 59:7
**2007** [3] - 37:14, 59:3, 59:7
**2008** [13] - 35:25, 36:3, 36:8, 39:8, 74:12, 75:4, 82:12, 82:23, 83:12, 102:15, 103:7, 119:14, 132:5
**2009** [1] - 103:25
**2010** [4] - 3:4, 59:3, 103:19
**2011** [5] - 16:25, 17:1, 17:4, 101:16, 103:19
**2012** [1] - 37:7
**2013** [25] - 1:10, 9:10, 16:19, 17:12, 17:21, 18:14, 25:25, 37:8, 39:6, 40:9, 43:5, 48:8, 48:13, 49:5, 49:14, 50:13, 52:8, 53:24, 54:12, 54:18, 54:24, 55:5, 62:9, 103:24, 130:24
**2014** [6] - 17:24, 48:6, 48:10, 49:3, 49:12, 49:22
**2015** [1] - 49:16
**2016** [1] - 49:6
**21** [11] - 10:14, 10:16, 11:7, 11:13, 20:13, 20:15, 20:16, 22:17, 23:5, 55:5, 55:8
**22** [12] - 11:9, 11:14, 55:18, 58:10, 58:18, 112:9, 112:15, 123:23, 124:5, 129:13, 129:19, 132:10
**22,000** [1] - 9:10
**23** [7] - 53:14, 54:24,

58:10, 85:8, 85:9, 109:12, 132:14
**24** [1] - 55:25
**24th** [1] - 41:11
**25** [6] - 1:10, 40:9, 40:19, 55:11, 56:4, 95:1
**2500** [1] - 16:8
**25th** [8] - 41:12, 42:2, 43:5, 44:3, 95:11, 95:17, 95:21, 107:10
**26** [2] - 56:8, 94:11
**28** [1] - 1:24
**29** [7] - 5:15, 58:20, 63:17, 64:3, 66:2, 66:14, 120:16
**290** [1] - 135:4
**2:30** [1] - 76:2
**2nd** [2] - 17:11, 18:14

**3**

**3** [3] - 43:24, 44:18, 66:6
**30** [4] - 62:25, 63:2, 63:5, 63:8
**30th** [3] - 25:25, 37:8, 62:9
**31** [3] - 54:12, 71:16, 73:7
**31st** [3] - 37:7, 45:9, 95:14
**38** [1] - 111:9
**39** [2] - 111:8, 111:9
**399** [1] - 16:15

**4**

**4.9** [1] - 130:9
**403** [1] - 46:6
**426** [1] - 127:23
**438** [1] - 127:24
**45** [1] - 16:18
**4th** [3] - 45:7, 81:16, 130:24

**5**

**5** [3] - 6:1, 25:20, 66:21
**50** [1] - 81:9
**500,000** [1] - 117:16
**5000** [4] - 98:2, 98:18, 99:5, 99:21
**541** [1] - 134:3
**56,000** [4] - 92:2,

92:10, 98:11, 98:19
**578** [1] - 135:4
**587** [1] - 78:7

**6**

**6** [2] - 54:10, 71:22
**600** [2] - 39:1, 39:13
**63** [21] - 26:7, 26:9, 26:10, 32:6, 32:8, 32:9, 33:7, 34:4, 36:18, 40:6, 43:25, 45:4, 47:20, 58:12, 58:18, 68:11, 68:23, 81:1, 83:3, 103:3, 129:13
**64** [1] - 58:10
**67** [1] - 16:19
**68** [3] - 16:19, 134:3

**7**

**7** [6] - 54:16, 54:18, 66:21, 70:20, 71:18, 71:19
**700** [1] - 73:11
**753** [1] - 1:25
**759** [1] - 134:5

**8**

**8** [2] - 30:11, 66:21
**80** [1] - 57:5
**800** [2] - 39:3, 39:9

**9**

**9** [1] - 66:21
**90** [1] - 57:5
**99.2** [1] - 22:17
**999** [1] - 37:14

**A**

**ability** [4] - 13:17, 89:14, 94:3, 120:22
**able** [16] - 12:10, 13:1, 13:2, 13:10, 26:22, 28:7, 52:24, 61:14, 91:5, 91:22, 121:1, 121:25, 124:16, 124:20, 124:21, 125:9
**absolute** [1] - 12:3
**absolutely** [5] - 87:2, 87:22, 104:13, 104:19, 120:22

**absorb** [2] - 119:17, 120:2
**accentuating** [1] - 11:19
**accepted** [1] - 49:24
**access** [2] - 50:22, 77:11
**accordance** [1] - 105:17
**account** [2] - 129:21, 133:12
**accountability** [1] - 32:14
**accurate** [13] - 19:12, 19:17, 35:6, 35:22, 38:8, 38:16, 48:15, 64:16, 69:23, 70:2, 70:12, 82:7, 108:10
**accurately** [1] - 82:1
**accused** [1] - 123:17
**achievement** [1] - 7:23
**achievements** [1] - 115:2
**acknowledge** [2] - 83:11, 102:14
**acknowledged** [3] - 59:22, 108:24, 124:17
**acquire** [6] - 51:11, 120:15, 120:19, 130:15, 130:17, 131:6
**acquiring** [7] - 44:8, 46:9, 46:19, 51:6, 91:18, 95:6, 130:23
**acquisition** [31] - 34:9, 35:3, 35:7, 35:13, 35:15, 35:16, 35:17, 35:18, 36:15, 43:15, 50:25, 81:8, 83:7, 91:13, 102:3, 102:7, 102:8, 102:12, 102:13, 103:9, 103:13, 103:14, 103:15, 103:23, 103:25, 104:3, 104:4, 104:9, 104:18, 119:22, 131:25
**acquisitions** [7] - 35:19, 80:22, 103:18, 104:1, 104:7, 132:2, 132:3
**Act** [1] - 85:16
**act** [3] - 12:22, 111:4, 132:21
**acting** [1] - 67:19
**action** [1] - 91:14
**ACTION** [1] - 1:4
**actions** [2] - 112:4, 132:13
**activities** [1] - 23:21

**actual** [3] - 10:11, 10:12, 127:18
**add** [1] - 39:1
**added** [3] - 109:11, 110:6, 110:7
**addition** [2] - 11:2, 132:12
**additional** [6] - 24:23, 54:17, 66:21, 71:20, 77:5, 85:3
**Additional** [1] - 55:10
**additionally** [3] - 17:22, 28:9, 37:8
**address** [5] - 53:20, 81:7, 96:16, 113:10, 122:23
**addressed** [1] - 113:11
**adds** [1] - 133:13
**adequate** [1] - 134:17
**adequately** [1] - 130:15
**admissibility** [1] - 62:19
**admissible** [2] - 47:15, 47:16
**admission** [5] - 18:2, 18:23, 26:1, 42:4, 52:9
**admit** [3] - 6:6, 46:11, 55:21
**admitted** [7] - 24:12, 43:12, 46:24, 50:12, 53:8, 72:13, 72:15
**adopted** [1] - 50:8
**advance** [1] - 134:18
**advantageous** [1] - 13:7
**adverse** [2] - 118:10, 124:19
**adversely** [1] - 118:13
**advise** [3] - 64:2, 64:20, 90:11
**advised** [13] - 34:9, 35:3, 35:7, 35:13, 35:16, 36:14, 65:16, 81:8, 102:3, 103:9, 103:15, 103:16, 119:22
**advises** [1] - 63:17
**advising** [1] - 65:1
**advisor** [1] - 25:3
**advisory** [15] - 22:4, 24:14, 24:19, 32:25, 51:24, 55:20, 55:21, 79:6, 80:13, 80:16, 90:9, 111:15, 116:13,

116:16, 120:18
**aerospace** [1] - 16:2
**affect** [1] - 118:13
**affected** [1] - 107:12
**affidavit** [8] - 19:4, 19:8, 21:2, 21:25, 22:2, 120:7, 120:8, 120:10
**affiliated** [1] - 67:25
**affiliation** [1] - 68:3
**afraid** [1] - 36:10
**afternoon** [2] - 105:20, 108:10
**Afternoon** [1] - 76:5
**age** [5] - 5:23, 58:20, 66:14, 67:3, 114:11
**agencies** [2] - 28:11, 28:13
**agency** [1] - 77:15
**ago** [7] - 36:8, 39:22, 52:23, 82:19, 96:12, 101:19, 113:20
**agree** [9] - 14:11, 43:11, 58:19, 67:5, 87:4, 90:25, 95:8, 98:21, 101:5
**agreed** [3] - 48:9, 48:12, 87:4
**agreement** [14] - 22:5, 24:14, 24:20, 25:2, 32:21, 32:25, 33:21, 49:15, 79:6, 80:13, 80:16, 116:13, 116:16, 120:18
**ahead** [2] - 30:1, 112:21
**AL** [1] - 1:6
**alerts** [1] - 112:23
**align** [1] - 32:21
**aligned** [2] - 117:15, 124:15
**allegation** [1] - 101:11
**allegations** [1] - 5:13
**alleged** [1] - 69:11
**allegedly** [2] - 118:22, 135:13
**alleging** [2] - 97:21, 97:25
**allocation** [2] - 31:6, 109:23
**allowed** [1] - 123:6
**almost** [2] - 88:19, 88:20
**alone** [2] - 103:15
**ALSTON** [1] - 1:17
**Alston** [1] - 2:9
**alter** [1] - 113:14
**altered** [1] - 127:22
**alternative** [3] -

51:15, 116:10, 134:17
**alternatives** [6] - 12:23, 53:18, 109:14, 109:19, 110:18, 112:2
**Alternatives** [1] - 132:17
**amenable** [2] - 48:7, 49:21
**amended** [2] - 36:13, 109:11
**amendment** [1] - 132:22
**Amendment** [1] - 115:6
**amount** [7] - 59:25, 64:13, 78:15, 79:23, 79:25, 94:20, 94:25
**analyst** [1] - 59:14
**analyzed** [1] - 74:9
**annexing** [1] - 120:8
**annual** [7] - 37:13, 48:6, 48:8, 48:10, 48:13, 53:24
**annum** [1] - 25:8
**answer** [17] - 5:9, 27:14, 27:15, 35:9, 51:11, 63:24, 64:2, 64:19, 64:22, 65:15, 75:24, 81:20, 88:18, 94:13, 97:23, 103:21, 123:13
**Antifraud** [1] - 123:5
**anyway** [2] - 46:17, 135:11
**apologize** [1] - 55:13
**apparent** [1] - 114:16
**appearance** [1] - 2:2
**appearing** [1] - 2:9
**application** [4] - 2:17, 2:20, 3:15, 136:6
**applied** [1] - 13:4
**applies** [1] - 115:6
**apply** [1] - 13:5
**appreciate** [4] - 19:25, 99:15, 123:18, 126:18
**approach** [4] - 15:3, 61:2, 71:6, 91:12
**appropriate** [3] - 66:16, 79:23, 120:1
**approximate** [2] - 79:24, 82:20
**area** [2] - 101:9, 119:25
**areas** [2] - 106:25, 128:24
**argued** [2] - 90:4, 105:25
**arguing** [2] - 75:24,

107:11
**argument** [11] - 7:19, 84:18, 86:15, 88:24, 89:19, 99:10, 99:12, 114:20, 126:2, 126:18, 133:23
**arise** [1] - 129:17
**arrangement** [7] - 13:8, 24:18, 79:2, 79:5, 79:7, 79:8, 129:11
**artist** [1] - 94:8
**AS** [2] - 14:18, 14:19
**as's** [1] - 56:11
**ascribe** [1] - 104:24
**aspects** [1] - 40:18
**asserted** [2] - 26:21, 43:1
**assertion** [1] - 66:20
**assertions** [1] - 127:25
**assessment** [1] - 112:2
**asset** [1] - 59:18
**associated** [2] - 34:11, 81:10
**assume** [6] - 102:10, 102:11, 102:13, 108:19, 135:15, 136:13
**assumed** [1] - 127:18
**assuming** [1] - 136:1
**asterisk** [1] - 53:21
**attached** [12] - 5:18, 12:24, 19:6, 19:13, 20:19, 20:22, 21:2, 22:14, 52:19, 53:2, 71:10, 130:25
**attaches** [2] - 61:5, 65:24
**attachment** [2] - 52:21, 53:6
**attacked** [1] - 113:22
**attempt** [2] - 100:22, 113:7
**Attempt** [1] - 76:22
**attempted** [2] - 28:6, 67:15
**attended** [1] - 134:12
**attention** [11] - 24:16, 24:25, 26:11, 31:3, 36:19, 40:8, 47:23, 53:20, 62:3, 63:10, 68:10
**attest** [1] - 116:25
**attorney** [2] - 21:10, 60:6
**ATTORNEYS** [2] - 1:20, 1:23

**attorneys** [1] - 21:8
**Attorneys** [2] - 1:16, 1:18
**atypical** [1] - 38:19
**August** [1] - 17:4
**authenticate** [1] - 14:2
**available** [7] - 26:14, 52:3, 77:16, 78:1, 113:16, 127:23, 133:14
**Avenue** [1] - 16:8
**average** [2] - 25:8, 60:2
**avers** [1] - 5:19
**avoid** [1] - 48:24
**await** [1] - 122:13
**aware** [4] - 16:22, 50:15, 56:17, 68:1

**B**

**backdoor** [1] - 47:7
**background** [3] - 13:15, 85:18, 126:23
**Background** [1] - 23:7
**backs** [1] - 130:24
**bad** [2] - 106:17, 118:19
**balance** [6] - 112:3, 121:11, 135:1, 135:5, 135:8
**Ballou** [30] - 17:7, 28:4, 28:18, 33:19, 56:20, 67:17, 67:18, 67:19, 67:24, 68:5, 88:5, 88:9, 88:10, 94:14, 94:19, 96:7, 98:2, 98:16, 98:18, 99:22, 105:3, 114:22, 115:1, 118:25, 120:22, 120:25, 129:2, 130:3, 130:9
**Ballou's** [5] - 28:15, 67:7, 94:5, 94:6, 130:1
**bang** [1] - 99:17
**BARNA** [2] - 1:21, 2:22
**Barna** [1] - 2:22
**base** [2] - 21:6, 57:17
**based** [5] - 11:21, 21:7, 25:11, 107:17, 135:12
**basic** [1] - 95:9
**basis** [10] - 7:5, 11:24, 31:13, 33:18, 34:16, 56:12, 103:14,

**bit** [3] - 28:3, 60:3, 104:22
**blah** [3] - 48:13, 48:14
**block** [3] - 115:14, 115:19, 117:2
**blow** [1] - 121:14
**Board** [93] - 6:15, 6:17, 6:19, 6:21, 7:1, 7:5, 7:9, 7:11, 7:14, 7:17, 8:2, 12:1, 12:22, 13:3, 13:6, 17:8, 17:9, 17:23, 28:2, 28:25, 29:6, 29:11, 29:14, 32:12, 33:12, 33:16, 48:6, 48:12, 48:19, 49:3, 49:5, 49:12, 49:13, 51:14, 53:24, 54:2, 56:21, 57:12, 59:18, 60:5, 60:12, 60:18, 60:19, 61:21, 63:18, 64:4, 64:21, 65:17, 66:3, 66:14, 67:4, 81:7, 83:22, 83:24, 84:1, 84:5, 86:11, 86:14, 86:19, 86:25, 87:5, 87:17, 87:20, 87:23, 88:2, 88:13, 90:17, 90:20, 91:6, 91:11, 91:16, 94:1, 96:22, 97:7, 97:17, 113:7, 113:10, 114:15, 114:25, 120:24, 128:3, 128:7, 128:13, 128:18, 128:20, 128:24, 129:1, 129:5, 129:7, 135:12
**board** [1] - 27:17
**Board's** [2] - 40:13, 43:8
**Boards** [3] - 60:6, 113:23, 116:24
**BOCKIUS** [1] - 1:14
**Bockius** [2] - 2:5, 2:6
**boggling** [1] - 120:14
**boiler** [1] - 123:25
**bolded** [2] - 26:11, 36:19
**Bolger** [1] - 134:4
**BOLGER** [1] - 134:4
**book** [12] - 17:13, 19:8, 22:3, 24:12, 25:19, 68:21, 71:11, 71:23, 71:24, 71:25, 72:11, 85:1
**bother** [2] - 52:4, 82:25
**bothered** [1] - 64:5
**bottle** [1] - 105:15

**bottom** [10] - 10:14, 23:6, 26:8, 63:16, 66:8, 73:12, 74:12, 87:8, 87:10, 111:9
**bought** [1] - 101:16
**bound** [1] - 117:2
**box** [1] - 121:21
**Bradley** [1] - 23:25
**break** [1] - 76:1
**brief** [8] - 3:11, 8:13, 52:12, 55:15, 86:12, 105:18, 108:6, 123:18
**briefing** [1] - 126:17
**bring** [5] - 17:22, 31:5, 89:14, 106:20, 107:12, 128:23
**broke** [2] - 48:20, 49:9
**brought** [1] - 56:13
**bullet** [9] - 34:7, 40:8, 43:24, 44:18, 47:23, 53:17, 81:4, 111:10, 132:16
**bunch** [2] - 107:8, 107:15
**burden** [5] - 108:8, 108:9, 108:11, 131:3, 131:4
**business** [14] - 9:9, 15:21, 41:7, 42:17, 42:22, 43:12, 46:7, 46:24, 47:13, 75:12, 75:14, 85:19, 119:1
**buy** [5] - 28:22, 29:1, 29:4, 29:5, 118:8
**buyers** [1] - 4:12
**buying** [1] - 17:4
**BY** [7] - 1:14, 1:17, 1:19, 1:21, 14:20, 20:7, 57:25
**byelaws** [2] - 111:2, 112:8

**C**

**Caesars** [1] - 134:3
**calculate** [1] - 73:11
**calculated** [1] - 38:25
**calculating** [1] - 72:24
**Camden** [1] - 1:9
**candidate** [1] - 100:21
**candidates** [2] - 115:8, 128:25
**cannot** [10] - 11:19, 12:5, 12:14, 12:23, 13:9, 29:13, 91:9,

91:16, 107:22, 124:15
**capacity** [1] - 67:19
**capital** [5] - 31:6, 80:4, 96:24, 97:9, 109:23
**captioned** [1] - 72:20
**care** [2] - 31:15, 63:20
**carefully** [1] - 109:22
**Carl** [1] - 1:25
**carrot** [1] - 96:20
**carve** [1] - 124:22
**case** [38] - 4:10, 4:11, 4:18, 4:22, 7:23, 11:19, 11:23, 12:5, 12:8, 21:2, 22:22, 70:21, 81:14, 86:1, 86:6, 90:5, 98:18, 105:24, 107:4, 107:6, 108:5, 113:19, 113:21, 122:18, 122:24, 123:10, 123:11, 124:4, 124:15, 125:14, 126:10, 127:7, 127:23, 130:21, 133:22, 134:3, 134:10, 135:16
**cases** [10] - 89:6, 89:23, 105:25, 122:11, 122:22, 133:23, 134:6, 134:7, 134:10, 134:20
**cash** [1] - 39:1
**Cathcart** [2] - 114:8, 119:4
**caused** [2] - 127:15, 134:15
**cautioned** [1] - 125:8
**CDI** [14] - 28:5, 28:9, 28:10, 67:12, 67:13, 67:14, 67:15, 67:17, 67:22, 67:25, 68:5, 119:6, 120:25, 130:7
**center** [1] - 11:8
**centers** [1] - 16:6
**cents** [1] - 94:11
**CEO** [6] - 28:10, 109:15, 110:12, 110:21, 119:5, 132:18
**certain** [6] - 5:3, 13:2, 32:11, 116:3, 117:20, 127:25
**certainly** [11] - 27:16, 27:21, 41:19, 57:11, 100:3, 115:19, 116:21, 116:23, 119:9, 129:24, 135:14
**Certified** [1] - 1:24
**cetera** [5] - 34:22,

113:22, 113:23
**chair** [1] - 53:23
**chairman** [3] -
109:15, 110:12,
110:20
**Chairman** [1] -
132:18
**challenge** [1] -
116:18
**champions** [1] -
49:10
**change** [13] - 40:13,
43:8, 75:13, 75:16,
75:18, 77:24, 81:6,
111:1, 111:2, 112:7,
113:8, 127:15, 135:12
**changed** [1] - 121:17
**changes** [2] - 75:14,
109:16, 111:5
**changing** [1] - 50:21
**characterization** [1]
- 48:4
**CHARLES** [1] - 1:17
**Charles** [1] - 2:8
**Charming** [1] -
113:20
**chart** [12] - 73:3,
73:6, 74:8, 74:11,
74:12, 74:15, 74:22,
74:23, 75:3, 75:6,
75:10, 75:15
**charter** [1] - 112:8
**chartered** [1] - 59:14
**check** [1] - 21:3
**cherry** [10] - 37:5,
37:11, 37:22, 69:19,
69:23, 70:2, 70:6,
75:17, 75:19, 131:12
**chief** [8] - 14:1,
15:17, 35:9, 38:15,
40:15, 41:13, 50:15,
56:11
**choose** [1] - 5:21
**Christopher** [1] -
23:24
**Cinesta** [1] - 125:22
**Circuit** [11] - 89:6,
89:22, 114:8, 119:3,
125:21, 126:25,
135:1, 135:3
**circumstances** [3] -
91:10, 116:3, 127:17
**cite** [3] - 89:5, 93:10,
133:22
**cited** [7] - 89:23,
90:5, 105:18, 105:25,
108:6, 122:11, 122:22
**CIVIL** [1] - 1:4
**claim** [15] - 8:22,
43:6, 67:11, 89:15,

100:5, 100:6, 108:20,
109:4, 121:5, 127:24,
128:13, 132:9,
133:11, 135:10
**claimed** [2] - 86:19,
128:5
**claims** [4] - 14:8,
14:11, 121:8, 127:7
**clarify** [1] - 40:2
**class** [1] - 64:8
**classic** [1] - 42:9
**Classic** [1] - 55:10
**classification** [1] -
48:6
**clause** [1] - 128:22
**clean** [1] - 124:11
**clear** [6] - 39:11,
46:21, 87:22, 90:24,
115:5, 135:16
**clearly** [6] - 45:17,
64:10, 116:2, 129:2,
129:13, 129:14
**clerk** [1] - 3:2
**CLERK** [1] - 126:15
**client** [7] - 24:15,
24:17, 25:4, 25:5,
105:22, 106:5, 120:16
**client's** [1] - 119:23
**clients** [5] - 7:22,
15:24, 61:7, 91:14,
124:19
**close** [5] - 9:9, 32:13,
57:14, 57:15, 106:20
**closed** [1] - 28:8
**closing** [2] - 39:17,
84:18
**cockamamy** [1] -
49:21
**Cohen** [1] - 1:8
**collectively** [2] -
85:24, 97:6
**colorable** [1] - 121:5
**column** [1] - 97:4
**comfortable** [1] -
57:23
**coming** [4] - 28:24,
90:5, 99:16, 102:17
**comment** [4] - 47:24,
77:21, 77:23, 92:9
**commentary** [1] -
77:19
**comments** [3] - 14:4,
40:2, 78:2
**Commission** [4] -
18:21, 20:23, 61:7,
62:8
**committed** [5] -
33:11, 33:25, 116:20,
116:22, 124:14
**committee** [1] -

27:18
**common** [13] - 8:16,
8:25, 9:10, 9:11, 9:12,
9:13, 9:15, 9:23, 36:2,
48:11, 70:9, 96:23,
97:18
**companies** [6] -
36:4, 38:19, 74:17,
88:7, 119:8, 130:5
**company** [111] -
6:17, 7:6, 7:18, 12:14,
16:9, 16:11, 16:23,
27:17, 27:18, 27:20,
28:12, 28:22, 29:2,
29:4, 29:5, 29:12,
29:14, 29:25, 31:11,
32:2, 34:20, 34:24,
35:2, 36:6, 43:22,
44:15, 44:21, 45:15,
46:19, 47:25, 48:5,
48:9, 48:12, 51:11,
56:24, 57:9, 60:21,
61:21, 63:16, 63:18,
63:25, 64:2, 64:4,
64:20, 65:16, 65:23,
65:24, 66:2, 66:3,
66:7, 66:10, 66:13,
66:14, 66:20, 66:22,
67:4, 68:4, 68:6,
69:22, 70:2, 70:6,
73:10, 73:16, 73:17,
73:23, 74:8, 74:9,
74:13, 75:8, 78:8,
80:22, 87:6, 87:17,
88:13, 94:8, 94:10,
95:14, 98:7, 99:20,
100:25, 102:23,
103:18, 104:12,
112:1, 113:5, 113:6,
114:13, 115:19,
118:4, 119:24, 120:4,
120:11, 120:14,
120:18, 120:19,
120:21, 120:24,
120:25, 121:1,
123:25, 124:22,
124:24, 128:17,
130:3, 130:15,
130:18, 130:23,
131:14
**Company** [2] -
96:13, 96:22
**Company's** [3] -
34:8, 97:7, 108:1
**company's** [16] -
37:9, 38:16, 38:17,
48:3, 60:22, 66:3,
67:2, 70:15, 74:3,
74:11, 74:12, 78:6,
78:10, 81:7, 83:11,

97:18
**compare** [1] - 134:24
**compares** [1] -
132:13
**comparing** [2] -
60:5, 92:2
**comparison** [1] -
7:19
**compensation** [6] -
25:3, 31:7, 79:2, 79:4,
79:7, 79:8
**competent** [1] -
42:11
**competing** [3] -
105:6, 133:22
**complaint** [3] - 4:19,
96:1, 102:1
**complete** [21] - 21:4,
21:5, 21:8, 21:25,
36:1, 38:9, 38:10,
38:11, 40:17, 49:25,
50:9, 57:4, 74:23,
75:1, 75:2, 85:20,
98:15, 122:17, 125:6,
131:11
**completely** [5] -
5:22, 13:21, 43:19,
48:16, 121:15
**completeness** [2] -
19:11, 34:18
**complicated** [1] -
134:8
**complied** [1] - 114:9
**comply** [1] - 111:16
**composition** [2] -
40:13, 43:8
**comprehensive** [1] -
109:22
**concealed** [1] -
114:2
**concede** [3] - 6:25,
86:12, 107:14
**conceded** [6] - 6:4,
87:21, 90:21, 91:1,
115:11, 116:11
**conceding** [2] -
86:15, 86:18
**concerned** [3] -
36:20, 68:13, 69:9
**concerning** [9] - 5:3,
85:18, 94:9, 95:12,
96:3, 96:12, 101:8,
101:23, 123:23
**concerns** [1] - 98:3
**concession** [1] -
88:20
**conclude** [2] - 35:15,
69:14
**concluded** [2] -
35:14, 136:17

**concludes** [1] -
56:22
**concluding** [1] - 14:4
**conclusion** [3] -
31:14, 117:14, 122:2
**conclusions** [2] -
118:20, 119:18
**confident** [1] - 39:16
**confirm** [1] - 41:17
**confirmed** [1] -
103:23
**conflict** [16] - 12:3,
12:9, 12:16, 68:2,
90:23, 91:19, 94:2,
116:11, 116:21,
116:23, 117:6,
117:15, 118:15,
118:23, 129:12,
129:17
**conflicts** [5] - 5:4,
113:22, 114:2,
116:19, 117:2
**connection** [1] -
95:23
**CONRAD** [1] - 1:19
**Conrad** [1] - 2:13
**consent** [2] - 111:5,
132:22
**consequently** [1] -
132:7
**consider** [7] - 12:23,
13:6, 91:17, 91:23,
104:16, 109:22,
127:12
**consideration** [1] -
53:25
**considerations** [2] -
121:11, 121:12
**considered** [1] -
100:7
**constitutes** [1] - 8:6
**constituting** [2] -
9:11, 9:13
**consultants** [1] -
16:15
**consulting** [1] - 16:1
**Consumer** [2] -
135:3, 135:4
**contain** [2] - 5:6,
109:1
**contained** [1] -
106:22
**containing** [1] -
109:2
**contains** [1] - 46:3
**contemplate** [2] -
28:3, 127:16
**contend** [3] - 43:17,
44:5, 68:2
**contending** [2] -

86:22, 86:24
  **content** [1] - 42:10
  **contention** [11] -
58:1, 58:23, 58:25,
64:7, 69:5, 69:22,
70:1, 70:6, 70:8,
74:22, 82:6
  **contest** [14] - 3:23,
21:24, 44:19, 45:12,
48:24, 56:15, 56:18,
57:1, 57:3, 57:15,
112:25, 113:3
  **contested** [1] -
133:16
  **contesting** [2] - 5:8,
5:12
  **context** [8] - 4:15,
4:21, 6:13, 19:23,
83:13, 85:15, 104:25
  **continue** [4] - 29:23,
76:9, 93:13, 105:5
  **continues** [1] - 75:21
  **continuing** [1] - 33:5
  **contractors** [1] -
28:12
  **contractual** [1] -
91:20
  **contractural** [1] -
91:8
  **contradicting** [1] -
95:20
  **contrast** [24] - 6:15,
7:3, 7:8, 7:16, 7:24,
67:11, 69:22, 70:1,
73:15, 78:11, 87:15,
87:16, 87:24, 88:11,
88:15, 92:9, 99:4,
99:6, 114:19, 115:1,
115:2, 115:4, 128:17,
128:20
  **contrasting** [7] -
6:14, 13:16, 60:17,
88:11, 92:2, 114:23,
115:5
  **contravention** [1] -
26:25
  **control** [15] - 10:5,
29:25, 44:8, 50:22,
83:18, 83:20, 84:1,
84:5, 95:6, 95:13,
96:4, 130:15, 130:18,
130:23
  **controlling** [1] - 95:6
  **controls** [1] - 23:20
  **conventions** [1] -
87:7
  **conversation** [11] -
35:22, 40:10, 40:18,
41:12, 42:1, 42:11,
43:5, 43:16, 44:7,

131:2
  **conversations** [3] -
41:18, 48:18, 48:23
  **copy** [8] - 10:22,
11:9, 20:5, 20:10,
61:13, 61:14, 70:21,
71:1
  **core** [2] - 102:17,
102:18
  **corner** [9] - 23:5,
25:1, 26:7, 26:9, 31:1,
34:5, 47:21, 76:18,
132:11
  **corporate** [18] - 31:6,
40:24, 41:7, 49:11,
50:21, 109:16,
110:13, 110:16,
111:5, 111:11, 112:3,
112:7, 116:24,
118:25, 119:6,
119:13, 120:17,
132:17
  **correct** [56] - 1:24,
22:10, 22:11, 32:8,
32:17, 32:18, 33:3,
33:24, 35:21, 36:14,
42:14, 42:15, 50:5,
52:20, 53:18, 54:3,
59:4, 59:7, 59:11,
59:12, 59:14, 59:15,
59:18, 60:1, 61:21,
65:25, 66:1, 66:4,
66:5, 66:15, 67:8,
67:9, 67:16, 67:22,
67:25, 73:8, 73:13,
73:18, 73:23, 77:6,
77:19, 78:3, 78:4,
80:13, 80:18, 82:2,
83:12, 86:21, 89:11,
90:15, 105:15, 106:7,
107:22, 107:23, 116:1
  **corrected** [6] -
45:10, 89:9, 106:25,
109:11, 125:22,
133:19
  **correction** [2] - 90:8,
90:10
  **corrections** [2] -
108:18, 135:23
  **corrective** [5] -
89:25, 90:1, 105:17,
105:21, 125:24
  **corrected** [3] - 26:15,
32:15, 54:2
  **cost** [3] - 56:17,
135:18, 135:20
  **costly** [1] - 48:24
  **counsel** [18] - 2:2,
2:11, 3:11, 3:12, 3:21,
15:7, 15:13, 27:7,

42:16, 54:9, 57:22,
90:6, 91:11, 95:4,
113:12, 123:22,
126:17, 133:6
  **count** [2] - 8:22,
125:11
  **counter** [1] - 95:18
  **counter-
declaration** [1] - 95:18
  **countervailing** [1] -
108:8
  **counts** [1] - 119:16
  **couple** [2] - 29:5,
91:12
  **coupled** [1] - 22:1
  **course** [5] - 125:19,
125:20, 130:4, 136:9
  **court** [18] - 4:1, 5:1,
5:4, 21:18, 56:21,
71:1, 85:14, 113:11,
55:24, 56:3, 56:7,
121:16, 122:12,
122:16, 122:19,
126:14, 133:24,
134:14, 134:17
  **COURT** [242] - 1:1,
2:1, 2:10, 2:15, 2:18,
2:24, 3:5, 3:7, 3:18,
4:5, 4:24, 5:12, 5:23,
6:7, 6:10, 6:20, 6:24,
7:13, 8:8, 8:24, 9:4,
9:9, 9:18, 9:20, 10:3,
10:8, 10:11, 10:16,
10:20, 10:22, 11:1,
11:5, 11:9, 11:15,
12:16, 13:23, 14:6,
14:14, 14:16, 14:21,
14:23, 14:25, 15:6,
15:8, 15:12, 15:14,
18:4, 18:6, 18:24,
19:12, 19:15, 19:17,
20:3, 20:6, 21:21,
22:9, 22:14, 22:18,
22:21, 22:24, 25:17,
26:2, 26:4, 26:24,
27:7, 27:14, 28:15,
28:21, 28:23, 29:1,
29:7, 29:10, 29:17,
29:23, 30:1, 30:5,
30:7, 30:9, 30:15,
31:14, 31:20, 31:23,
34:16, 35:1, 37:2,
37:20, 37:24, 38:4,
38:8, 38:13, 39:4,
39:9, 39:17, 39:22,
39:24, 40:21, 40:25,
42:6, 42:13, 42:16,
42:20, 43:4, 43:19,
43:24, 44:13, 44:17,
44:25, 45:3, 45:6,

45:12, 45:15, 45:21,
46:1, 46:5, 46:11,
46:14, 46:23, 47:11,
51:4, 51:9, 52:11,
52:15, 53:8, 54:7,
54:14, 54:20, 55:1,
55:7, 55:14, 55:17,
55:24, 56:3, 56:7,
57:20, 57:23, 61:3,
61:11, 61:14, 61:17,
62:14, 62:17, 62:20,
63:3, 63:5, 64:19,
64:25, 65:11, 65:15,
65:19, 68:17, 68:19,
68:23, 68:25, 69:3,
69:7, 69:25, 70:25,
71:8, 71:24, 72:10,
75:21, 76:7, 84:8,
84:10, 84:13, 84:16,
84:19, 85:4, 85:6,
85:12, 86:18, 86:23,
87:9, 88:4, 91:24,
92:4, 92:11, 92:16,
92:19, 92:23, 93:4,
93:8, 93:14, 93:16,
94:22, 94:24, 96:7,
96:10, 96:14, 96:18,
97:13, 97:17, 97:21,
98:21, 99:2, 99:6,
99:12, 99:23, 100:13,
100:18, 101:3,
102:10, 102:24,
103:5, 103:17, 104:1,
104:6, 104:11,
104:22, 105:9,
105:21, 106:5,
106:19, 108:19,
109:5, 109:10,
109:19, 109:21,
110:5, 110:12,
110:15, 110:19,
110:22, 111:3, 111:7,
111:18, 111:23,
112:12, 112:18,
112:21, 117:5,
117:10, 117:19,
121:22, 122:6,
122:25, 123:14,
125:1, 126:7, 126:15,
126:16, 136:12
  **Court** [7] - 15:10,
76:6, 113:24, 115:3,
123:8, 127:8
  **Courthouse** [1] - 1:8
  **courts** [2] - 105:14,
133:24
  **Courts** [4] - 89:7,
105:12, 127:9, 134:8
  **covers** [2] - 36:12,
77:17

**COX** [92] - 1:17, 2:8,
3:25, 4:9, 5:2, 5:20,
6:2, 6:9, 6:13, 6:23,
6:25, 7:15, 8:10, 9:2,
9:7, 9:16, 9:19, 9:25,
10:6, 10:9, 10:13,
10:18, 10:21, 10:24,
11:3, 11:7, 11:14,
11:17, 12:18, 13:25,
14:7, 84:17, 85:13,
86:22, 87:2, 87:10,
88:8, 92:1, 92:7,
92:14, 92:18, 92:22,
92:25, 93:6, 93:10,
93:15, 93:18, 94:23,
94:25, 96:9, 96:11,
96:16, 96:19, 97:2,
97:4, 97:15, 97:20,
97:23, 98:24, 99:4,
99:9, 99:15, 99:25,
100:16, 100:22,
101:5, 102:16, 103:8,
104:4, 104:8, 104:13,
104:24, 105:10,
105:24, 106:8,
106:20, 108:21,
109:7, 109:12,
109:20, 109:24,
110:7, 110:13,
110:17, 110:20,
110:23, 111:4, 111:8,
111:20, 123:16,
125:3, 136:15
  **Cox** [8] - 2:8, 2:25,
3:17, 3:18, 85:12,
119:21, 123:14
  **Cox's** [1] - 114:20
  **create** [2] - 89:12,
89:13
  **creates** [1] - 117:14
  **creating** [1] - 119:21
  **credentials** [2] -
59:14, 128:25
  **credibility** [1] - 131:3
  **credible** [1] - 11:24
  **credited** [1] - 47:15
  **Crescendo** [1] -
113:21
  **crisis** [1] - 82:24
  **cronies** [1] - 113:9
  **CROSS** [1] - 57:25
  **cross** [5] - 15:9,
57:20, 88:23, 102:25,
103:1
  **cross-examination**
[1] - 88:23
  **crux** [1] - 6:3
  **cure** [4] - 31:9,
77:24, 102:19, 102:22
  **cures** [1] - 31:21

curing [1] - 134:10
current [7] - 25:8,
102:5, 102:6, 102:12,
102:13, 110:24,
120:20

# D

D-1 [2] - 63:6, 63:11
D-2 [1] - 65:22
D-30 [1] - 63:6
D-31 [1] - 71:15
daily [1] - 25:8
damage [4] - 57:16,
108:13, 108:14,
134:15
data [2] - 38:4,
131:24
date [6] - 37:12,
37:24, 37:25, 38:21,
52:7, 78:13
dated [1] - 130:24
dates [1] - 37:22
day-to-day [1] - 57:8
days [3] - 37:19,
38:2, 70:11
deal [2] - 5:17, 5:24
dealing [1] - 43:4
decades [1] - 119:1
deceive [1] - 122:9
deceived [1] - 122:3
December [2] - 37:7,
107:5
deciding [3] - 100:8,
104:17, 127:12
decision [7] - 13:20,
106:17, 106:18,
113:20, 114:1, 126:9,
133:19
decisions [4] -
12:10, 13:3, 109:23,
129:21
deck [1] - 78:5
Declaration [34] -
8:14, 10:21, 15:10,
17:17, 18:11, 25:20,
41:3, 51:19, 54:10,
54:17, 54:23, 55:4,
55:10, 61:5, 62:4,
62:25, 70:21, 70:25,
71:7, 71:10, 71:12,
71:19, 72:4, 72:8,
72:11, 73:16, 84:24,
84:25, 95:19, 95:22,
95:24, 112:10, 130:25
declaration [1] -
95:18
declassification [2] -
48:8, 48:19

declassified [2] -
49:3, 49:12
declassify [1] - 48:12
declassifying [3] -
17:23, 49:14, 49:22
deemed [1] - 9:22
defect [1] - 134:10
defective [1] - 134:1
DEFENDANT [2] -
63:8, 71:16
defendant [12] -
47:3, 58:14, 80:21,
93:24, 128:4, 128:6,
129:5, 130:21,
134:20, 134:22,
134:25, 135:7
defendant's [23] -
33:5, 47:19, 50:12,
52:19, 54:11, 55:4,
62:16, 63:1, 63:11,
68:12, 71:14, 71:15,
74:11, 77:18, 80:17,
80:25, 86:4, 86:5,
90:6, 95:4, 97:25,
103:4, 132:10
Defendant's [3] -
54:17, 54:23, 56:22
Defendants [3] - 1:7,
1:18, 85:10
DEFENDANTS [2] -
1:20, 1:23
defendants [88] -
2:14, 4:2, 4:6, 4:7,
4:22, 16:22, 17:6,
18:19, 18:20, 19:5,
20:9, 21:17, 22:8,
27:9, 30:23, 30:24,
32:1, 33:2, 33:23,
36:13, 40:1, 43:5,
44:6, 44:10, 46:18,
47:24, 50:2, 50:24,
51:13, 53:3, 58:2,
58:19, 59:2, 59:6,
59:9, 59:13, 59:16,
59:25, 60:10, 67:11,
68:12, 69:19, 70:14,
71:21, 72:23, 73:6,
74:23, 76:13, 77:3,
78:1, 78:10, 78:11,
79:6, 81:15, 82:7,
83:5, 83:10, 85:25,
87:18, 88:25, 89:2,
89:4, 90:25, 91:4,
94:15, 94:16, 94:18,
97:12, 98:22, 99:17,
101:11, 102:16,
102:19, 102:25,
104:21, 107:13,
107:18, 108:9,
125:18, 128:1, 128:9,

130:2, 130:17,
131:18, 132:4,
132:15, 132:23,
133:23
defendants' [1] -
129:4
defense [12] - 2:11,
2:23, 3:11, 3:12, 3:21,
3:23, 15:7, 84:19,
86:4, 86:5, 108:9,
133:6
defenses [1] - 88:16
deficiencies [1] -
31:9
deficiency [1] -
31:25
deficient [2] -
100:23, 128:24
defining [1] - 127:10
Definitive [1] - 55:10
definitive [13] -
25:22, 31:10, 32:4,
33:6, 33:23, 34:3,
40:2, 40:5, 43:17,
47:19, 54:17, 80:25,
106:2
degree [1] - 59:9
Delaware [2] -
122:18
delay [2] - 48:5,
134:11
deliberations [1] -
127:18
demonstrably [2] -
5:5, 87:21
demonstrated [3] -
35:2, 132:8, 133:10
demonstrating [1] -
131:5
denial [1] - 127:4
denies [1] - 121:5
deny [3] - 44:16,
121:22, 136:6
denying [1] - 121:25
depressed [1] - 36:5
DEPUTY [1] - 126:15
describe [1] - 31:10
described [2] -
79:12, 79:13
describes [1] - 82:1
describing [5] - 44:6,
80:12, 81:16, 81:23,
114:21
description [4] -
40:17, 44:2, 70:3,
82:8
deserve [1] - 97:8
designed [1] -

106:16
desired [1] - 17:7
detail [1] - 106:23
details [1] - 95:16
detective [1] -
116:12
determination [2] -
13:10, 91:16
determinations [1] -
102:21
determinative [1] -
125:25
determine [5] - 83:1,
92:23, 121:15,
121:18, 131:3
detriment [1] -
101:18
devastating [1] -
121:14
dialogue [1] - 104:15
different [5] - 64:7,
64:10, 64:25, 122:4,
133:1
different [14] - 4:21,
15:22, 28:2, 47:15,
50:10, 87:7, 87:25,
101:9, 104:22,
114:21, 117:16,
124:2, 131:13
difficult [1] - 134:9
dire [4] - 19:25, 20:3,
20:4, 52:14
DIRE [1] - 20:7
direct [6] - 26:11,
36:18, 58:8, 62:3,
68:10, 87:14
DIRECT [1] - 14:20
directed [1] - 64:23
directing [2] - 40:8,
63:10
direction [1] - 32:8
directives [1] - 48:9
directly [4] - 8:18,
9:10, 9:12, 98:24
Director [10] - 11:25,
12:13, 27:20, 88:12,
97:16, 98:7, 98:10,
99:3, 99:8, 110:9
director [1] - 61:19
directors [10] -
17:21, 97:6, 97:10,
97:13, 97:15, 97:17,
98:4, 113:21, 120:24,
133:9
Directors [3] - 17:8,
96:21, 135:12
directors' [2] - 48:13,
133:7
directs [1] - 23:21
disadvantage [1] -

112:13
disadvantageous [1]
- 13:7
disagree [3] - 66:19,
95:4, 101:5
disagreement [1] -
106:10
disagreements [2] -
49:17, 113:6
discipline [1] - 4:14
disclaim [4] - 10:1,
10:4, 44:16, 51:7
disclaimed [1] - 8:11
disclaimer [1] -
116:1
disclaiming [3] -
8:20, 8:21, 115:24
disclaims [4] - 8:16,
8:25, 9:14, 12:11
disclose [34] - 3:1,
10:5, 46:2, 46:10,
46:11, 46:15, 46:21,
50:19, 50:24, 51:13,
58:25, 78:10, 82:11,
82:16, 82:25, 86:15,
94:16, 94:18, 100:11,
100:13, 106:6,
109:17, 110:3, 110:4,
110:9, 111:16,
111:25, 119:7, 124:4,
124:11, 125:24,
130:2, 130:6
disclosed [61] - 5:14,
5:15, 5:17, 12:9,
12:15, 12:17, 12:20,
13:9, 17:3, 19:23,
23:9, 23:20, 28:13,
29:16, 32:1, 44:6,
44:10, 44:19, 45:17,
45:18, 45:22, 46:18,
58:20, 59:2, 59:6,
59:9, 59:13, 59:22,
59:25, 60:21, 64:1,
70:14, 80:10, 81:19,
82:17, 86:24, 88:25,
89:3, 89:4, 94:13,
94:17, 94:18, 96:4,
96:5, 106:4, 106:6,
109:25, 114:16,
118:17, 119:2, 124:2,
124:9, 129:13,
129:14, 130:6,
130:16, 131:7
discloses [4] -
23:11, 63:16, 66:2,
119:5
disclosing [2] -
12:19, 124:9
disclosure [26] -
4:21, 10:9, 10:12,

52:20, 60:7, 66:10, 89:9, 90:1, 90:12, 90:15, 95:8, 101:1, 104:20, 105:17, 105:19, 108:10, 115:21, 117:5, 125:6, 125:22, 127:14, 127:20, 130:16, 132:4, 136:2

**disclosures** [28] - 4:23, 4:25, 6:11, 7:3, 8:11, 13:19, 44:14, 80:18, 80:21, 81:19, 85:21, 93:24, 98:15, 100:15, 105:7, 105:16, 105:22, 106:1, 106:25, 107:20, 108:4, 108:23, 114:7, 130:1, 131:18, 132:1, 133:12, 135:21

**discovery** [4] - 3:8, 107:8, 122:19, 136:8

**discrete** [2] - 15:23, 15:24

**discuss** [2] - 41:24, 72:8

**discussed** [5] - 33:19, 33:20, 48:3, 107:1, 108:15

**discussion** [6] - 72:19, 72:23, 85:22, 94:20, 95:1, 104:15

**discussions** [6] - 16:25, 48:4, 48:20, 49:4, 111:25, 132:12

**dismiss** [1] - 121:7

**dispassionate** [1] - 13:18

**dispose** [2] - 116:4, 116:7

**dispositive** [1] - 9:23

**dispute** [18] - 22:9, 46:12, 46:15, 46:18, 48:1, 51:12, 86:23, 87:4, 87:21, 88:22, 90:24, 91:3, 96:4, 101:25, 102:18, 114:5, 128:2, 128:4

**disputes** [1] - 120:10

**disqualifies** [1] - 118:16

**disruption** [1] - 122:21

**disseminated** [1] - 66:11

**dissident** [1] - 123:3

**distant** [1] - 119:15

**distracting** [1] - 48:24

**distraction** [2] - 57:4, 57:7

**District** [5] - 89:7, 113:24, 133:24, 134:3, 134:5

**DISTRICT** [3] - 1:1, 1:1, 1:11

**divided** [1] - 129:20

**dividend** [3] - 39:2, 39:12, 39:13

**division** [1] - 25:6

**docket** [1] - 4:11

**Document** [2] - 10:19, 11:1

**document** [18] - 4:20, 11:8, 17:15, 17:19, 17:20, 18:10, 28:14, 37:7, 41:6, 43:11, 48:2, 51:21, 52:7, 52:24, 76:17, 83:5, 111:9

**documentary** [1] - 121:8

**dollar** [5] - 35:8, 39:12, 39:13, 39:22, 39:23

**dollars** [6] - 35:5, 35:20, 81:9, 94:11, 102:4, 115:15

**domain** [1] - 5:10

**done** [14] - 8:1, 9:16, 12:12, 37:4, 86:1, 107:18, 107:19, 107:21, 114:25, 120:15, 122:17, 122:22, 125:19, 125:20

**doubles** [1] - 118:5

**doubtful** [1] - 53:22

**down** [13] - 2:3, 31:3, 36:1, 40:9, 48:20, 49:9, 75:7, 77:13, 111:12, 113:20, 115:16, 122:18, 132:10

**drafts** [1] - 41:21

**draw** [11] - 6:19, 7:3, 7:10, 7:11, 7:15, 31:3, 31:15, 87:19, 93:20, 117:14, 118:20

**drawing** [2] - 24:16, 47:23

**drawn** [2] - 7:24, 115:3

**dream** [1] - 27:25

**DRINKWINE** [1] - 1:15

**drive** [1] - 117:22

**drum** [1] - 118:21

**dual** [1] - 72:15

**due** [1] - 9:25

**DULY** [1] - 14:18

**during** [5] - 70:16, 73:12, 78:7, 88:22, 114:20

**duties** [2] - 13:11, 13:13

**duty** [1] - 91:19

**dwell** [1] - 117:13

## E

**early** [1] - 17:1

**easiest** [2] - 10:13, 72:5

**easily** [2] - 122:16, 125:25

**easy** [2] - 109:2, 111:14

**ECF** [2] - 10:14, 53:13

**economics** [1] - 59:10

**education** [1] - 87:12

**effect** [2] - 96:2, 106:2

**effectively** [1] - 121:18

**effectuate** [2] - 83:25, 113:8

**effectuated** [1] - 83:21

**effort** [1] - 121:2

**efforts** [2] - 29:12, 47:24

**Egan** [1] - 56:1

**eggs** [1] - 107:25

**eight** [11] - 31:1, 63:14, 65:22, 66:7, 87:7, 96:20, 104:2, 111:8, 128:15, 128:17, 130:7

**eighteen** [1] - 18:25

**either** [12] - 11:7, 12:7, 28:12, 35:11, 37:14, 89:17, 92:10, 93:21, 98:6, 100:21, 107:6, 133:11

**elect** [5] - 7:7, 7:17, 53:23, 65:4, 133:2

**elected** [8] - 32:11, 98:16, 110:3, 110:9, 122:14, 122:15, 132:25, 133:5

**electing** [1] - 98:2

**election** [21] - 49:6, 56:20, 56:21, 56:23, 93:20, 93:22, 107:23, 108:1, 121:15,

121:18, 126:1, 126:4, 133:9, 133:16, 134:1, 134:11, 134:12, 134:16, 135:11, 135:16, 135:17

**elections** [1] - 107:17

**Electric** [2] - 114:8, 119:4

**eleven** [3] - 23:6, 26:2, 84:25

**Eleven** [1] - 68:18

**eliminate** [1] - 42:20

**eliminates** [1] - 42:17

**Elizabeth** [1] - 2:6

**ELIZABETH** [1] - 1:15

**embarrassed** [1] - 49:20

**emphatically** [1] - 49:1

**employ** [2] - 16:13, 16:14

**employed** [1] - 15:16

**employees** [2] - 16:14, 57:7

**employment** [1] - 33:20

**enable** [1] - 83:25

**encourage** [1] - 109:21

**end** [8] - 37:7, 37:12, 37:25, 75:22, 93:20, 103:24, 103:25, 121:14

**ended** [1] - 39:6

**engage** [1] - 135:1

**engaging** [1] - 112:1

**engineer** [1] - 15:25

**engineering** [1] - 15:25

**enhancing** [2] - 51:15, 53:25

**entail** [2] - 40:12, 43:7

**enter** [1] - 54:6

**entered** [1] - 19:4

**entire** [3] - 9:17, 72:4, 108:12

**entirety** [1] - 115:5

**entities** [5] - 5:18, 23:18, 24:4, 78:17, 115:23

**entrenched** [1] - 97:9

**equitable** [1] - 5:1

**error** [1] - 89:13

**ESQUIRE** [8] - 1:14, 1:15, 1:15, 1:17, 1:19,

1:21, 1:22, 1:22

**essentially** [1] - 24:22

**establish** [1] - 46:16

**established** [3] - 42:16, 47:12, 131:8

**estimate** [1] - 135:20

**et** [5] - 34:22, 113:22, 113:23

**ET** [1] - 1:6

**evaluate** [7] - 91:6, 94:4, 106:13, 124:20, 124:21, 124:23

**event** [5] - 25:11, 27:23, 80:2, 80:6, 118:19

**events** [2] - 101:18, 136:9

**evidence** [37] - 14:5, 18:3, 22:25, 24:12, 26:4, 30:5, 30:15, 40:23, 43:20, 45:9, 46:13, 46:14, 50:12, 53:8, 54:14, 54:20, 55:1, 55:7, 55:17, 55:24, 56:3, 56:7, 61:10, 63:6, 72:4, 84:13, 84:20, 84:22, 85:7, 85:8, 95:15, 98:8, 101:12, 101:20, 102:7, 103:13

**EVIDENCE** [15] - 18:7, 23:1, 26:5, 30:17, 53:9, 54:15, 54:21, 55:2, 55:8, 55:18, 55:25, 56:4, 56:8, 63:8, 85:9

**exact** [2] - 82:21, 105:13

**exactly** [10] - 16:24, 37:13, 38:24, 45:24, 60:23, 67:18, 75:7, 82:1, 106:5, 114:10

**examination** [1] - 88:23

**EXAMINATION** [3] - 14:20, 20:7, 57:25

**examine** [3] - 15:10, 57:20, 127:6

**examined** [3] - 78:8, 103:1

**example** [4] - 11:25, 13:3, 58:8, 91:11

**except** [5] - 8:18, 19:2, 57:13, 88:4, 124:24

**exception** [2] - 42:24, 46:6

**excess** [1] - 25:14

**Exchange** [5] -

18:21, 20:23, 61:7, 62:8, 85:16
**exclude** [1] - 94:9
**excuse** [5] - 8:17, 79:25, 89:2, 94:17, 107:18
**executed** [1] - 27:19
**executive** [3] - 31:7, 40:15, 119:1
**exemplary** [1] - 74:21
**exercise** [2] - 33:15, 116:22
**exercising** [3] - 33:11, 33:25, 116:20
**Exhibit** [50] - 8:14, 10:21, 11:1, 11:5, 17:16, 18:11, 19:4, 22:17, 25:19, 25:20, 30:4, 30:11, 41:2, 41:3, 51:18, 54:10, 54:16, 54:22, 55:3, 55:9, 62:4, 62:15, 63:1, 63:11, 65:12, 66:6, 68:11, 68:17, 70:20, 71:18, 71:19, 71:22, 73:17, 73:19, 73:22, 74:24, 76:13, 85:7, 85:8, 112:9, 112:15, 123:23, 124:5, 128:16, 129:13, 130:21, 131:9, 132:10, 132:14
**exhibit** [47] - 6:1, 10:16, 10:25, 17:16, 18:3, 18:10, 19:3, 19:7, 19:8, 19:19, 19:20, 19:22, 19:24, 20:1, 20:16, 22:2, 22:7, 24:11, 24:16, 25:1, 26:1, 33:5, 42:4, 42:6, 44:24, 44:25, 47:18, 52:9, 52:19, 54:10, 54:16, 62:13, 62:14, 65:22, 68:15, 70:19, 72:7, 72:11, 80:24, 83:4, 85:6, 87:6, 96:19, 96:24, 97:1, 103:2, 129:15
**EXHIBIT** [13] - 18:7, 26:5, 30:17, 53:9, 54:15, 54:21, 55:2, 55:8, 55:18, 55:25, 56:4, 56:8, 71:16
**exhibits** [26] - 3:12, 15:4, 17:14, 19:6, 19:9, 19:13, 20:19, 20:22, 21:1, 22:3, 54:5, 61:6, 61:8, 62:22, 62:24, 63:6,

66:21, 66:25, 71:10, 72:6, 84:23, 84:24, 84:25, 85:2, 85:15
**EXHIBITS** [3] - 23:1, 63:8, 85:9
**existence** [1] - 136:1
**exit** [1] - 118:7
**expected** [1] - 57:15
**expedited** [2] - 3:7, 136:8
**expense** [3] - 108:13, 135:14, 135:15
**expensive** [3] - 57:2, 57:3, 135:17
**experience** [77] - 6:5, 6:8, 6:11, 6:14, 6:17, 6:19, 6:21, 7:1, 7:4, 7:6, 7:9, 7:11, 7:14, 7:17, 8:3, 13:15, 26:13, 26:21, 28:17, 28:19, 29:18, 31:5, 31:11, 32:2, 37:9, 58:15, 59:17, 60:1, 61:21, 61:24, 63:18, 64:4, 64:21, 64:24, 65:17, 66:4, 66:15, 66:17, 67:4, 86:10, 86:13, 86:14, 86:20, 86:25, 87:5, 87:6, 87:12, 87:16, 87:17, 87:20, 87:23, 87:25, 88:2, 88:3, 88:6, 88:10, 88:13, 88:14, 90:17, 90:19, 90:20, 94:1, 94:6, 94:7, 114:12, 114:15, 114:24, 119:1, 120:16, 128:2, 128:11, 128:18, 128:24, 129:8
**experiences** [3] - 85:19, 129:3, 129:24
**expertise** [1] - 94:7
**explain** [4] - 22:7, 48:17, 78:11, 128:6
**explained** [2] - 60:7, 129:16
**explaining** [1] - 37:22
**explains** [2] - 79:6, 79:8
**explicit** [3] - 117:6, 128:8, 131:16
**explicitly** [4] - 6:22, 128:6, 129:16, 131:21
**exploration** [1] - 43:16
**explore** [2] - 26:14, 26:22

**exploring** [1] - 50:25
**exposure** [1] - 112:14
**expressed** [7] - 17:1, 43:21, 44:7, 44:14, 44:20, 45:13, 131:5
**expression** [1] - 92:1
**extensive** [1] - 48:18
**extent** [2] - 8:18, 134:11
**extra** [1] - 57:13
**extraordinary** [2] - 50:20, 112:7
**extremely** [2] - 36:2, 48:22

---

# F

**F3rd** [1] - 135:4
**fabrication** [1] - 49:25
**facilities** [1] - 16:9
**fact** [44] - 7:5, 13:9, 19:3, 19:23, 21:11, 21:23, 24:10, 27:21, 44:11, 44:23, 46:9, 48:19, 50:24, 60:3, 60:8, 60:20, 68:3, 70:14, 75:16, 83:9, 83:11, 87:5, 89:7, 95:9, 95:10, 95:11, 95:20, 101:25, 104:14, 104:16, 104:18, 106:14, 115:18, 116:9, 119:20, 123:4, 127:10, 127:14, 127:17, 127:20, 128:9, 129:24, 129:25, 132:7
**factor** [2] - 134:25, 135:24
**facts** [12] - 27:13, 38:12, 69:11, 86:2, 87:4, 88:17, 90:2, 95:9, 101:24, 113:18, 113:19, 115:22
**factual** [11] - 26:20, 27:5, 27:10, 87:4, 87:22, 90:24, 95:3, 96:2, 103:13, 119:24
**factually** [1] - 91:21
**fail** [1] - 46:2
**failed** [5] - 29:5, 46:2, 46:9, 46:11, 68:6
**failure** [1] - 31:10
**fair** [28] - 40:17, 61:19, 61:24, 62:1,

62:6, 64:13, 66:9, 67:1, 67:4, 71:19, 79:11, 79:13, 79:16, 79:18, 79:25, 81:25, 83:4, 93:19, 93:22, 94:20, 94:25, 99:9, 101:1, 104:25, 105:1, 105:2, 105:19, 107:23
**fairly** [4] - 12:9, 12:15, 13:19, 13:21
**faithful** [2] - 13:11, 13:13
**false** [40] - 5:5, 5:8, 5:13, 7:2, 8:1, 27:6, 48:16, 49:8, 56:23, 58:2, 58:9, 69:5, 69:7, 87:21, 88:14, 88:20, 89:8, 89:11, 89:16, 89:18, 89:24, 90:7, 90:17, 97:19, 97:21, 98:1, 98:5, 101:19, 101:23, 102:19, 102:21, 102:22, 106:15, 106:21, 107:14, 108:22, 125:17, 125:23, 131:9, 135:13
**familiar** [2] - 113:4, 134:14
**family** [4] - 11:22, 23:16, 24:5, 124:20
**Family** [1] - 23:17
**favors** [2] - 135:9, 135:24
**FAY** [57] - 1:15, 2:6, 14:15, 14:20, 15:3, 15:7, 15:9, 15:13, 15:15, 18:2, 18:23, 18:25, 19:19, 21:16, 22:6, 23:2, 26:1, 27:8, 30:6, 30:12, 31:18, 31:22, 31:24, 40:23, 42:4, 43:3, 43:10, 43:23, 44:1, 45:25, 46:3, 46:6, 46:12, 46:20, 46:24, 52:9, 53:5, 54:4, 54:8, 54:16, 54:22, 55:3, 55:9, 55:19, 56:1, 56:5, 56:9, 57:18, 62:18, 63:4, 71:2, 72:13, 84:9, 84:12, 84:15, 85:5, 136:16
**Fay** [13] - 2:6, 2:25, 13:25, 18:8, 19:17, 23:3, 30:18, 38:14, 39:25, 47:17, 53:11, 56:10, 87:13
**February** [4] - 45:7, 55:11, 81:16, 130:24

**fee** [4] - 25:10, 25:11, 78:22, 129:14
**fell** [1] - 75:7
**few** [5] - 27:25, 54:5, 113:20, 123:19, 126:8
**fiduciary** [2] - 91:7, 125:14
**field** [2] - 107:17, 107:19
**fields** [1] - 50:22
**fifteen** [1] - 10:16
**Fifth** [4] - 89:6, 89:22, 107:5, 125:21
**fifty** [8] - 34:10, 35:4, 35:8, 35:20, 39:19, 93:2, 102:4, 103:10
**fifty-six** [1] - 93:2
**fight** [3] - 72:1, 85:23, 135:18
**figure** [2] - 99:24, 100:3
**file** [7] - 10:14, 50:19, 89:17, 95:19, 109:2, 109:3, 123:8
**filed** [45] - 4:19, 18:14, 18:16, 18:17, 18:19, 18:20, 18:21, 19:5, 20:23, 20:24, 22:8, 22:10, 25:21, 25:24, 30:23, 30:24, 37:7, 51:22, 52:21, 53:5, 54:11, 54:18, 54:23, 55:4, 55:11, 58:2, 61:6, 62:6, 62:7, 62:8, 63:11, 66:10, 70:25, 71:20, 73:23, 74:8, 75:17, 76:13, 77:5, 77:7, 77:15, 78:1, 79:6, 85:3, 111:24
**files** [1] - 41:7
**filing** [23] - 5:24, 10:10, 20:19, 20:22, 21:3, 21:14, 21:19, 22:4, 22:7, 23:10, 27:9, 43:6, 50:12, 50:17, 51:13, 53:2, 53:13, 62:19, 65:16, 65:23, 66:7, 74:3, 111:25
**filing's** [1] - 26:25
**filings** [23] - 3:20, 3:22, 5:18, 6:21, 17:3, 17:11, 21:11, 21:17, 21:24, 51:10, 52:20, 56:22, 61:20, 63:20, 65:9, 66:22, 102:14, 113:16, 128:1, 128:6, 128:10, 131:15
**final** [1] - 101:22

**Financial** [1] - 134:5
**financial** [15] - 14:1, 15:17, 34:8, 35:2, 35:6, 35:9, 36:1, 38:15, 41:13, 50:15, 56:11, 59:14, 59:17, 81:8, 82:24
**fine** [7] - 7:23, 30:1, 42:23, 44:17, 94:24, 125:10, 130:9
**fined** [1] - 130:8
**fines** [2] - 28:11, 130:11
**Finish** [1] - 69:25
**finish** [4] - 14:4, 54:4, 75:23, 112:22
**fired** [1] - 29:24
**firm** [4] - 51:24, 59:7, 62:7, 79:25
**firm's** [2] - 16:16, 27:22
**firms** [1] - 88:6
**first** [31] - 8:3, 16:22, 32:6, 32:10, 33:10, 34:7, 40:14, 41:3, 41:6, 43:10, 50:7, 68:21, 77:2, 81:4, 81:14, 81:18, 86:6, 86:9, 87:10, 87:14, 88:4, 88:5, 90:15, 97:5, 111:10, 113:10, 123:22, 127:25, 128:1, 128:22
**First** [2] - 115:6, 134:4
**fiscal** [2] - 16:17, 16:18
**five** [55] - 10:6, 10:9, 11:15, 25:2, 31:1, 35:19, 36:8, 37:11, 37:12, 37:18, 38:2, 38:20, 38:21, 38:23, 39:5, 39:10, 39:15, 39:16, 39:22, 46:6, 50:18, 53:14, 66:7, 66:21, 69:24, 70:10, 70:11, 72:19, 74:15, 74:17, 74:19, 74:20, 75:3, 78:15, 78:16, 78:17, 87:8, 96:20, 96:25, 97:4, 97:5, 101:14, 101:15, 101:18, 102:2, 104:2, 109:12, 110:4, 114:12, 119:16, 129:15, 131:12, 131:13, 131:19, 132:14
**fix** [1] - 111:14
**fixed** [1] - 107:15

**flat** [1] - 99:7
**FLEMING** [18] - 1:22, 2:16, 18:5, 30:8, 42:8, 111:21, 111:24, 112:16, 112:19, 112:22, 117:7, 117:12, 117:25, 121:24, 122:8, 123:1, 126:12, 136:11
**Fleming** [19] - 2:16, 2:25, 7:21, 14:11, 61:5, 62:4, 62:15, 62:25, 90:3, 105:25, 111:21, 112:10, 123:23, 124:7, 124:13, 124:17, 125:5, 125:16
**Fleming's** [2] - 73:16, 73:19
**focus** [2] - 29:18, 86:3
**focusing** [3] - 87:13, 88:18, 127:24
**folks** [1] - 112:13
**follow** [6] - 40:10, 41:10, 44:22, 67:18, 99:13, 105:24
**follow-up** [2] - 40:10, 41:10
**following** [1] - 41:15
**FOLLOWS** [1] - 14:19
**footnote** [1] - 53:21
**FOR** [4] - 1:1, 1:20, 1:23, 71:16
**forever** [1] - 90:14
**forget** [2] - 44:13, 45:2
**form** [4] - 51:3, 51:4, 110:8, 112:23
**formally** [3] - 13:19, 17:10, 30:10
**forth** [5] - 17:23, 66:13, 85:23, 120:12, 123:21
**forward** [3] - 36:17, 74:14, 135:11
**Foundation** [1] - 23:17
**foundation** [5] - 11:23, 23:21, 24:5, 40:22, 46:17
**founder** [1] - 31:4
**founding** [1] - 59:2
**four** [17] - 35:18, 53:14, 94:11, 102:9, 103:23, 104:4, 108:25, 109:13, 110:8, 110:15, 111:12, 111:25, 112:6, 112:16, 124:11, 126:25, 130:7
**Four** [3] - 109:17, 109:25, 132:12
**fourth** [4] - 36:3, 36:8, 47:23, 96:6
**frankly** [7] - 19:24, 22:4, 22:16, 46:13, 104:23, 120:12, 132:25
**free** [6] - 19:8, 49:18, 93:25, 126:9
**free-standing** [1] - 19:8
**freestanding** [1] - 19:22
**FROME** [1] - 1:21
**Frome** [3] - 2:16, 2:19, 2:22
**front** [6] - 17:14, 20:10, 70:22, 71:2, 76:14, 82:3
**full** [16] - 14:21, 54:1, 67:2, 70:14, 85:20, 90:6, 98:14, 98:15, 101:1, 105:1, 105:2, 105:19, 107:23, 125:6, 136:2
**fully** [5] - 5:22, 12:9, 13:21, 26:14, 59:25
**fund** [1] - 37:15
**fundamental** [2] - 85:21, 85:22
**furthermore** [1] - 133:6

**G**

**gain** [2] - 25:15, 91:13
**gains** [1] - 117:9
**game** [38] - 8:7, 8:23, 12:6, 12:7, 32:13, 79:14, 90:23, 91:22, 91:25, 92:5, 92:6, 92:8, 92:9, 92:12, 92:13, 92:20, 92:21, 92:24, 92:25, 93:1, 93:3, 93:5, 93:7, 93:9, 96:14, 98:23, 98:25, 99:3, 100:17, 115:10, 115:11, 115:14, 115:18, 115:20, 129:9, 129:10, 129:11
**General** [2] - 114:8, 119:4
**general** [3] - 23:14, 41:17, 112:24
**generally** [1] - 50:18

**Gerhardt** [1] - 125:21
**Gerhart** [1] - 89:22
**Gerry** [1] - 1:9
**gist** [1] - 3:13
**given** [2] - 27:21, 103:6
**glad** [1] - 123:13
**glaring** [1] - 29:15
**Glass** [1] - 55:22
**gleaned** [1] - 80:13
**Global** [4] - 94:9, 94:19, 119:5, 119:10
**goodwill** [1] - 119:19
**gotcha** [2] - 111:7, 112:18
**governance** [8] - 31:6, 49:11, 109:16, 110:14, 110:16, 111:5, 111:11, 132:17
**Government** [2] - 28:11, 28:12
**government** [2] - 28:13, 130:10
**grant** [6] - 90:13, 108:17, 122:10, 122:17, 126:3, 126:5
**granted** [4] - 2:25, 105:4, 107:4, 108:2
**granting** [1] - 127:4
**great** [4] - 7:7, 7:8, 75:15, 116:12
**greater** [5] - 32:14, 38:20, 117:21, 127:5, 135:15
**grossly** [1] - 128:24
**group** [16] - 9:2, 9:17, 25:21, 34:21, 43:14, 45:11, 46:8, 48:25, 81:6, 91:2, 91:9, 91:21, 95:25, 97:15, 101:16
**Group** [4] - 17:21, 23:12, 55:10, 121:20
**Group's** [1] - 122:14
**group's** [1] - 48:11
**groups** [2] - 130:22, 131:6
**guarantee** [1] - 13:12
**guess** [8] - 3:1, 18:17, 22:3, 27:2, 64:14, 72:18, 101:5, 111:9
**guidance** [1] - 127:9
**guiding** [1] - 134:10
**guys** [2] - 49:10, 118:15

**H**

**Hac** [4] - 2:9, 2:17, 2:20, 2:24
**hand** [13] - 11:7, 14:17, 23:5, 25:1, 26:7, 26:9, 31:1, 34:5, 47:21, 49:12, 53:13, 76:18, 132:11
**hard** [5] - 10:22, 11:2, 104:10, 117:4, 118:9
**hard-bound** [1] - 11:2
**hardship** [2] - 121:12, 135:8
**hardships** [1] - 135:2
**harm** [9] - 105:11, 108:5, 121:10, 121:12, 122:12, 127:5, 133:20, 133:21, 135:5
**hate** [1] - 122:25
**HAVING** [1] - 14:18
**head** [1] - 82:21
**headed** [2] - 33:7, 53:14
**header** [1] - 69:9
**heading** [4] - 10:12, 10:18, 26:12, 132:15
**headline** [2] - 111:10, 124:3
**headquarters** [2] - 16:7, 16:10
**Health** [1] - 135:3
**healthcare** [1] - 16:3
**hear** [3] - 14:4, 15:1, 126:20
**heard** [10] - 85:14, 86:9, 88:22, 111:22, 115:25, 116:10, 119:20, 120:6, 120:24, 122:23
**hearing** [1] - 85:24
**hearsay** [11] - 42:9, 42:14, 42:18, 42:21, 42:24, 46:6, 47:1, 47:9, 47:11
**hedge** [1] - 37:14
**height** [1] - 82:24
**held** [9] - 8:25, 9:15, 9:24, 11:22, 91:2, 113:24, 114:8, 115:23, 133:24
**help** [2] - 57:9, 121:19
**helpful** [1] - 126:20
**herein** [1] - 8:17
**hidden** [1] - 114:2

**high** [2] - 37:14, 39:16
**higher** [1] - 39:16
**himself** [3] - 5:16, 60:5, 60:17
**hire** [1] - 116:12
**hiring** [1] - 80:16
**historical** [1] - 131:22
**history** [1] - 73:6
**hit** [1] - 37:14
**hold** [6] - 75:21, 112:12, 112:21, 129:3, 134:6
**holding** [1] - 135:15
**Honor** [145] - 2:8, 2:12, 2:20, 2:21, 3:4, 3:6, 3:17, 3:25, 4:1, 4:9, 5:2, 5:20, 6:3, 6:9, 6:13, 6:23, 8:10, 9:3, 9:17, 9:25, 10:25, 11:3, 11:11, 11:18, 11:23, 12:18, 13:22, 13:25, 15:3, 18:2, 18:5, 19:2, 19:21, 20:5, 21:15, 21:16, 21:23, 22:11, 22:23, 26:3, 26:19, 27:4, 27:8, 31:18, 34:15, 40:20, 42:8, 42:19, 43:11, 44:2, 44:11, 44:22, 44:23, 47:3, 51:6, 52:13, 54:4, 55:12, 57:21, 61:2, 61:4, 61:12, 61:13, 61:16, 62:12, 62:21, 62:23, 64:18, 64:22, 64:24, 71:5, 71:6, 72:3, 72:14, 76:10, 84:12, 84:15, 84:17, 84:21, 85:11, 85:13, 86:3, 86:8, 87:2, 88:8, 89:1, 92:1, 92:7, 92:14, 92:22, 93:11, 93:12, 93:18, 94:21, 96:2, 96:9, 96:12, 96:17, 97:23, 97:24, 99:9, 99:15, 99:25, 101:6, 103:3, 103:21, 104:9, 104:14, 104:24, 105:10, 105:20, 106:8, 106:21, 108:21, 109:8, 109:20, 109:24, 111:20, 111:21, 112:10, 112:16, 112:20, 112:23, 113:4, 113:19, 115:24, 116:18, 117:7,

117:15, 118:19, 120:12, 121:4, 122:4, 122:11, 122:23, 123:13, 123:18, 125:3, 125:17, 126:6, 126:12, 136:11, 136:14, 136:15, 136:16
**Honor's** [2] - 14:7, 101:13
**HONORABLE** [1] - 1:11
**hope** [1] - 53:22
**hopeless** [1] - 94:2
**horribles** [1] - 90:14
**hospitals** [1] - 16:5
**hostile** [2] - 28:6, 28:16
**Hotel** [1] - 89:21
**Hotels** [1] - 125:22
**hour** [1] - 76:1
**House** [1] - 134:14
**hum** [2] - 73:5, 74:7
**hundred** [10] - 16:18, 16:19, 34:10, 35:4, 35:8, 35:20, 81:9, 82:22, 102:3, 103:10
**hundreds** [1] - 39:16
**hunt** [1] - 77:13

**I**

**i.e** [1] - 100:25
**idea** [1] - 21:21
**ideas** [1] - 53:25
**identification** [9] - 17:16, 18:10, 25:19, 30:4, 41:2, 42:5, 51:18, 71:13, 71:15
**IDENTIFICATION** [1] - 71:16
**identified** [2] - 31:10, 60:23
**identify** [2] - 22:6, 54:9
**Identity** [1] - 23:7
**ignore** [2] - 88:4, 120:2
**ignores** [1] - 75:11
**ill** [12] - 34:9, 35:3, 35:7, 35:13, 35:16, 36:14, 81:8, 102:3, 103:9, 103:15, 103:16, 119:22
**ill-advised** [12] - 34:9, 35:3, 35:7, 35:13, 35:16, 36:14, 81:8, 102:3, 103:9, 103:15, 103:16,

119:22
**illegal** [1] - 134:15
**illustrate** [1] - 37:5
**immediately** [3] - 59:20, 114:14
**impact** [3] - 56:24, 57:10, 124:24
**implement** [1] - 120:23
**implementation** [2] - 48:5, 48:7
**implicated** [1] - 130:10
**important** [21] - 27:15, 38:12, 40:18, 44:9, 48:22, 49:6, 49:11, 64:15, 93:19, 95:3, 100:1, 100:7, 104:17, 112:20, 112:23, 114:6, 119:10, 119:15, 120:3, 120:21, 127:12
**importantly** [2] - 28:20, 57:7
**impossibility** [4] - 91:7, 122:21, 125:15
**impossible** [1] - 131:2
**improperly** [1] - 42:9
**improvements** [1] - 132:18
**IN** [15] - 18:7, 23:1, 26:5, 30:17, 53:9, 54:15, 54:21, 55:2, 55:8, 55:18, 55:25, 56:4, 56:8, 63:8, 85:9
**inaccurate** [14] - 38:4, 38:7, 48:7, 48:14, 58:23, 82:4, 82:9, 90:2, 90:11, 106:3, 130:11, 131:10, 132:5, 133:18
**inaction** [1] - 67:5
**INC** [1] - 1:3
**incentive** [4] - 80:8, 120:19, 120:20
**incentives** [1] - 80:12
**inclined** [1] - 100:4
**include** [10] - 39:12, 39:13, 49:15, 88:12, 97:16, 112:1, 112:4, 112:6, 113:16, 132:12
**included** [1] - 86:16
**including** [3] - 105:25, 107:8, 108:13
**income** [2] - 27:22, 27:23
**incomplete** [10] - 19:3, 19:18, 21:9,

35:12, 79:19, 79:20, 80:21, 82:10, 82:11, 134:19
**Incorporated** [1] - 135:3
**increase** [2] - 78:7, 120:20
**increased** [1] - 39:9
**incredible** [1] - 75:13
**incumbent** [5] - 7:4, 7:5, 100:23, 129:1, 129:4
**incumbents** [1] - 100:9
**incurred** [1] - 56:17
**indeed** [5] - 20:21, 119:4, 120:8, 121:3, 130:20
**Independent** [3] - 96:21, 97:13, 97:17
**independent** [10] - 33:11, 33:15, 33:25, 53:23, 97:6, 98:3, 113:5, 116:19, 116:20, 116:22
**indicate** [1] - 43:14
**indifferent** [1] - 106:17
**indirect** [1] - 117:1
**indirectly** [2] - 116:9, 120:6
**industries** [2] - 6:12, 86:13
**Industries** [1] - 127:23
**industry** [14] - 6:6, 6:8, 16:2, 60:4, 60:8, 60:11, 86:20, 87:1, 114:15, 120:16, 128:4, 128:7, 128:14
**inference** [7] - 6:18, 7:9, 7:11, 87:19, 99:8, 104:6, 128:19
**infers** [1] - 102:11
**influence** [1] - 68:7
**inform** [2] - 13:20, 17:20
**information** [29] - 4:12, 15:22, 23:9, 60:15, 75:1, 75:12, 75:13, 85:18, 88:21, 100:6, 106:16, 109:1, 113:2, 113:13, 113:14, 113:15, 113:25, 118:23, 119:17, 126:2, 126:4, 127:22, 133:14, 133:15, 133:17, 134:19, 135:13, 136:2, 136:3

**informed** [4] - 4:13, 85:17, 105:1, 108:8
**inherent** [1] - 13:14
**initiatives** [1] - 28:2
**injunction** [21] - 3:9, 89:5, 90:13, 105:4, 107:2, 107:4, 108:2, 108:17, 121:6, 121:13, 121:19, 121:22, 121:25, 122:6, 122:10, 126:3, 126:5, 126:24, 135:6, 135:8, 136:7
**injunctive** [1] - 105:13
**injured** [1] - 127:3
**injuries** [1] - 134:24
**injury** [4] - 134:2, 134:24, 135:6, 135:7
**inoculate** [1] - 89:14
**inside** [1] - 112:13
**insisted** [2] - 48:5, 49:1, 49:14
**instead** [1] - 81:5
**Institutional** [1] - 51:23
**instruments** [1] - 112:8
**insurance** [1] - 13:14
**intangibles** [1] - 34:11
**intend** [2] - 31:19, 124:23
**intent** [4] - 17:21, 17:22, 45:11, 108:25
**intention** [2] - 95:13, 130:17
**intentions** [1] - 130:15
**interest** [52] - 5:4, 8:19, 8:21, 8:22, 10:2, 11:15, 12:8, 12:12, 14:8, 14:11, 17:1, 29:11, 29:14, 32:21, 43:21, 44:8, 44:15, 44:20, 45:13, 45:18, 45:19, 45:23, 46:8, 46:19, 46:20, 51:5, 91:15, 95:5, 95:13, 99:7, 100:10, 100:11, 100:13, 100:24, 101:1, 108:7, 115:23, 116:17, 116:24, 117:23, 118:1, 125:2, 125:8, 127:7, 130:22, 130:23, 131:5, 131:6, 135:24, 136:1
**interested** [3] - 43:15, 50:25, 96:1
**interesting** [3] - 5:6,

37:6, 125:16
**interests** [4] - 24:7, 117:15, 118:18, 124:15
**internet** [2] - 65:25, 116:14
**interpret** [2] - 92:14, 92:16
**interrupted** [1] - 36:10
**introduce** [3] - 22:12, 42:25, 84:14
**introduced** [2] - 95:15
**introducing** [1] - 43:20
**invalidated** [1] - 56:24
**invested** [1] - 97:9
**investigation** [1] - 130:8
**investigations** [1] - 130:10
**investigator** [1] - 80:16
**investing** [2] - 78:2, 79:25
**investment** [19] - 22:4, 24:8, 24:14, 24:19, 25:3, 32:25, 59:17, 79:5, 80:6, 80:13, 80:15, 92:3, 97:10, 116:13, 116:15, 118:7, 120:18, 120:21, 125:9
**investments** [1] - 24:7
**investor** [16] - 4:16, 31:5, 67:1, 87:12, 104:16, 108:23, 109:3, 109:5, 109:8, 110:10, 118:8, 124:2, 127:15, 127:21, 129:18, 129:22
**investors** [7] - 52:24, 64:12, 64:13, 67:5, 97:11, 114:1, 126:3
**inviting** [1] - 89:12
**involve** [1] - 134:7
**involved** [4] - 23:12, 56:12, 88:7, 128:14
**involves** [1] - 110:13
**ironic** [1] - 119:12
**irrelevant** [2] - 4:4, 120:13
**irreparable** [9] - 105:11, 108:5, 121:10, 121:12, 122:12, 133:20, 133:21, 134:2, 134:24

**irreparably** [1] - 127:3
**irrevocable** [1] - 25:7
**IRS** [4] - 9:24, 18:18, 24:4, 25:6
**IRS19** [6] - 23:13, 23:14, 23:19, 24:15, 33:22, 95:25
**ISF** [2] - 55:19, 56:5
**ISS** [8] - 51:23, 52:2, 52:5, 52:17, 90:9, 109:9, 111:15, 124:3
**issue** [40] - 3:10, 4:1, 4:3, 4:4, 11:24, 13:20, 45:16, 48:20, 77:17, 86:5, 87:22, 88:2, 88:14, 89:3, 90:22, 94:16, 94:17, 94:18, 94:20, 101:10, 101:22, 101:23, 102:17, 102:18, 102:21, 104:15, 105:16, 106:10, 106:13, 106:14, 112:7, 114:18, 115:9, 118:16, 125:24, 130:14, 135:7
**issued** [1] - 135:8
**issuer** [1] - 11:16
**issues** [11] - 22:22, 84:1, 86:2, 91:6, 91:23, 107:10, 107:21, 112:24, 124:22, 124:23, 131:3
**IT** [1] - 15:24
**italicized** [2] - 26:11, 36:19
**Item** [3] - 109:16, 109:25, 132:12
**item** [22] - 10:6, 10:9, 11:15, 23:6, 23:9, 62:5, 71:25, 90:15, 94:4, 96:6, 96:8, 108:25, 110:8, 111:6, 111:11, 111:12, 111:25, 112:5, 112:16, 124:11, 124:18
**items** [4] - 59:21, 86:8, 110:10, 110:15
**itself** [4] - 53:14, 61:5, 76:17, 131:14

**J**

**January** [17] - 17:11, 18:14, 40:9, 40:19, 41:11, 41:12, 42:2, 43:5, 44:3, 45:9,

50:13, 95:1, 95:11, 95:14, 95:21, 116:14, 116:15
**Jeff** [1] - 20:8
**JEFFREY** [1] - 1:22
**Jeffrey** [1] - 2:19
**JERSEY** [1] - 1:1
**Jersey** [6] - 1:9, 16:8, 16:9, 16:12, 134:4, 134:6
**jinnee** [1] - 105:15
**job** [1] - 63:20
**John** [2] - 1:9, 2:4
**JOHN** [1] - 1:14
**Johnson** [2] - 135:4
**Jones** [1] - 56:1
**Josh** [1] - 2:12
**JOSHUA** [1] - 1:19
**judge** [1] - 65:20
**JUDGE** [1] - 1:11
**Judge** [5] - 44:16, 47:5, 52:10, 57:24, 121:24
**judgment** [7] - 4:13, 33:12, 33:16, 33:25, 116:20, 116:22, 118:18
**Judgment** [1] - 121:7
**judicial** [1] - 21:18
**July** [2] - 37:17, 59:7
**June** [1] - 37:16
**justifiable** [1] - 65:6
**JUSTIN** [1] - 1:15
**juxtapose** [1] - 88:11
**juxtaposing** [2] - 101:7
**juxtaposition** [2] - 90:18, 98:12

**K**

**keep** [2] - 13:23, 123:20
**Kerr** [18] - 6:16, 6:17, 7:17, 7:19, 87:16, 88:12, 92:2, 92:9, 92:11, 93:3, 93:4, 93:8, 98:11, 98:19, 98:22, 115:1, 128:17, 128:20
**Kerr's** [5] - 7:16, 7:25, 13:16, 88:1, 90:18
**Kevin** [2] - 14:15, 14:22
**KEVIN** [1] - 14:18
**key** [2] - 19:19, 43:16
**kind** [3] - 37:13, 61:8, 104:3

**kinds** [1] - 40:21
**Kiper** [10] - 8:24, 9:5, 9:10, 9:14, 9:22, 23:24, 24:2, 24:23, 116:2, 116:3
**knock** [1] - 121:20
**knowing** [1] - 130:5
**knowledge** [2] - 26:20, 28:14
**known** [1] - 107:13
**knows** [1] - 90:3
**Koppic** [2] - 40:10, 41:3, 95:23
**Koppic's** [3] - 41:14, 41:17, 95:22
**Kopyt** [21] - 40:14, 40:15, 40:19, 41:10, 41:21, 42:10, 42:23, 43:13, 43:17, 44:15, 47:5, 47:8, 81:17, 95:16, 97:16, 117:16, 120:7, 120:9, 130:19, 130:22, 130:25
**Kopyt's** [4] - 42:21, 45:10, 46:3, 47:8
**KUGLER** [1] - 1:11

**L**

**labeled** [5] - 30:25, 34:4, 36:18, 40:6, 47:20
**labelling** [1] - 88:2
**lack** [6] - 27:13, 31:11, 32:1, 67:4, 90:17, 96:22
**laid** [3] - 112:8, 112:10, 112:11
**language** [3] - 81:19, 116:17, 128:15
**larger** [1] - 88:6
**largest** [4] - 16:11, 113:5, 115:18, 117:1
**last** [30] - 9:21, 14:23, 16:16, 16:18, 24:25, 33:10, 35:18, 35:19, 36:6, 39:18, 53:21, 57:5, 66:8, 67:14, 69:1, 74:13, 74:20, 75:12, 83:11, 90:14, 96:20, 97:8, 102:8, 103:23, 114:12, 116:15, 119:15, 120:6, 127:6
**lasts** [2] - 104:9, 108:17
**latched** [1] - 114:19
**late** [1] - 39:5
**laundry** [1] - 124:1

**law** [20] - 3:2, 7:13, 13:10, 31:17, 46:21, 65:7, 105:17, 105:24, 108:5, 111:17, 113:12, 126:25, 128:8, 129:17, 129:23, 130:1, 133:11, 133:22, 134:21, 134:22
**Law** [1] - 44:5
**laws** [1] - 117:13
**lawsuit** [1] - 89:18
**lead** [2] - 90:20, 103:16
**leads** [1] - 102:3
**learn** [1] - 126:4
**least** [8] - 19:9, 27:22, 28:3, 57:2, 66:21, 71:19, 114:12, 127:6
**leave** [1] - 83:13
**led** [2] - 103:10, 130:10
**left** [2] - 82:18, 120:9
**legal** [4] - 31:14, 89:12, 89:20, 90:6
**LEGION** [1] - 1:6
**Legion** [45] - 12:4, 12:21, 13:8, 13:11, 17:21, 18:17, 19:5, 22:5, 23:12, 23:25, 24:2, 24:3, 24:6, 24:14, 24:17, 25:3, 25:5, 25:21, 31:5, 33:21, 37:4, 49:1, 51:20, 52:1, 57:12, 59:2, 72:1, 78:21, 79:1, 79:9, 79:17, 80:4, 80:8, 83:19, 91:8, 91:14, 94:3, 115:13, 116:9, 117:19, 121:20, 122:14, 124:19, 129:11
**Legion's** [2] - 78:18, 79:8
**Leon** [1] - 57:6
**Leonetti** [1] - 25:6
**less** [13] - 9:11, 9:13, 12:13, 25:12, 75:1, 96:22, 97:7, 97:14, 97:18, 98:6, 98:10, 100:25, 135:21
**letter** [36] - 34:20, 34:21, 34:23, 41:10, 41:11, 41:18, 41:22, 41:24, 43:20, 45:7, 45:8, 45:9, 45:10, 46:3, 47:8, 47:10, 47:14, 62:6, 62:7,

64:5, 64:23, 65:1, 72:1, 73:25, 81:16, 81:23, 81:24, 82:1, 82:3, 82:5, 95:14, 120:7, 120:8, 120:10, 130:19, 130:24

**letters** [3] - 45:22, 64:17, 65:5

**level** [2] - 42:17, 81:7

**levels** [2] - 49:7

**LEWIS** [1] - 1:14

**Lewis** [3] - 2:4, 2:6, 55:22

**lie** [1] - 50:9

**LIEPE** [3] - 31:13, 71:4, 71:13

**lies** [1] - 136:1

**likelihood** [8] - 108:3, 127:11, 127:14, 127:17, 127:20, 132:8, 135:10, 136:5

**likely** [1] - 133:8, 133:21

**line** [2] - 20:22, 66:8

**Lionetti** [1] - 23:16

**liquidate** [1] - 118:5

**liquidates** [1] - 94:11

**liquidity** [5] - 25:11, 27:23, 80:2, 80:6

**list** [2] - 110:10, 124:1

**litigating** [1] - 107:6

**LLP** [4] - 1:14, 1:17, 1:21, 2:9

**located** [1] - 16:7

**Lone** [11] - 90:4, 106:1, 122:24, 123:1, 123:2, 125:15, 125:20, 134:13, 135:25

**look** [21] - 10:3, 22:17, 38:19, 50:1, 66:6, 66:7, 69:20, 70:10, 70:20, 71:23, 74:5, 74:17, 76:25, 80:17, 83:15, 101:14, 114:20, 117:25, 123:24, 127:9, 131:14

**looked** [3] - 66:25, 74:24, 114:19

**looking** [9] - 11:12, 37:9, 37:10, 39:7, 44:24, 69:24, 70:16, 74:25, 113:3

**looks** [2] - 93:21, 123:15

**lose** [2] - 93:20, 126:4

**loss** [1] - 132:25

**lost** [2] - 43:19, 87:3

**low** [2] - 74:20, 75:4

**lower** [6] - 16:5, 39:20, 76:18, 100:12, 100:14, 132:19

**lowering** [1] - 110:25

**lowest** [1] - 74:13

**loyalties** [3] - 91:19, 91:20, 129:20

**lunch** [1] - 76:1

**luncheon** [1] - 76:4

## M

**m-i-l-l-e-r** [1] - 14:24

**M20** [5] - 23:13, 23:14, 23:16, 23:22, 24:5

**M2O** [1] - 25:6

**ma'am** [1] - 33:9

**magical** [1] - 94:14

**main** [1] - 48:21

**major** [5] - 27:22, 49:8, 64:16, 122:21

**majority** [1] - 27:24

**managed** [1] - 78:17

**management** [9] - 25:10, 57:4, 63:18, 64:4, 64:21, 66:3, 66:15, 112:3, 113:8

**manager** [1] - 79:9

**managing** [2] - 115:15, 115:18

**mandatory** [1] - 115:21

**March** [2] - 9:9, 54:24

**mark** [3] - 70:9, 71:13, 71:14

**marked** [4] - 17:15, 18:10, 71:25, 85:1

**MARKED** [1] - 71:16

**markedly** [1] - 12:13

**market** [3] - 16:20, 25:8, 118:7

**marketplace** [1] - 4:12

**markets** [1] - 36:2

**Material** [1] - 55:11

**material** [19] - 35:22, 44:4, 45:5, 46:1, 46:9, 54:11, 86:19, 95:7, 95:8, 106:9, 114:14, 119:12, 122:1, 127:11, 129:23, 129:24, 130:13, 132:7, 133:18

**materiality** [1] - 127:10

**materially** [1] - 136:2

**materials** [34] - 48:5, 54:18, 58:1, 58:14, 60:20, 62:7, 62:8, 63:11, 64:15, 67:2, 68:12, 70:17, 71:20, 73:17, 73:23, 74:3, 77:2, 77:4, 77:6, 77:8, 77:11, 78:1, 80:25, 81:15, 83:10, 84:23, 85:3, 86:25, 91:5, 94:12, 106:21, 114:3, 118:22, 125:12

**matter** [16] - 3:10, 3:11, 3:16, 4:5, 4:20, 4:17, 13:10, 43:1, 46:17, 65:7, 65:8, 87:3, 89:20, 126:24, 136:8, 136:17

**matters** [9] - 3:21, 4:17, 33:12, 33:16, 34:1, 87:15, 88:3, 113:17, 114:5

**McClellan** [1] - 16:8

**McConnell** [2] - 23:20, 80:5

**MCGAHREN** [7] - 1:14, 2:4, 3:6, 3:17, 11:11, 71:5, 136:14

**McGahren** [1] - 2:4

**mean** [13] - 5:14, 18:17, 28:16, 43:1, 47:2, 70:12, 79:21, 79:23, 93:16, 93:19, 103:20, 104:11, 134:21

**meaning** [2] - 60:21, 64:8

**meaningful** [8] - 40:13, 43:7, 81:6, 96:12, 96:22, 98:4, 98:17, 100:10

**means** [10] - 61:23, 75:2, 90:1, 117:11, 117:13, 119:22, 128:19, 128:20, 129:3, 132:18

**measurement** [1] - 38:21

**meeting** [13] - 17:22, 40:11, 41:11, 48:7, 48:8, 48:10, 48:13, 53:24, 111:1, 122:13, 122:17, 122:19, 122:20

**meetings** [1] - 132:20

**meets** [1] - 31:16

**melt** [1] - 36:1

**member** [11] - 6:15,

12:1, 12:22, 27:20, 29:11, 86:11, 86:20, 86:25, 91:11, 128:21

**members** [5] - 9:2, 32:11, 49:16, 129:1, 129:5

**mentioned** [2] - 122:24, 124:13

**Merck** [1] - 135:4

**merger** [1] - 134:9

**mergers** [1] - 50:21

**meritorious** [1] - 108:3

**merits** [5] - 4:14, 108:4, 127:2, 133:11, 136:6

**meshes** [1] - 85:25

**met** [1] - 131:4

**methodology** [1] - 72:24

**microphone** [1] - 15:1

**mid** [1] - 16:25

**middle** [8] - 26:12, 32:10, 34:7, 37:17, 81:4, 103:5

**might** [10] - 4:11, 36:10, 39:19, 72:5, 95:25, 118:11, 118:15, 124:1, 124:24, 133:5

**Miller** [57] - 8:14, 10:21, 14:1, 14:15, 14:16, 14:22, 14:25, 15:16, 17:13, 17:17, 18:9, 18:11, 18:13, 20:8, 23:4, 25:18, 25:20, 26:6, 30:3, 30:11, 30:19, 31:25, 32:7, 36:6, 40:1, 41:1, 47:18, 51:19, 51:21, 52:17, 53:12, 54:5, 54:10, 54:17, 54:23, 55:3, 55:9, 56:11, 57:19, 58:1, 76:8, 76:12, 83:17, 84:10, 84:24, 95:12, 102:8, 103:1, 103:22, 108:14, 115:10, 116:10, 116:11, 120:7, 130:20, 131:10, 135:18

**MILLER** [3] - 14:18, 14:20, 57:25

**Miller's** [2] - 84:24, 101:25

**million** [16] - 5:16, 8:9, 9:24, 10:4, 16:18, 16:19, 34:10, 35:4, 35:8, 35:20, 81:9,

102:4, 103:10, 115:14, 115:15, 130:9

**mind** [3] - 29:11, 29:14, 120:14

**minor** [1] - 135:22

**minority** [1] - 115:7

**minute** [3] - 44:13, 94:21, 94:23

**minutes** [1] - 126:8

**mis** [1] - 72:25

**misimpressions** [1] - 45:10

**mislead** [1] - 97:11

**Mislead** [1] - 76:22

**misleading** [53] - 5:5, 5:8, 5:13, 7:2, 7:10, 7:12, 8:1, 35:12, 37:19, 37:20, 37:21, 38:6, 56:23, 58:2, 58:9, 69:6, 69:14, 69:18, 72:25, 75:17, 80:21, 81:12, 81:24, 82:10, 88:14, 88:21, 89:8, 89:16, 89:19, 89:24, 90:7, 90:18, 98:1, 98:5, 101:20, 101:23, 102:19, 102:21, 102:22, 104:21, 106:22, 108:22, 123:2, 125:18, 125:23, 130:12, 131:10, 131:23, 132:5, 134:19, 135:13, 136:2

**misrepresentations** [1] - 133:18

**Miss** [2] - 13:25, 87:13

**miss** [2] - 19:17, 36:11

**misses** [2] - 61:25

**missing** [1] - 60:7

**misspoke** [1] - 52:6

**misstated** [2] - 113:12, 130:12

**misstatement** [3] - 119:20, 122:2, 129:24

**mistaken** [1] - 17:12

**misunderstood** [1] - 103:2

**Mitchell** [1] - 1:8

**mix** [3] - 113:14, 127:22, 133:14

**modesty** [1] - 104:24

**moment** [5] - 52:10, 52:23, 55:12, 62:23, 86:4, 88:9, 96:12

**money** [4] - 23:19, 57:13, 79:12, 79:17, 79:21, 79:22, 79:23,

80:1, 115:12, 115:13, 117:17, 117:19, 118:2, 118:9
**month** [1] - 37:17
**months** [10] - 28:5, 28:8, 29:24, 37:18, 38:2, 57:5, 67:14, 68:5, 70:11
**moot** [1] - 109:4
**moreover** [1] - 10:2
**MORGAN** [1] - 1:14
**Morgan** [2] - 2:4, 2:6
**morning** [14] - 2:8, 2:12, 2:21, 5:7, 20:8, 39:21, 61:14, 85:15, 86:12, 88:24, 91:12, 95:19, 115:25, 120:9
**most** [2] - 70:9, 74:17
**motion** [3] - 85:22, 95:23, 108:17
**motions** [2] - 2:24, 3:7
**motive** [1] - 104:23
**move** [8] - 28:4, 30:3, 50:10, 52:9, 64:18, 70:11, 121:7, 133:20
**moved** [2] - 123:10, 124:6
**moves** [4] - 18:2, 18:23, 26:1, 42:4
**moving** [7] - 22:21, 30:5, 30:6, 32:8, 127:1, 127:3, 127:5
**MP11** [1] - 34:3
**MR** [198] - 2:4, 2:8, 2:12, 2:16, 2:19, 3:4, 3:6, 3:17, 3:25, 4:9, 5:2, 5:20, 6:2, 6:9, 6:13, 6:23, 6:25, 7:15, 8:10, 9:2, 9:7, 9:16, 9:19, 9:25, 10:6, 10:9, 10:13, 10:18, 10:21, 10:24, 11:3, 11:7, 11:11, 11:14, 11:17, 12:18, 13:25, 14:7, 18:5, 19:1, 19:21, 20:5, 20:7, 21:15, 21:23, 22:11, 22:16, 22:20, 22:23, 25:13, 25:16, 26:3, 26:19, 27:2, 30:8, 30:10, 30:13, 31:12, 31:13, 34:15, 34:17, 37:1, 40:20, 42:8, 42:15, 42:19, 44:11, 44:16, 44:22, 45:1, 45:4, 45:7, 45:14, 45:20, 45:24, 47:1, 51:3,

51:5, 52:10, 52:13, 53:7, 53:10, 54:13, 54:19, 54:25, 55:6, 55:12, 55:16, 55:23, 56:2, 56:6, 57:21, 57:24, 57:25, 61:2, 61:4, 61:12, 61:15, 62:12, 62:15, 62:21, 63:7, 64:18, 65:20, 68:9, 68:24, 71:4, 71:5, 71:6, 71:13, 71:14, 72:3, 72:12, 72:14, 76:3, 76:10, 83:16, 84:7, 84:17, 84:21, 85:11, 85:13, 86:22, 87:2, 87:10, 88:8, 92:1, 92:7, 92:14, 92:18, 92:22, 92:25, 93:6, 93:10, 93:15, 93:18, 94:23, 94:25, 96:9, 96:11, 96:16, 96:19, 97:1, 97:2, 97:3, 97:4, 97:15, 97:20, 97:23, 98:24, 99:4, 99:9, 99:15, 99:25, 100:16, 100:22, 101:5, 102:16, 103:3, 103:8, 104:4, 104:8, 104:13, 104:24, 105:10, 105:24, 106:8, 106:20, 108:21, 109:7, 109:12, 109:20, 109:24, 110:7, 110:13, 110:17, 110:20, 110:23, 111:4, 111:8, 111:20, 111:21, 111:24, 112:16, 112:19, 112:22, 117:7, 117:12, 117:25, 121:24, 122:8, 123:1, 123:16, 125:3, 126:12, 136:11, 136:14, 136:15
**MS** [57] - 2:6, 2:22, 14:15, 14:20, 15:3, 15:7, 15:9, 15:13, 15:15, 18:2, 18:23, 18:25, 19:19, 21:16, 22:6, 23:2, 26:1, 27:8, 30:6, 30:12, 31:18, 31:22, 31:24, 40:23, 42:4, 43:3, 43:10, 43:23, 44:1, 45:25, 46:3, 46:6, 46:12, 46:20, 46:24, 52:9, 53:5, 54:4, 54:8, 54:16, 54:22, 55:3, 55:9, 55:19, 56:1,

56:5, 56:9, 57:18, 62:18, 63:4, 71:2, 72:13, 84:9, 84:12, 84:15, 85:5, 136:16
**Ms.Fay** [1] - 30:2
**multiple** [4] - 48:22, 49:2, 81:19, 113:23
**must** [4] - 80:2, 95:8, 127:19, 128:20

## N

**NAD** [1] - 132:12
**name** [4] - 2:12, 14:21, 14:23, 20:8
**names** [1] - 130:5
**Nami** [1] - 1:25
**NASDAQ** [1] - 16:21
**naturally** [1] - 134:8
**nature** [1] - 4:25
**necessarily** [3] - 65:9, 116:6, 117:23
**necessary** [4] - 21:20, 26:13, 26:22, 58:16
**need** [14] - 89:25, 91:24, 92:4, 94:8, 94:21, 94:23, 101:1, 107:2, 110:11, 111:16, 126:7, 133:19, 135:5, 136:7
**needs** [5] - 89:9, 109:10, 110:5, 110:7, 118:17
**negative** [1] - 128:19
**negotiation** [1] - 50:6
**net** [1] - 117:9
**never** [35] - 4:18, 7:19, 27:16, 27:17, 27:18, 35:14, 38:20, 44:19, 44:21, 45:17, 45:18, 45:22, 46:18, 49:24, 60:4, 60:8, 60:19, 69:7, 70:10, 70:12, 70:13, 86:18, 86:24, 94:12, 98:22, 98:24, 114:17, 120:15, 123:16, 128:3, 128:5, 130:10, 130:21
**NEW** [1] - 1:1
**new** [4] - 89:13, 119:12, 123:8, 134:2
**New** [6] - 1:9, 16:8, 16:9, 16:12, 134:4, 134:5
**news** [1] - 90:5
**next** [11] - 19:19,

19:22, 44:23, 65:19, 73:3, 87:14, 90:22, 94:20, 96:6, 101:10, 123:9
**Nicole** [1] - 2:22
**NICOLE** [1] - 1:21
**nine** [2] - 84:25, 104:2
**nitpicking** [1] - 115:3
**nobody** [2] - 93:21, 107:2
**nominate** [1] - 17:7
**nominating** [1] - 17:21
**nomination** [1] - 17:11
**nominee** [6] - 7:4, 7:5, 7:8, 61:19, 101:3, 114:22
**nominee's** [1] - 85:18
**nominees** [35] - 26:12, 26:21, 32:11, 33:11, 33:24, 48:11, 49:3, 49:13, 51:14, 53:15, 53:23, 54:1, 58:14, 88:12, 93:6, 99:18, 99:20, 100:23, 101:2, 109:13, 109:21, 113:6, 114:21, 114:22, 114:23, 121:21, 124:3, 124:4, 124:5, 124:7, 128:23, 129:4, 129:6, 132:15
**Nominees** [1] - 110:9
**nominees'** [1] - 5:4
**non** [1] - 127:5
**non-moving** [1] - 127:5
**none** [3] - 28:13, 80:10, 131:9
**nonresponsive** [1] - 64:19
**normal** [2] - 101:14, 136:9
**Northway** [1] - 127:23
**note** [4] - 48:11, 73:10, 112:23, 114:6
**noted** [2] - 133:6, 134:14
**nothing** [7] - 29:3, 114:1, 119:6, 130:11, 130:12, 132:5, 136:11
**notice** [4] - 21:18, 93:15, 126:19, 133:4
**noticed** [1] - 17:22
**notified** [1] - 17:6
**notwithstanding** [1]

- 68:3
**Novarkis** [1] - 135:3
**November** [9] - 1:10, 38:25, 39:6, 39:7, 52:8, 54:18, 55:5, 109:9
**number** [20] - 10:16, 17:17, 35:21, 35:22, 38:18, 53:14, 61:5, 63:1, 72:18, 73:12, 76:17, 85:14, 95:10, 95:11, 98:8, 98:9, 100:25, 103:2, 107:21, 109:7
**NUMBER** [1] - 1:4
**numbering** [4] - 20:13, 45:2, 58:13, 72:15
**numbers** [4] - 15:9, 79:24, 82:20, 82:21
**nurses** [1] - 16:4

## O

**O'Brien** [1] - 2:13
**O'BRIEN** [1] - 1:19
**O'Connell** [22] - 5:17, 11:22, 12:4, 12:8, 23:15, 23:16, 23:17, 24:4, 25:6, 25:7, 78:17, 79:12, 91:2, 91:9, 91:13, 91:20, 101:15, 115:23, 124:19, 124:24, 125:9
**O'Connell's** [1] - 13:12
**O'Connells** [2] - 94:3, 115:12
**oath** [4] - 20:1, 21:1, 71:12, 95:24
**object** [6] - 19:2, 22:1, 22:13, 27:2, 42:8, 47:1
**objected** [1] - 47:2
**objection** [31] - 18:4, 18:5, 18:24, 19:2, 25:13, 26:2, 26:19, 30:7, 30:13, 30:14, 31:12, 31:13, 34:15, 34:16, 37:1, 40:20, 47:7, 47:13, 51:3, 52:13, 53:7, 54:13, 54:19, 54:25, 55:6, 55:16, 55:23, 56:2, 56:6, 63:3, 65:7
**objections** [5] - 30:9, 40:21, 42:7, 62:17, 85:4

**objective** [12] - 11:25, 27:21, 28:1, 28:3, 28:5, 28:21, 29:7, 29:9, 29:22, 67:11, 125:11, 125:13
**objectively** [14] - 12:10, 12:22, 12:23, 13:9, 91:6, 91:10, 91:22, 94:4, 124:16, 124:20, 124:21, 124:23, 125:2, 125:7
**objectivity** [6] - 26:13, 26:22, 28:17, 28:20, 29:19, 29:20
**obligation** [1] - 4:21
**obligations** [5] - 12:4, 12:5, 91:8, 125:14
**observe** [1] - 41:14
**obviously** [2] - 49:19, 78:25
**occasions** [1] - 49:2
**occupy** [1] - 83:22
**occur** [3] - 108:5, 133:4, 134:13
**occurred** [8] - 35:23, 82:18, 82:22, 82:23, 83:2, 83:12, 101:18
**occurs** [2] - 80:6, 91:4
**October** [5] - 25:25, 37:8, 54:12, 62:9, 73:7
**OF** [3] - 1:1, 14:20, 57:25
**offer** [13] - 28:9, 45:9, 47:2, 62:12, 62:22, 62:24, 72:4, 84:22, 95:13, 95:17, 118:6, 119:9, 119:11
**offered** [7] - 19:3, 28:6, 49:23, 49:25, 72:7, 120:7
**offering** [3] - 19:20, 21:18, 85:20
**office** [1] - 16:11
**officer** [8] - 14:1, 15:17, 35:10, 38:15, 40:15, 41:13, 50:15, 56:11
**offs** [23] - 34:11, 35:5, 35:20, 36:2, 80:22, 81:10, 82:8, 82:12, 82:23, 83:2, 83:6, 83:11, 102:2, 102:4, 102:15, 103:6, 103:10, 103:11, 103:16, 119:14, 132:1, 132:4
**often** [2] - 38:3,

41:16
**old** [4] - 5:15, 63:18, 64:3, 120:16
**OLSHAN** [1] - 1:21
**Olshan** [3] - 2:16, 2:19, 2:22
**omission** [8] - 29:15, 44:5, 46:1, 88:15, 89:25, 90:17, 129:23, 132:7
**omissions** [6] - 5:6, 5:9, 5:14, 64:16, 106:22, 130:13
**omit** [1] - 19:6
**omits** [2] - 35:22, 35:24
**omitted** [10] - 43:17, 86:16, 86:17, 88:21, 113:13, 127:10, 127:14, 127:17, 127:20, 131:23
**omitting** [2] - 38:11
**on-line** [1] - 20:22
**once** [2] - 25:11, 112:24
**One** [2] - 1:9, 24:22
**one** [91] - 4:16, 6:17, 7:6, 7:9, 7:18, 9:5, 9:11, 9:13, 11:12, 15:22, 17:15, 17:17, 19:1, 19:4, 19:9, 19:22, 22:3, 24:16, 34:10, 35:4, 35:18, 36:17, 37:5, 37:10, 38:18, 38:22, 41:19, 47:4, 48:10, 49:7, 52:10, 52:14, 52:19, 55:12, 55:19, 56:20, 56:25, 58:8, 60:18, 62:14, 62:16, 62:22, 62:24, 63:1, 63:5, 63:10, 65:14, 70:10, 70:22, 72:3, 72:5, 72:7, 74:12, 77:8, 77:17, 83:23, 84:3, 84:4, 86:9, 88:19, 95:10, 95:11, 96:23, 97:7, 97:14, 97:18, 100:25, 102:8, 103:23, 103:25, 104:9, 104:18, 106:12, 106:14, 109:7, 113:11, 114:18, 116:14, 116:15, 119:20, 119:25, 122:15, 122:22, 127:7, 131:6, 134:2, 134:13, 135:20
**ones** [2] - 64:5, 64:6
**ongoing** [4] - 102:5,

102:6, 102:12, 102:13
**onus** [1] - 89:10
**Open** [1] - 76:6
**open** [4] - 17:13, 17:18, 119:21, 126:14
**opened** [1] - 18:12
**opening** [1] - 112:8
**operate** [1] - 57:8
**operates** [1] - 6:6
**operating** [1] - 88:6
**operational** [3] - 27:19, 88:10, 94:5
**opinion** [20] - 26:24, 26:25, 27:3, 27:5, 27:10, 29:8, 29:21, 31:16, 31:19, 36:5, 37:2, 58:6, 59:24, 60:22, 65:7, 65:8, 68:6, 68:7, 129:7
**opportunities** [2] - 26:14, 26:23
**opportunity** [5] - 19:25, 93:23, 105:14, 120:5, 123:17
**opposed** [4] - 91:14, 91:21, 107:24, 122:15
**opposing** [2] - 89:17, 113:12
**opposite** [1] - 104:8
**opposition** [1] - 6:5
**Order** [2] - 3:9, 136:10
**order** [2] - 118:4, 134:1
**ordered** [1] - 123:8
**ordering** [1] - 134:12
**organization** [1] - 112:2
**organizational** [1] - 94:7
**original** [1] - 77:24
**originally** [1] - 124:8
**otherwise** [4] - 4:18, 71:11, 134:7, 134:23
**ought** [3] - 100:9, 125:5
**outcome** [4] - 121:15, 121:18, 122:13, 125:25
**outcomes** [1] - 122:16
**outset** [1] - 114:17
**outstanding** [7] - 9:12, 9:14, 96:23, 97:7, 97:14, 97:18, 126:18
**overrule** [1] - 47:13
**overture** [1] - 96:3
**overturn** [1] - 107:6
**own** [15] - 4:13, 8:18,

80:17, 91:24, 97:7, 97:11, 97:13, 97:17, 113:16, 117:14, 118:18, 118:21, 119:13, 119:17, 130:6
**owned** [2] - 9:10, 9:12
**owners** [1] - 24:1
**ownership** [28] - 5:4, 5:24, 8:4, 8:11, 8:16, 8:25, 9:15, 10:4, 11:20, 11:21, 12:24, 96:22, 98:4, 98:17, 99:19, 101:8, 112:24, 114:25, 115:20, 115:24, 116:5, 116:6, 116:8, 117:1, 124:25
**owning** [1] - 96:22
**owns** [7] - 5:15, 5:16, 8:8, 32:20, 98:2, 117:16

## P

**P-1** [2] - 18:3, 18:6
**P-10** [1] - 70:24
**P-11** [1] - 25:20, 26:4, 26:6, 32:5, 33:5, 40:5, 47:18, 68:22, 80:24, 103:3, 129:18
**P-12** [2] - 54:10, 54:14
**P-13** [12] - 34:4, 54:16, 71:25, 72:12, 72:13, 72:14, 72:17, 76:16, 87:6, 96:25, 97:2, 131:16
**P-14** [3] - 30:19, 30:21, 130:7
**P-15** [2] - 85:2, 96:19
**P-16** [5] - 52:9, 76:15, 76:16, 109:8, 131:17
**P-17** [1] - 85:2
**P-18** [13] - 18:10, 18:13, 20:4, 20:10, 20:15, 20:16, 20:24, 22:10, 22:15, 22:24, 23:4, 50:11
**P-19** [5] - 22:9, 22:12, 22:24, 24:11, 24:13
**P-2** [5] - 41:9, 41:10, 42:5, 46:3, 46:24
**P-20** [1] - 54:22
**P-21** [1] - 55:3
**P-22** [1] - 55:9
**P-23** [1] - 85:2
**P-24** [1] - 55:22

**P-25** [1] - 56:1
**P-26** [1] - 56:5
**Page** [4] - 26:7, 26:10, 58:12, 97:4
**page** [91] - 5:25, 8:13, 8:14, 9:21, 10:7, 10:9, 10:11, 10:12, 11:5, 11:8, 11:12, 12:17, 20:13, 20:16, 21:13, 22:17, 23:4, 23:5, 23:6, 24:16, 25:1, 25:2, 26:6, 26:8, 26:12, 30:25, 31:1, 32:5, 32:6, 33:7, 34:4, 36:17, 36:18, 40:6, 43:13, 43:25, 44:23, 47:20, 53:12, 53:13, 53:14, 58:10, 63:14, 65:22, 66:7, 66:8, 68:11, 68:22, 68:23, 72:18, 73:3, 73:4, 74:5, 76:18, 76:20, 76:25, 77:2, 81:1, 81:5, 81:23, 83:3, 87:7, 96:19, 96:20, 96:25, 103:3, 105:18, 106:2, 109:13, 111:6, 111:13, 112:16, 112:17, 128:15, 128:17, 128:23, 129:13, 129:15, 129:19, 130:7, 131:16, 131:20, 132:10, 132:14
**pages** [4] - 58:18, 89:5, 89:23, 111:9
**pagination** [1] - 132:11
**paginations** [1] - 11:12
**paid** [2] - 25:5, 80:1
**paper** [1] - 98:8
**papers** [5] - 3:10, 5:6, 7:24, 108:15, 110:2
**parade** [1] - 90:13
**paragraph** [26] - 9:5, 9:7, 9:21, 9:22, 31:3, 32:7, 32:10, 33:10, 35:24, 38:5, 68:25, 69:1, 69:5, 69:8, 69:11, 81:15, 83:12, 87:11, 87:14, 87:20, 87:23, 88:5, 97:5, 103:5, 128:16, 128:22
**paragraphs** [2] - 112:5, 115:4
**parcel** [1] - 108:21, 108:22
**pardon** [1] - 94:22

**parens** [1] - 32:12
**Parsippany** [1] - 16:12
**part** [22] - 7:2, 7:12, 19:7, 19:21, 22:10, 24:1, 34:18, 43:16, 49:4, 49:14, 78:22, 87:3, 88:4, 91:1, 95:22, 98:13, 105:11, 108:21, 108:22, 109:10, 110:11, 130:17
**partial** [4] - 12:19, 13:14, 13:16, 13:19
**participants** [2] - 107:9, 112:25
**participation** [4] - 116:5, 116:8, 116:9, 117:8
**particular** [3] - 35:24, 81:23, 93:7
**particularly** [1] - 129:18
**parties** [9] - 4:17, 23:11, 65:4, 85:3, 85:19, 85:23, 111:25, 133:22, 135:5
**Partner** [1] - 94:3
**partner** [1] - 23:14
**partners** [1] - 25:6
**Partners** [27] - 12:4, 12:21, 13:8, 13:11, 18:17, 19:5, 22:5, 23:25, 24:2, 24:3, 24:4, 24:6, 24:15, 31:5, 33:21, 37:4, 49:1, 51:20, 52:1, 59:3, 78:18, 78:21, 83:19, 91:9, 91:14, 124:19
**PARTNERS** [1] - 1:6
**party** [5] - 47:12, 89:17, 127:1, 127:3, 127:5
**patently** [1] - 49:8
**path** [1] - 105:5
**patience** [1] - 123:18
**pattern** [1] - 104:7
**pause** [2] - 52:12, 55:15
**pay** [1] - 25:7
**pecuniary** [2] - 8:19, 125:8
**pending** [2] - 2:17, 2:20
**Pennsauken** [1] - 16:8
**Pennsylvania** [2] - 59:11, 113:24
**people** [9] - 16:13,

57:8, 60:5, 118:23, 119:16, 119:17, 122:15, 125:23, 129:5
**per** [2] - 25:8, 123:5
**percent** [27] - 9:11, 9:13, 12:2, 13:5, 25:8, 25:12, 25:14, 25:15, 39:1, 39:3, 39:9, 39:13, 50:18, 57:5, 73:11, 78:7, 80:3, 91:18, 96:23, 97:7, 97:14, 97:18, 100:25, 110:4, 116:25
**perfect** [1] - 121:1
**perfectly** [2] - 119:25, 121:1
**performance** [45] - 25:10, 34:9, 34:25, 35:3, 35:6, 36:20, 36:24, 37:18, 38:1, 38:18, 38:19, 38:23, 40:3, 68:13, 68:25, 69:10, 69:16, 69:20, 70:3, 70:9, 70:15, 73:7, 73:11, 73:12, 74:4, 74:13, 74:19, 74:21, 77:19, 77:22, 77:23, 78:3, 78:22, 81:8, 101:9, 101:11, 101:15, 113:6, 113:17, 119:7, 119:13, 130:3, 131:8, 131:21, 131:23
**performed** [1] - 119:24
**performing** [1] - 37:10
**performs** [1] - 15:23
**perhaps** [2] - 57:6, 129:10
**period** [14] - 35:5, 37:5, 70:16, 73:13, 75:18, 75:19, 78:7, 82:17, 100:15, 101:14, 102:15, 119:25, 131:12, 131:13
**permit** [6] - 15:10, 20:3, 27:14, 27:15, 42:25, 133:12
**person** [6] - 61:23, 89:8, 106:12, 122:15, 133:4
**personal** [6] - 8:19, 27:5, 67:10, 67:19, 83:17, 83:19
**personally** [1] - 24:24
**persons** [1] - 8:15
**persuade** [1] -

100:22
**persuasive** [1] - 134:23
**pertains** [1] - 82:4
**Philadelphia** [1] - 113:24
**phone** [1] - 47:6
**phrase** [2] - 114:18, 114:20
**pick** [3] - 37:5, 69:23, 70:2
**picked** [5] - 37:11, 49:12, 122:7, 122:8, 131:12
**picking** [3] - 37:22, 69:19
**picks** [3] - 70:7, 75:17, 75:19
**piece** [2] - 22:6, 82:17, 100:3
**pieces** [1] - 6:2
**Pierstead** [1] - 72:21
**pill** [7] - 12:2, 13:4, 91:17, 118:12, 118:14, 118:15, 124:18
**place** [6] - 12:2, 36:2, 81:18, 114:9, 120:14, 123:7
**places** [1] - 82:7
**plaintiff** [35] - 2:5, 2:7, 3:8, 3:19, 3:20, 18:2, 18:23, 30:10, 42:4, 72:7, 126:23, 127:7, 127:25, 128:14, 128:18, 130:14, 131:3, 131:4, 131:11, 131:14, 132:8, 132:22, 133:10, 133:21, 133:22, 134:6, 134:21, 134:23, 134:25, 135:6, 135:9, 135:11, 135:14, 135:25
**Plaintiff** [1] - 26:1
**PLAINTIFF** [14] - 18:7, 23:1, 26:5, 30:17, 53:9, 54:15, 54:21, 55:2, 55:8, 55:18, 55:25, 56:4, 56:8, 85:9
**Plaintiff's** [22] - 3:10, 3:15, 17:13, 17:15, 25:19, 30:4, 58:11, 68:10, 76:12, 80:24, 85:2, 85:6, 85:7, 128:16, 129:13, 129:14, 130:18, 130:20, 131:9,

132:14, 136:6
**plaintiff's** [7] - 41:2, 51:17, 52:17, 72:10, 75:6, 117:21, 134:7
**Plaintiffs** [3] - 1:4, 1:16, 90:25
**plaintiffs** [11] - 2:2, 6:4, 52:9, 85:1, 89:3, 94:17, 102:23, 102:24, 107:18, 108:11, 133:13
**plaintiffs'** [1] - 99:18
**plan** [7] - 83:18, 83:19, 83:21, 111:10, 120:6, 120:23, 133:5
**planning** [3] - 120:11, 132:24, 133:1
**plans** [2] - 50:20, 53:25, 108:25, 109:17, 110:4, 111:13, 111:16, 124:10, 124:12
**plate** [1] - 124:1
**playing** [2] - 107:17, 107:19
**Plaza** [1] - 1:9
**plural** [2] - 17:24, 128:23
**plus** [1] - 73:11
**point** [63] - 5:14, 6:17, 8:12, 11:19, 14:3, 21:16, 31:15, 34:7, 37:6, 40:9, 42:21, 44:1, 44:9, 46:22, 47:23, 48:22, 51:8, 53:17, 60:24, 61:25, 62:21, 64:17, 72:3, 73:10, 79:15, 81:4, 83:10, 85:21, 85:22, 88:11, 89:7, 89:19, 95:18, 96:13, 98:12, 100:16, 101:2, 101:3, 102:20, 104:14, 104:19, 104:20, 104:25, 105:4, 106:20, 106:24, 107:3, 107:20, 111:10, 112:11, 112:19, 117:18, 117:21, 118:7, 119:19, 120:1, 121:10, 124:7, 125:4, 125:16, 131:11, 132:16
**pointed** [5] - 37:7, 51:6, 110:1, 118:11, 118:22
**points** [3] - 114:25, 123:12, 123:19
**poison** [7] - 12:2,

13:4, 91:17, 118:12, 118:14, 118:15, 124:18
**poor** [1] - 34:8, 34:24, 35:2, 35:6, 36:20, 36:23, 68:13, 69:15, 81:7, 101:12, 101:13
**poorly** [1] - 119:25
**portion** [4] - 47:14, 68:11, 90:16, 94:9
**portrayal** [2] - 38:16, 38:17
**pose** [1] - 68:2
**posed** [1] - 35:1
**position** [10] - 12:14, 37:15, 41:14, 78:6, 90:3, 91:19, 118:5, 119:23, 124:8, 126:5
**positions** [4] - 110:12, 110:21, 132:19, 133:7
**possibilities** [1] - 112:11
**possibility** [3] - 40:12, 43:7, 44:4
**possible** [2] - 28:16, 80:9
**possibly** [2] - 33:15, 91:10
**posted** [3] - 116:13, 116:14, 116:15
**potential** [7] - 46:8, 57:10, 96:3, 100:17, 129:12, 135:6, 135:7
**potentially** [5] - 43:15, 50:25, 95:6, 96:1, 134:18
**pounded** [1] - 118:21
**power** [6] - 9:23, 16:2, 83:25, 84:5, 116:3, 116:7
**practice** [2] - 41:14, 41:17
**pre** [1] - 85:1
**pre-marked** [1] - 85:1
**precedent** [1] - 119:7
**preceding** [1] - 87:19
**precise** [1] - 129:16
**precisely** [4] - 61:8, 70:15, 114:4, 119:23
**preclude** [2] - 13:2, 91:17
**precludes** [1] - 12:10
**preferable** [1] - 134:11
**preliminarily** [1] - 81:25
**preliminary** [13] -

3:9, 50:7, 89:5, 90:13, 105:4, 107:2, 107:3, 108:2, 108:17, 121:6, 126:24, 127:4, 136:7

**premarked** [1] - 15:4

**prepared** [2] - 14:1, 21:17

**present** [1] - 104:4

**presentation** [13] - 51:20, 52:1, 52:2, 52:5, 52:17, 76:13, 108:23, 109:4, 109:8, 109:13, 110:11, 124:3, 132:15

**presentations** [1] - 109:5

**presented** [5] - 51:23, 114:3, 115:22, 121:9, 121:13

**preservation** [1] - 97:11

**press** [8] - 65:6, 65:24, 66:10, 66:11, 73:24, 73:25, 89:1, 105:6

**presumably** [1] - 114:10

**presume** [4] - 48:25, 57:17, 79:20, 80:3

**presumed** [1] - 51:5

**presuming** [1] - 48:25

**pretty** [2] - 28:10, 57:9

**prevent** [2] - 123:11, 134:17

**prevents** [1] - 24:23

**previous** [1] - 9:21

**previously** [1] - 130:3

**price** [26] - 28:7, 37:18, 39:17, 70:3, 70:9, 73:7, 74:9, 74:13, 75:3, 77:19, 77:22, 78:2, 78:7, 78:15, 78:16, 79:11, 79:17, 113:17, 115:11, 115:16, 115:17, 118:1, 118:3, 118:5, 118:9, 119:15

**prices** [2] - 36:5, 39:9

**primarily** [3] - 16:1, 16:4, 36:4

**primary** [1] - 52:4

**principals** [2] - 24:1, 131:2

**principle** [1] - 19:2, 134:10

**private** [1] - 80:16

**Pro** [4] - 2:9, 2:17, 2:20, 2:24

**probability** [2] - 127:2, 133:10

**problem** [14] - 5:10, 8:5, 12:18, 12:25, 13:1, 13:14, 13:18, 19:21, 21:22, 42:20, 69:15, 91:3, 102:6

**problems** [1] - 130:7

**proceed** [2] - 30:16, 61:11

**process** [2] - 4:14, 108:12

**produced** [1] - 102:7

**profit** [9] - 78:19, 78:22, 78:25, 79:1, 116:5, 116:8, 117:8, 117:21, 117:23

**profits** [1] - 117:4

**project** [2] - 15:24, 16:1

**projects** [1] - 15:23

**promote** [3] - 32:13, 110:15, 132:17

**proof** [1] - 127:13

**proper** [3] - 125:18, 125:19, 125:20

**proposal** [6] - 12:2, 48:8, 50:8, 51:15, 53:23, 118:12

**proposals** [6] - 17:23, 50:20, 53:25, 109:18, 124:10, 124:12

**proposed** [1] - 105:21

**provide** [11] - 25:2, 80:2, 85:20, 90:15, 91:10, 98:15, 114:11, 120:19, 127:9, 132:20, 132:21

**provided** [2] - 106:15, 127:9

**providers** [1] - 16:5

**provides** [2] - 16:1, 95:24

**providing** [6] - 24:17, 84:17, 100:6, 110:23, 111:4, 124:22

**provision** [1] - 24:22

**provisions** [1] - 24:20

**proxies** [5] - 64:15, 65:3, 85:20, 123:12, 134:1

**proxy** [96] - 3:23, 4:2, 4:3, 4:15, 5:18, 6:7, 6:10, 25:22, 30:22, 31:10, 31:25, 32:5,

33:2, 33:6, 33:24, 34:3, 36:14, 40:2, 40:5, 43:17, 44:2, 45:5, 47:19, 47:25, 48:4, 48:24, 50:2, 50:7, 51:24, 52:3, 52:20, 55:20, 55:21, 56:5, 56:12, 56:15, 56:18, 56:22, 57:1, 58:1, 58:11, 58:14, 60:20, 61:20, 62:7, 64:6, 64:8, 64:12, 65:10, 67:12, 68:12, 71:20, 73:17, 73:22, 74:3, 75:17, 77:2, 77:4, 77:5, 77:8, 77:24, 80:25, 81:15, 85:3, 85:16, 85:23, 86:17, 86:19, 86:24, 89:17, 90:9, 91:5, 97:25, 103:4, 104:20, 106:3, 106:7, 106:21, 106:25, 111:15, 112:25, 113:3, 114:14, 116:16, 117:7, 117:12, 118:17, 118:22, 119:22, 122:1, 123:2, 123:9, 129:22, 134:16, 135:18

**prudence** [1] - 110:16

**public** [38] - 4:20, 5:10, 27:17, 27:18, 27:20, 31:11, 32:2, 60:5, 60:6, 60:12, 61:21, 63:18, 64:3, 65:17, 66:6, 66:9, 66:11, 66:14, 66:22, 67:4, 77:12, 78:2, 80:18, 87:17, 88:13, 89:20, 94:10, 108:7, 114:13, 114:15, 127:6, 128:3, 128:17, 135:24, 135:25, 136:4

**publicly** [1] - 61:6

**published** [1] - 65:24

**publishes** [1] - 77:14

**pulled** [1] - 93:12

**purchase** [1] - 25:9

**purchases** [1] - 17:2

**purchasing** [1] - 24:23

**purport** [1] - 49:10

**purported** [1] - 21:4

**purpose** [9] - 10:1, 43:2, 43:8, 43:19, 47:2, 51:7, 52:4, 83:1, 107:16

**pursuant** [1] - 119:2

**pursued** [1] - 136:9

**pursuit** [1] - 112:3

**put** [33] - 12:2, 13:4, 14:1, 14:2, 17:9, 19:6, 19:10, 21:25, 49:4, 57:9, 64:23, 65:6, 66:13, 71:18, 75:15, 84:20, 85:15, 93:24, 95:18, 98:7, 98:8, 104:21, 106:21, 106:25, 108:9, 110:11, 118:14, 124:5, 125:12, 126:19, 127:19, 133:4

**putting** [4] - 5:23, 65:1, 65:8, 126:2

**Q**

**Q4** [1] - 82:23

**qualification** [4] - 7:20, 58:15, 66:16, 100:24

**qualifications** [13] - 5:4, 7:25, 8:1, 26:13, 26:22, 28:17, 28:19, 29:18, 58:4, 58:15, 60:22, 67:8, 113:17

**qualified** [1] - 67:3

**qualifies** [2] - 115:17, 115:20

**qualities** [1] - 7:8

**quarter** [2] - 36:3, 36:8

**questions** [12] - 42:6, 57:18, 72:17, 75:24, 75:25, 81:3, 84:2, 84:7, 88:23, 113:11, 123:13

**quick** [2] - 36:11, 123:19

**quickly** [2] - 80:9, 128:12

**quite** [4] - 27:25, 28:1, 39:15, 113:9

**quote** [4] - 8:15, 32:12, 32:13, 34:8

**quotes** [1] - 38:2

**quoting** [2] - 34:19, 135:25

**R**

**R's** [1] - 64:9

**rails** [1] - 85:24

**raise** [1] - 14:16

**raised** [2] - 115:9, 130:14

**range** [2] - 39:19,

114:24

**rather** [2] - 62:25, 80:17

**RCM** [65] - 1:3, 2:5, 2:7, 5:2, 6:6, 6:18, 12:5, 12:11, 13:7, 13:13, 14:15, 15:17, 15:18, 15:21, 16:13, 16:20, 16:22, 17:6, 17:20, 24:9, 24:21, 24:24, 28:6, 28:7, 28:16, 36:23, 40:15, 41:7, 43:15, 44:8, 46:9, 51:1, 51:6, 56:11, 56:17, 56:21, 62:7, 63:11, 65:18, 67:15, 67:20, 72:20, 72:24, 77:19, 77:22, 77:23, 78:6, 78:15, 79:18, 80:1, 83:18, 83:20, 87:17, 89:3, 89:11, 90:9, 91:11, 91:21, 98:10, 102:5, 108:11, 118:21, 121:13, 128:18

**RCM's** [13] - 4:3, 7:8, 16:7, 36:20, 40:3, 68:13, 73:7, 76:22, 78:2, 113:16, 124:16, 128:24, 129:1

**reach** [2] - 48:21, 119:17

**read** [27] - 3:10, 21:13, 26:15, 32:14, 34:18, 34:19, 36:11, 54:2, 64:5, 64:6, 64:11, 64:12, 67:1, 79:5, 100:4, 102:11, 104:18, 104:19, 104:23, 106:10, 115:4, 121:17, 128:21, 129:7, 129:18, 132:1, 132:3

**reader** [1] - 60:2

**readily** [1] - 113:15

**reading** [15] - 10:24, 10:25, 11:3, 11:6, 11:17, 64:9, 64:14, 66:24, 90:19, 104:25, 106:11, 114:13, 128:12, 128:22, 129:17

**reads** [6] - 26:12, 31:4, 32:10, 40:9, 53:22, 81:5

**ready** [4] - 2:1, 120:17, 126:11

**real** [1] - 97:10

**really** [12] - 5:7, 6:3, 34:24, 65:7, 86:5,

113:18, 114:17, 115:2, 117:3, 122:4, 126:18

**reason** [19] - 3:19, 4:9, 7:1, 7:16, 21:8, 48:21, 63:22, 66:19, 66:23, 82:4, 88:1, 89:15, 90:16, 93:23, 106:8, 107:22, 115:3, 118:6, 134:22

**reasonable** [17] - 91:10, 100:7, 104:16, 125:7, 127:2, 127:12, 127:15, 127:19, 127:21, 128:12, 128:22, 129:18, 129:22, 130:4, 132:8, 133:2, 133:3

**reasonably** [2] - 90:19, 100:1

**reasons** [5] - 33:8, 58:3, 108:1, 108:16, 121:4

**rebuffed** [1] - 121:1

**received** [9] - 5:7, 18:6, 22:25, 26:4, 30:15, 55:17, 59:9, 63:6, 105:8

**RECEIVED** [15] - 18:7, 23:1, 26:5, 30:17, 53:9, 54:15, 54:21, 55:2, 55:8, 55:18, 55:25, 56:4, 56:8, 63:8, 85:9

**receives** [1] - 87:19

**recess** [2] - 76:4, 126:13

**recognize** [1] - 128:12

**recollection** [3] - 43:13, 46:4, 46:16

**recommend** [1] - 54:1

**record** [20] - 4:20, 40:14, 42:17, 42:22, 43:12, 46:7, 46:25, 47:13, 51:6, 89:20, 95:2, 95:3, 95:10, 95:23, 96:2, 121:9, 132:1, 132:3

**recorded** [3] - 46:4, 46:16, 103:6

**records** [2] - 14:2, 40:24

**redirect** [1] - 84:8

**redo** [1] - 108:12

**reelection** [2] - 48:10, 49:16

**reference** [2] - 8:13, 125:15

**referenced** [1] - 15:9

**references** [1] - 128:11

**referred** [4] - 58:8, 112:5, 116:16, 132:13

**referring** [4] - 9:8, 32:24, 60:25, 109:6

**refers** [3] - 34:8, 35:19, 55:19

**reflecting** [1] - 109:3

**reform** [1] - 111:11

**regard** [1] - 31:6

**regarding** [8] - 3:20, 24:20, 36:14, 42:1, 77:18, 78:6, 83:6, 94:1

**regular** [2] - 41:14, 56:12

**regulations** [2] - 119:3, 119:6

**rehab** [1] - 16:6

**reiterate** [1] - 111:10

**reiterated** [2] - 40:11, 43:6

**reject** [1] - 121:2

**relaid** [1] - 95:12

**relation** [1] - 6:15

**relationship** [6] - 12:21, 23:13, 23:15, 23:24, 24:3, 94:2

**relative** [1] - 135:5

**relatively** [2] - 111:14, 135:22

**release** [5] - 65:24, 66:10, 66:11, 73:24, 73:25

**releases** [3] - 65:6, 89:1, 105:6

**relevance** [1] - 27:2

**relevant** [15] - 6:11, 22:22, 22:23, 27:4, 31:5, 63:22, 85:18, 86:13, 86:20, 87:1, 87:6, 113:19, 119:14, 135:2

**relied** [1] - 134:20

**relief** [5] - 105:14, 108:20, 122:17, 127:4

**relies** [2] - 131:14, 134:6

**rely** [1] - 133:23

**relying** [1] - 21:10

**remedy** [1] - 5:1

**remember** [1] - 101:10

**remote** [2] - 120:2, 120:13

**renders** [1] - 97:25

**repeatedly** [2] - 93:6, 133:6

**rephrase** [1] - 31:22

**report** [5] - 42:1, 55:22, 56:1, 56:5, 61:20

**reported** [3] - 8:16, 43:13, 61:23

**reporting** [1] - 8:15

**reports** [1] - 55:20

**represent** [2] - 20:9, 124:16, 125:2

**representation** [3] - 57:12, 92:8, 114:13

**representations** [1] - 5:3

**representative** [2] - 67:17, 67:19

**representing** [1] - 124:14

**represents** [2] - 24:7, 49:1

**reputation** [1] - 57:10

**reputational** [1] - 108:13

**request** [1] - 108:16

**require** [6] - 4:25, 85:17, 89:10, 106:24, 111:2, 127:13

**required** [10] - 1:24, 50:16, 50:19, 61:20, 109:25, 111:6, 111:12, 114:7, 119:9, 129:17

**requirement** [2] - 117:12, 118:4

**requirements** [1] - 31:16

**requires** [11] - 7:13, 85:19, 89:10, 98:14, 108:25, 109:17, 110:4, 119:7, 124:11, 128:8, 130:2

**requiring** [1] - 5:10

**research** [1] - 130:6

**resolve** [2] - 47:25, 126:10

**respect** [13] - 8:4, 9:16, 9:23, 9:25, 25:3, 32:19, 37:3, 41:15, 50:20, 58:3, 74:8, 82:7

**respectfully** [2] - 27:4, 108:16

**respond** [1] - 120:4

**responds** [1] - 45:8

**response** [3] - 35:12, 101:13, 123:15

**rest** [6] - 32:22, 48:14, 84:16, 117:24, 118:1, 131:15

**result** [3] - 127:5, 133:8, 133:25

**resulted** [4] - 34:10, 35:4, 35:8, 81:9

**results** [6] - 57:9, 122:20, 123:6, 134:1, 134:12, 134:16

**resume** [1] - 59:21

**retail** [2] - 64:11, 64:13

**retired** [1] - 118:25

**retiring** [1] - 28:5

**Return** [1] - 72:20

**return** [8] - 25:14, 72:24, 80:3, 80:9, 131:17, 131:19, 131:20, 131:21

**returned** [2] - 25:12, 39:2

**revenues** [1] - 16:16

**reverse** [1] - 122:20

**review** [10] - 41:21, 53:17, 62:5, 109:19, 109:22, 110:17, 111:13, 112:1, 114:5, 132:16

**reviewing** [1] - 109:14

**right-hand** [3] - 34:5, 47:21, 53:13

**rise** [2] - 75:7, 126:15

**risk** [1] - 97:10

**ROBERT** [1] - 1:11

**role** [4] - 28:15, 41:13, 50:15, 109:15

**rolling** [1] - 39:14

**roughly** [1] - 115:15

**Rule** [1] - 54:11

**rule** [2] - 42:24, 46:6

**rules** [4] - 4:24, 85:17, 114:7, 114:11

**Rules** [2] - 61:19, 123:6

**run** [6] - 49:18, 49:19, 49:22, 101:14, 101:15, 101:17

**running** [5] - 6:16, 98:11, 98:19, 99:20, 113:7

**Russell** [1] - 72:20

## S

**sake** [2] - 19:11, 35:21

**sale** [3] - 13:6, 78:22, 79:13

**satisfies** [1] - 119:3

**save** [2] - 54:8, 66:18

**saw** [1] - 108:23

**scenario** [5] - 78:21, 78:24, 79:21, 113:4, 113:10

**scenarios** [1] - 27:25

**Schedule** [8] - 9:20, 10:1, 30:22, 54:23, 55:4, 109:25, 111:16, 124:10

**schedule** [13] - 9:19, 10:6, 10:10, 10:18, 18:14, 19:5, 25:21, 109:1, 110:8, 112:6, 123:24, 129:14

**scheme** [1] - 120:13

**School** [1] - 59:10

**schools** [1] - 16:5

**screams** [1] - 105:13

**se** [1] - 123:5

**seasoned** [1] - 87:11

**seat** [5] - 3:5, 14:25, 76:8, 109:14, 126:16

**seats** [6] - 48:13, 83:22, 83:24, 84:4, 113:7, 120:24

**SEC** [31] - 3:20, 3:22, 4:24, 8:11, 21:17, 21:19, 22:8, 25:24, 44:19, 51:22, 52:20, 53:6, 54:12, 54:18, 54:24, 55:4, 55:11, 58:2, 61:19, 62:19, 63:12, 65:25, 66:10, 71:21, 77:5, 77:7, 77:14, 78:1, 114:7, 119:2, 119:6

**second** [9] - 8:13, 19:1, 42:17, 62:5, 76:25, 83:5, 128:16, 135:16, 135:17

**Second** [2] - 89:6, 89:21, 125:21

**secret** [3] - 120:6, 120:11, 120:13

**Section** [17] - 1:25, 24:22, 86:6, 89:14, 98:14, 99:25, 100:5, 108:20, 108:25, 109:1, 109:17, 110:3, 127:8, 127:24, 132:9

**section** [5] - 11:18, 23:10, 85:16, 100:5, 124:10

**Securities** [8] - 18:21, 20:23, 21:3, 22:4, 44:5, 61:6, 62:8, 89:13

**securities** [5] - 4:10, 4:13, 5:5, 11:15,

11:22
 **security** [1] - 53:2
 **see** [30] - 12:18,
20:14, 21:3, 22:18,
31:7, 33:12, 33:15,
34:12, 36:21, 38:1,
38:3, 53:13, 60:3,
72:19, 72:21, 72:23,
73:1, 73:2, 73:3, 76:1,
76:23, 81:10, 84:19,
88:1, 111:12, 113:4,
116:17, 118:18,
122:13, 122:14
 **seeing** [1] - 136:13
 **seek** [4] - 51:14,
110:9, 110:10, 132:16
 **Seek** [1] - 53:15
 **seeking** [4] - 3:8,
5:1, 108:20, 126:24
 **seeks** [1] - 132:22
 **seem** [2] - 9:7,
90:23, 126:2
 **segment** [2] - 15:23,
15:25, 16:3
 **segments** [1] - 15:22
 **selected** [1] - 75:8
 **sell** [3] - 78:18,
115:12, 118:4
 **sellers** [1] - 4:13
 **sells** [1] - 117:17
 **send** [1] - 65:4
 **sensivised** [1] -
79:17
 **sent** [3] - 34:20,
73:25, 81:16
 **sentence** [10] - 31:4,
32:11, 33:10, 34:7,
34:18, 34:19, 53:21,
81:4, 87:14, 97:8
 **separate** [4] - 3:22,
22:7, 110:12, 132:18
 **separating** [2] -
109:15, 110:20
 **series** [2] - 86:7
 **serious** [1] - 53:24
 **serve** [5] - 48:10,
83:1, 113:22, 117:2,
136:3
 **served** [5] - 60:11,
60:18, 60:19, 119:8,
128:13
 **service** [3] - 15:24,
16:5, 111:15
 **Services** [2] - 51:24,
134:5
 **services** [8] - 15:24,
16:1, 16:3, 24:17,
24:19, 55:20, 55:21,
90:9
 **Session** [1] - 76:5

**settle** [2] - 48:23,
49:2
 **settled** [1] - 49:9
 **settlement** [10] -
40:12, 43:7, 44:4,
48:4, 48:20, 48:21,
49:4, 49:14, 49:24,
50:5
 **seven** [5] - 74:5,
86:2, 86:8, 104:2,
114:5
 **several** [3] - 119:1,
123:4, 134:7
 **share** [21] - 5:24,
17:2, 39:9, 74:9, 78:7,
78:14, 94:11, 112:24,
113:17, 114:25,
115:14, 115:16,
115:17, 117:1, 117:4,
117:25, 118:3, 118:5,
118:9, 119:15
 **shared** [1] - 9:23
 **shareholder** [21] -
57:17, 60:15, 65:4,
72:24, 78:19, 100:2,
100:3, 100:7, 110:24,
110:25, 113:5,
118:14, 127:12,
127:19, 128:12,
130:4, 133:2, 133:3,
134:18, 136:4
 **shareholders** [76] -
4:7, 16:23, 16:24,
17:2, 27:11, 27:24,
27:25, 29:11, 32:22,
39:2, 41:15, 41:18,
44:9, 44:20, 46:19,
48:23, 49:8, 50:16,
50:19, 52:1, 52:3,
56:15, 57:11, 57:14,
58:20, 63:17, 64:3,
64:8, 64:11, 64:14,
64:20, 64:23, 65:1,
65:5, 65:9, 65:13,
65:16, 77:10, 77:11,
79:22, 80:10, 85:17,
90:11, 99:23, 100:19,
100:21, 100:23,
110:23, 111:4,
112:24, 113:1, 113:2,
113:15, 113:25,
115:22, 116:25,
117:13, 117:24,
118:2, 118:11,
118:17, 120:11,
121:19, 122:2, 122:3,
122:10, 123:4, 125:2,
129:5, 132:19,
132:20, 132:21,
133:13, 133:14,

133:15
 **Shareholders** [2] -
51:24, 76:23
 **shares** [69] - 5:16,
5:17, 8:5, 8:9, 8:16,
8:25, 9:10, 9:11, 9:12,
9:13, 9:15, 9:24, 10:2,
10:5, 12:13, 12:25,
14:9, 14:12, 24:24,
32:20, 39:18, 78:18,
79:13, 90:25, 91:2,
91:2, 91:18, 91:24,
92:2, 92:4, 92:10,
93:2, 97:14, 98:2,
98:3, 98:6, 98:8, 98:9,
98:10, 98:11, 98:18,
98:19, 98:20, 99:4,
99:10, 99:21, 100:14,
100:20, 100:25,
101:4, 101:16,
115:12, 115:14,
115:19, 115:21,
115:23, 116:2, 116:4,
116:7, 117:9, 117:16,
117:17, 118:6, 118:8,
129:10
 **sheets** [1] - 112:3
 **shielding** [2] -
107:20
 **shift** [1] - 89:10
 **Shops** [1] - 113:20
 **short** [1] - 126:19
 **shortcomings** [4] -
60:23, 64:17, 65:10,
65:12
 **show** [5] - 27:13,
40:24, 71:6, 98:8,
133:21
 **Show** [1] - 3:9
 **showed** [2] - 74:19,
123:24
 **showing** [6] - 61:4,
71:9, 71:10, 122:3,
122:12, 127:16
 **shown** [7] - 74:23,
108:3, 108:4, 127:1,
127:2, 134:24, 135:10
 **shows** [5] - 75:3,
75:6, 75:10, 108:6
 **side** [4] - 13:8, 53:13,
61:8, 93:21
 **sides** [3] - 114:3,
133:15, 133:16
 **SIFA** [1] - 56:12
 **sign** [1] - 71:12
 **signaling** [1] - 87:24
 **signature** [1] - 71:17
 **signatures** [1] -
20:15
 **signed** [1] - 71:10

 **significance** [1] -
127:18
 **significant** [9] -
28:11, 32:12, 41:18,
41:19, 41:20, 56:25,
57:17, 59:17, 60:1
 **significantly** [3] -
32:13, 113:14, 127:22
 **similar** [1] - 123:11
 **simple** [2] - 51:9,
90:12
 **simply** [3] - 9:5,
119:20, 123:8
 **Sinesta** [1] - 89:21
 **single** [3] - 21:13,
98:7, 115:19
 **sit** [1] - 20:21
 **sitting** [1] - 106:11
 **situation** [6] - 7:21,
13:5, 32:22, 79:16,
105:13, 124:18
 **situations** [2] -
129:16, 129:19
 **six** [22] - 25:2, 28:5,
28:8, 29:24, 37:18,
38:2, 39:19, 49:16,
67:14, 68:5, 70:11,
73:4, 83:22, 83:24,
93:2, 104:2, 110:2,
114:5, 129:15,
131:16, 133:7
 **six-fifty** [1] - 39:19
 **sixty** [1] - 45:2
 **sixty-three** [1] - 45:2
 **skin** [38] - 8:6, 8:23,
12:6, 12:7, 79:14,
90:22, 91:22, 91:25,
92:4, 92:5, 92:6, 92:8,
92:10, 92:12, 92:13,
92:20, 92:21, 92:24,
92:25, 93:1, 93:2,
93:5, 93:7, 93:9,
96:14, 98:22, 98:25,
99:3, 100:17, 115:10,
115:11, 115:13,
115:18, 115:20,
129:9, 129:10, 129:11
 **Skin** [1] - 32:13
 **slate** [1] - 122:14
 **slide** [3] - 76:18,
76:22, 77:17
 **slightly** [2] - 39:23,
131:13
 **small** [1] - 100:24
 **smaller** [1] - 75:8
 **so-called** [1] - 113:9
 **solicitation** [3] -
4:15, 33:8, 85:17
 **soliciting** [1] - 54:11
 **solution** [1] - 90:12

 **someone** [6] - 60:17,
116:21, 116:25,
117:3, 123:11, 133:1
 **somewhat** [2] -
119:12, 129:20
 **soon** [2] - 4:19,
107:1
 **sophisticated** [1] -
99:24
 **sorry** [31] - 30:8,
30:10, 31:18, 32:7,
32:24, 45:1, 58:10,
58:12, 61:12, 61:13,
61:15, 62:23, 68:15,
68:16, 68:21, 68:22,
69:9, 71:23, 72:14,
72:15, 73:16, 73:22,
76:19, 96:7, 97:1,
112:9, 118:12, 132:21
 **sort** [5] - 87:3, 90:16,
113:4, 120:23, 123:25
 **source** [2] - 27:22
 **sources** [1] - 113:18
 **speaking** [1] - 125:4
 **special** [5] - 39:1,
39:12, 39:13, 111:1,
132:20
 **specialty** [1] - 16:3
 **specific** [4] - 7:24,
8:12, 24:20, 113:1
 **specifically** [6] -
8:10, 8:15, 32:5,
67:15, 109:6, 117:8
 **spell** [1] - 14:23
 **spend** [1] - 57:2
 **spending** [1] - 57:13
 **spent** [2] - 57:4, 86:9
 **spin** [2] - 113:18,
119:21
 **spoken** [2] - 4:2,
56:15
 **spots** [1] - 110:2
 **spun** [1] - 122:11
 **staffing** [3] - 15:24,
16:3, 16:4
 **stake** [3] - 96:12,
97:10, 114:3
 **stakes** [1] - 98:17
 **stand** [8] - 47:5,
48:9, 49:5, 49:6,
49:13, 49:16, 76:8,
78:18
 **standard** [13] -
17:25, 89:1, 89:2,
89:13, 89:21, 90:7,
99:25, 100:5, 113:13,
113:15, 119:3, 127:16
 **standing** [2] - 19:8,
103:22
 **stands** [1] - 115:13

**standstill** [2] - 49:15, 49:17
**Star** [11] - 90:4, 106:1, 122:24, 123:1, 123:2, 125:15, 125:20, 134:13, 135:25
**start** [7] - 2:2, 37:24, 40:22, 40:25, 51:25, 87:23, 126:17
**started** [3] - 17:3, 75:7, 76:7
**starting** [2] - 85:21, 114:9
**starts** [2] - 74:12, 128:23
**state** [7] - 14:21, 27:12, 59:20, 91:4, 122:22, 123:4, 132:23
**State** [1] - 134:5
**statement** [67] - 5:19, 7:18, 10:1, 25:22, 26:17, 26:18, 26:20, 27:6, 27:8, 27:9, 27:10, 30:22, 31:9, 32:1, 32:5, 32:17, 33:2, 33:3, 33:6, 33:14, 33:24, 34:3, 34:12, 34:14, 36:14, 36:23, 37:3, 40:2, 40:5, 40:17, 42:13, 43:18, 44:2, 47:3, 47:11, 47:19, 48:15, 50:2, 50:5, 56:22, 58:9, 58:10, 58:11, 58:13, 75:16, 75:19, 83:4, 89:8, 89:11, 89:16, 89:25, 90:8, 95:1, 95:5, 95:20, 95:21, 102:22, 103:14, 117:8, 119:22, 123:2, 125:12, 128:8, 128:15
**statements** [14] - 3:24, 5:8, 6:8, 101:8, 101:9, 101:23, 102:19, 102:23, 106:14, 106:15, 120:10, 125:18, 125:23, 132:6
**states** [4] - 33:10, 34:8, 47:14, 116:2
**STATES** [2] - 1:1, 1:11
**States** [2] - 1:8, 61:6
**stating** [2] - 34:20, 95:24
**statutes** [1] - 4:24
**Steak** [1] - 134:14
**step** [3] - 83:23,

126:22
**stewards** [6] - 96:24, 97:9, 98:5, 99:19, 100:11, 101:2
**sticker** [1] - 71:18
**still** [2] - 44:17, 68:2
**stipulate** [1] - 62:18
**stipulating** [2] - 53:5, 61:9
**stipulation** [2] - 54:6, 55:22
**stock** [46] - 8:4, 16:20, 24:21, 25:9, 36:5, 36:20, 36:23, 37:9, 37:15, 37:18, 38:1, 38:16, 38:17, 38:19, 38:23, 40:3, 68:13, 68:25, 69:9, 69:15, 70:3, 70:9, 70:15, 73:7, 73:12, 74:19, 74:21, 75:3, 77:19, 77:21, 77:23, 78:2, 79:18, 96:23, 97:8, 97:14, 97:19, 101:9, 101:11, 101:14, 115:11, 131:8, 131:21, 131:23
**stockholder** [16] - 34:21, 45:11, 51:15, 54:1, 72:20, 81:6, 87:18, 90:19, 96:24, 97:9, 106:9, 106:11, 107:5, 107:7, 107:12, 110:4
**stockholders** [29] - 5:3, 6:18, 7:7, 8:20, 8:21, 12:5, 12:11, 12:25, 13:7, 13:13, 14:10, 26:15, 32:14, 74:1, 87:24, 91:15, 91:17, 97:8, 100:9, 102:5, 105:1, 105:7, 107:13, 108:7, 108:11, 108:14, 124:17, 125:7, 125:10
**stockholders'** [1] - 48:11
**stop** [1] - 75:24
**story** [3] - 47:15, 49:21, 50:8
**strategic** [6] - 51:14, 109:14, 109:22, 110:17, 111:13, 112:2
**Strategical** [1] - 132:16
**strategical** [2] - 53:17, 109:19
**strategies** [2] - 27:19, 35:7
**strategy** [26] - 34:9,

35:3, 35:13, 35:15, 35:16, 35:17, 36:15, 80:22, 81:8, 83:7, 102:3, 102:7, 102:12, 102:13, 103:9, 103:12, 103:13, 103:14, 103:15, 103:16, 104:3, 104:4, 104:10, 104:18, 119:22, 131:25
**stretch** [1] - 80:7
**strike** [2] - 58:11, 64:18
**stuck** [1] - 107:6
**subheading** [1] - 36:19
**subject** [5] - 28:10, 84:17, 118:25, 130:8, 135:12
**submission** [5] - 7:1, 95:19, 97:15, 123:3, 130:19
**submissions** [2] - 4:2, 4:3
**submit** [3] - 3:19, 27:4, 121:5
**submitted** [5] - 2:9, 3:11, 86:12, 95:22, 105:23
**subsequent** [1] - 65:8
**substantial** [12] - 8:6, 8:23, 11:20, 12:6, 12:7, 50:22, 103:6, 127:11, 127:13, 127:16, 127:20
**substantive** [1] - 72:6
**success** [6] - 108:3, 127:2, 132:8, 133:10, 135:10, 136:5
**successful** [1] - 90:4
**suffered** [1] - 101:18
**sufficient** [4] - 99:18, 110:1, 114:10, 133:17
**suggest** [5] - 6:9, 7:10, 98:5, 104:8, 104:10
**suggested** [3] - 98:25, 105:12, 125:20
**suggesting** [10] - 8:2, 13:17, 98:1, 99:2, 102:4, 102:6, 103:8, 103:11, 103:12
**summary** [1] - 83:9
**Summary** [1] - 121:7
**supp** [2] - 134:3, 134:5
**supplement** [1] - 31:25

**supplemental** [3] - 30:22, 77:8, 105:7
**supplemented** [5] - 33:2, 33:23, 36:13, 40:1, 50:2
**supply** [1] - 80:4
**supplying** [1] - 23:19
**support** [6] - 46:13, 76:19, 123:3, 123:5, 123:7, 123:9
**supporting** [1] - 124:8
**suppose** [2] - 79:2, 79:3
**supposedly** [1] - 113:13
**Supreme** [1] - 127:8
**surely** [1] - 129:12
**surprised** [2] - 14:12, 14:13
**surrounding** [1] - 45:11
**survive** [1] - 47:10
**suspect** [1] - 57:2
**swearing** [1] - 21:1
**swing** [1] - 126:1
**sworn** [2] - 20:1, 95:24
**SWORN** [1] - 14:18
**system** [1] - 20:14

## T

**Tab** [3] - 25:18, 30:3, 51:17
**tab** [6] - 17:15, 18:9, 24:11, 41:1, 41:4, 63:10
**table** [3] - 2:3, 15:13, 57:22
**taint** [2] - 93:25
**takeover** [11] - 28:6, 28:16, 67:15, 67:17, 67:20, 68:6, 120:11, 120:12, 120:14, 120:23, 120:25
**talks** [6] - 9:5, 73:25, 87:11, 87:12, 97:6, 111:11
**tech** [1] - 16:5
**TECHNOLOGIES** [1] - 1:3
**Technologies** [10] - 2:5, 2:7, 14:15, 15:17, 15:19, 17:20, 24:9, 40:16, 41:7, 83:20
**technology** [3] - 15:23, 75:12, 75:14
**telephone** [5] -

40:10, 41:11, 42:10, 44:3
**ten** [19] - 72:19, 73:13, 74:13, 75:6, 75:12, 75:15, 80:3, 87:8, 96:25, 97:4, 97:5, 101:19, 115:15, 128:16, 131:17, 131:19, 131:20
**tenant** [1] - 47:25
**tenure** [2] - 67:12, 67:13
**terminated** [1] - 68:5
**terms** [4] - 48:10, 60:3, 64:11, 101:22
**test** [2] - 7:3, 100:2
**TESTIFIED** [1] - 14:18
**testified** [11] - 59:24, 60:14, 67:7, 77:18, 81:3, 81:12, 82:12, 101:25, 102:8, 102:25, 130:20
**testify** [2] - 42:12, 79:5
**testifying** [1] - 61:9
**testimony** [12] - 14:2, 58:8, 68:4, 70:4, 85:14, 85:25, 95:11, 101:12, 107:9, 115:25, 135:18, 135:19
**text** [1] - 26:8
**thanking** [1] - 126:17
**THE** [272] - 1:1, 1:11, 2:1, 2:10, 2:15, 2:18, 2:24, 3:5, 3:7, 3:18, 4:5, 4:24, 5:12, 5:23, 6:7, 6:10, 6:20, 6:24, 7:13, 8:8, 8:24, 9:4, 9:9, 9:18, 9:20, 10:3, 10:8, 10:11, 10:16, 10:20, 10:22, 11:1, 11:5, 11:9, 11:15, 12:16, 13:23, 14:6, 14:14, 14:16, 14:21, 14:22, 14:23, 14:24, 14:25, 15:2, 15:6, 15:8, 15:12, 15:14, 18:4, 18:6, 18:24, 19:12, 19:14, 19:15, 19:16, 19:17, 20:3, 20:6, 21:21, 22:9, 22:14, 22:18, 22:21, 22:24, 25:17, 26:2, 26:4, 26:24, 27:7, 27:14, 28:15, 28:18, 28:21, 28:22, 28:23, 28:24, 29:1, 29:3, 29:7, 29:8, 29:10,

29:13, 29:17, 29:21, 29:23, 29:24, 30:1, 30:5, 30:7, 30:9, 30:15, 31:14, 31:20, 31:23, 34:16, 35:1, 35:11, 37:2, 37:20, 37:21, 37:24, 38:1, 38:4, 38:6, 38:8, 38:10, 38:13, 39:4, 39:5, 39:9, 39:11, 39:17, 39:19, 39:22, 39:23, 39:24, 40:21, 40:25, 42:6, 42:13, 42:16, 42:20, 43:4, 43:19, 43:24, 44:13, 44:17, 44:25, 45:3, 45:6, 45:12, 45:15, 45:21, 46:1, 46:5, 46:11, 46:14, 46:23, 47:11, 51:4, 51:9, 52:11, 52:15, 53:8, 54:7, 54:14, 54:20, 55:1, 55:7, 55:14, 55:17, 55:24, 56:3, 56:7, 57:20, 57:23, 61:3, 61:11, 61:14, 61:17, 62:14, 62:17, 62:20, 63:3, 63:5, 64:19, 64:22, 64:25, 65:3, 65:11, 65:14, 65:15, 65:18, 65:19, 68:17, 68:19, 68:20, 68:23, 68:25, 69:2, 69:3, 69:7, 69:25, 70:25, 71:8, 71:24, 72:10, 75:21, 76:7, 84:8, 84:10, 84:13, 84:16, 84:19, 85:4, 85:6, 85:12, 86:18, 86:23, 87:9, 88:4, 91:24, 92:4, 92:11, 92:16, 92:19, 92:23, 93:4, 93:8, 93:14, 93:16, 94:22, 94:24, 96:7, 96:10, 96:14, 96:18, 97:13, 97:17, 97:21, 98:21, 99:2, 99:6, 99:12, 99:23, 100:13, 100:18, 101:3, 102:10, 102:24, 103:5, 103:17, 103:20, 104:1, 104:6, 104:11, 104:22, 105:9, 105:21, 106:5, 106:19, 108:19, 109:5, 109:10, 109:19, 109:21, 110:5, 110:12, 110:15, 110:19, 110:22, 111:3, 111:7,

111:18, 111:23, 112:12, 112:18, 112:21, 117:5, 117:10, 117:19, 121:22, 122:6, 122:25, 123:14, 125:1, 126:7, 126:15, 126:16, 136:12
   **themselves** [2] - 24:24, 58:19
   **theoretically** [1] - 4:18
   **theory** [1] - 116:10
   **therapists** [1] - 16:4
   **there'll** [2] - 57:13, 107:5
   **therefore** [6] - 4:12, 98:4, 131:6, 133:5, 133:9, 136:8
   **therein** [1] - 8:19
   **they've** [17] - 7:24, 8:1, 9:16, 19:3, 44:19, 47:12, 86:18, 88:21, 88:22, 101:16, 107:21, 114:24, 115:9, 120:15, 124:2, 124:6, 124:8
   **thinking** [1] - 116:12
   **thinks** [1] - 119:21
   **third** [7] - 16:3, 31:3, 35:25, 40:8, 53:17, 96:8, 134:25
   **Third** [5] - 114:8, 119:3, 126:25, 135:1, 135:3
   **thirds** [2] - 35:23, 82:18
   **Thirteen** [2] - 45:1
   **thirteen** [2] - 45:4, 109:16
   **thirty** [1] - 111:8
   **THOMAS** [1] - 1:22
   **Thomas** [3] - 2:16, 61:5, 111:21
   **thoughts** [1] - 126:8
   **thousand** [15] - 5:16, 8:5, 12:13, 90:25, 92:3, 92:23, 92:25, 93:1, 93:2, 98:10, 98:18, 100:14, 100:20, 101:4, 129:10
   **three** [11] - 15:22, 37:10, 38:21, 45:2, 49:5, 49:7, 49:9, 49:13, 55:21, 70:10, 84:23
   **threshold** [4] - 12:3, 50:16, 110:25, 132:19
   **throw** [1] - 100:9
   **tie** [1] - 40:23

   **tilt** [1] - 107:19
   **titan** [1] - 120:17
   **Title** [1] - 1:24
   **today** [15] - 2:10, 3:11, 20:21, 38:18, 38:24, 39:15, 56:13, 63:23, 68:7, 78:16, 86:8, 106:23, 108:20, 123:19, 126:11
   **together** [4] - 22:13, 100:4, 126:8, 126:19
   **tomorrow** [1] - 93:17
   **took** [3] - 36:6, 74:15, 94:10
   **top** [27] - 10:14, 11:11, 11:12, 20:14, 23:5, 25:1, 26:7, 26:9, 31:1, 32:6, 33:7, 34:5, 36:18, 40:6, 47:20, 58:13, 72:18, 74:6, 76:19, 76:22, 81:5, 82:21, 87:8, 96:19, 96:25, 97:4, 97:5
   **topic** [2] - 50:10, 83:5
   **total** [3] - 16:16, 113:14, 127:22
   **Total** [1] - 72:20
   **totality** [1] - 133:13
   **tout** [1] - 94:6
   **traded** [1] - 16:20
   **trading** [1] - 39:21
   **training** [1] - 50:21
   **transaction** [3] - 13:6, 28:8, 133:25
   **transactions** [4] - 50:21, 112:4, 112:7, 134:8
   **tremendous** [1] - 57:7
   **trial** [2] - 121:6, 122:19
   **tried** [9] - 28:22, 29:4, 29:24, 52:25, 67:17, 67:20, 68:6, 107:19, 120:25
   **trigger** [1] - 91:13
   **trips** [1] - 12:19
   **true** [27] - 1:24, 26:17, 26:20, 27:3, 27:6, 32:19, 33:14, 33:17, 34:14, 36:23, 36:25, 45:20, 69:8, 69:12, 75:9, 75:10, 90:2, 97:13, 97:19, 102:10, 102:14, 103:17, 106:14, 106:16, 116:21, 126:4, 132:23
   **trumpet** [1] - 121:14

   **trust** [6] - 11:22, 12:4, 23:16, 23:21, 24:5, 25:7
   **truth** [6] - 27:13, 43:1, 49:20, 98:13, 98:14, 136:1
   **truthful** [6] - 4:22, 4:25, 29:19, 64:16, 85:20, 126:2
   **truthfully** [3] - 4:2, 5:21, 13:21
   **truths** [1] - 13:17
   **try** [8] - 14:25, 37:5, 85:15, 107:25, 125:1, 125:6, 126:10
   **trying** [19] - 7:10, 7:11, 29:1, 29:4, 37:15, 42:9, 42:21, 42:25, 45:8, 47:2, 47:3, 47:7, 93:19, 93:22, 93:23, 99:13, 104:25, 122:9, 123:11
   **TSC** [7] - 127:23
   **tumultuous** [1] - 75:13
   **turn** [36] - 17:14, 18:9, 20:13, 23:4, 24:11, 25:18, 26:6, 30:3, 30:25, 32:4, 33:6, 34:4, 36:17, 40:5, 41:1, 47:20, 48:9, 50:11, 51:17, 53:12, 58:18, 63:14, 65:22, 68:8, 70:19, 71:19, 72:18, 73:3, 73:15, 73:22, 76:12, 76:16, 80:24, 80:25, 83:3, 129:9
   **turnaround** [1] - 94:7
   **turning** [1] - 24:25
   **Twenty** [1] - 55:17
   **twenty** [1] - 32:8
   **Twenty-two** [1] - 55:17
   **twice** [1] - 116:16
   **two** [49] - 11:12, 19:6, 20:18, 23:6, 23:9, 25:7, 28:24, 35:18, 35:23, 41:1, 41:4, 43:13, 48:13, 49:6, 49:8, 49:12, 52:2, 55:17, 57:5, 58:18, 65:4, 65:22, 72:3, 82:18, 83:12, 83:22, 83:24, 84:2, 84:3, 84:4, 109:14, 110:2, 113:6, 113:7, 114:21, 114:22, 115:2, 115:4, 115:5, 120:23, 122:4,

122:15, 127:7, 133:7, 133:9, 133:23
   **tying** [1] - 107:24
   **type** [6] - 4:10, 16:5, 23:9, 105:13, 109:24, 116:23
   **types** [2] - 28:2, 107:10
   **typical** [2] - 4:10, 38:21
   **typically** [3] - 37:8, 37:10, 113:2

## U

   **U.S** [1] - 127:24
   **U.S.C** [1] - 1:25
   **Udell** [11] - 2:19, 2:25, 20:8, 21:15, 52:16, 61:18, 63:9, 65:21, 69:4, 72:16, 76:11
   **UDELL** [79] - 1:22, 2:19, 19:1, 19:21, 20:5, 20:7, 21:23, 22:11, 22:16, 22:20, 22:23, 25:13, 25:16, 26:3, 26:19, 27:2, 30:10, 30:13, 31:12, 34:15, 34:17, 37:1, 40:20, 42:15, 42:19, 44:11, 44:16, 44:22, 45:1, 45:4, 45:7, 45:14, 45:20, 45:24, 47:1, 51:3, 51:5, 52:10, 52:13, 53:7, 53:10, 54:13, 54:19, 54:25, 55:6, 55:12, 55:16, 55:23, 56:2, 56:6, 57:21, 57:24, 57:25, 61:2, 61:4, 61:12, 61:15, 62:12, 62:15, 62:21, 63:7, 64:18, 65:20, 68:9, 68:24, 71:6, 71:14, 72:3, 72:12, 72:14, 76:3, 76:10, 83:16, 84:7, 84:21, 85:11, 97:1, 97:3, 103:3
   **Udell's** [1] - 88:23
   **uh-hum** [2] - 73:5, 74:7
   **unable** [1] - 113:22
   **unbelievable** [1] - 75:14
   **unconditionally** [2] - 125:12, 125:13
   **unconflicted** [1] - 13:18
   **under** [23] - 20:1,

21:1, 39:23, 44:5,
54:11, 61:19, 71:12,
95:24, 108:5, 109:25,
110:8, 110:15,
112:25, 114:10,
116:3, 121:8, 127:7,
127:8, 127:17,
129:23, 132:9,
132:11, 132:14

**underscores** [1] -
104:15

**underscoring** [1] -
104:20

**undisclosed** [2] -
108:24, 118:22

**undisputed** [1] -
113:19

**undo** [2] - 134:15,
135:14

**UNITED** [2] - 1:1,
1:11

**United** [2] - 1:8, 61:6

**University** [1] - 59:10

**unless** [6] - 11:20,
42:23, 49:2, 89:17,
107:2, 117:17

**unlike** [1] - 74:11

**unlimited** [1] - 80:4

**unlock** [1] - 26:14

**unrivaled** [1] -
128:25

**unscramble** [3] -
107:25, 133:25, 134:9

**untrue** [4] - 27:12,
37:3, 49:8, 91:21

**untruthful** [2] - 5:23,
5:25

**unvested** [5] - 96:24,
98:5, 99:19, 100:11,
101:2

**up** [38] - 11:11, 13:5,
14:4, 14:16, 27:25,
40:10, 40:23, 41:10,
41:15, 42:24, 44:22,
49:20, 54:4, 57:9,
65:10, 65:11, 67:18,
75:4, 78:15, 78:16,
78:17, 79:12, 79:18,
99:13, 107:24,
112:22, 115:12,
115:17, 117:3, 117:4,
118:1, 118:3, 118:9,
122:7, 122:8, 129:3,
129:22, 130:24

**upper** [3] - 11:7,
109:12, 132:11

**user** [1] - 37:6

# V

**Vacation** [3] - 55:10,
119:5, 119:11

**value** [5] - 25:8,
51:15, 54:1, 120:3,
120:20

**values** [1] - 26:14

**variety** [1] - 122:16

**various** [4] - 23:11,
23:18, 24:4, 28:11

**verified** [2] - 96:1,
102:1

**verifying** [1] - 21:11

**versus** [13] - 72:20,
113:8, 113:21, 114:8,
114:21, 114:22,
114:23, 119:4,
127:23, 134:3, 134:4,
135:4, 135:7

**vested** [1] - 100:24

**Vice** [4] - 2:9, 2:17,
2:20, 2:24

**view** [17] - 14:8,
33:18, 38:15, 64:9,
66:3, 66:13, 67:3,
67:10, 69:18, 77:21,
78:10, 78:11, 78:13,
83:17, 83:19, 90:20

**viewed** [1] - 127:21

**violation** [3] - 46:21,
86:6, 123:5

**virtue** [1] - 67:3

**virtues** [2] - 115:7,
115:8

**Vizi** [141] - 5:15, 5:25,
6:5, 6:11, 6:16, 6:19,
6:21, 7:7, 7:10, 7:14,
7:17, 8:2, 8:5, 8:24,
9:5, 9:12, 9:14, 9:22,
11:20, 11:25, 12:20,
12:22, 13:8, 17:7,
17:9, 23:25, 24:2,
24:23, 27:16, 31:4,
32:12, 33:20, 34:20,
34:21, 34:22, 34:23,
35:14, 35:19, 37:4,
40:9, 40:11, 40:18,
41:10, 42:2, 42:13,
42:22, 43:6, 43:14,
43:21, 44:7, 44:11,
44:14, 44:20, 45:8,
45:10, 45:13, 46:7,
47:6, 47:9, 47:14,
48:18, 48:25, 56:20,
58:4, 58:20, 59:6,
59:9, 59:13, 60:22,
63:17, 64:3, 64:20,
65:17, 66:2, 66:14,

66:21, 67:3, 67:5,
78:25, 79:9, 79:17,
79:21, 79:24, 80:4,
81:5, 81:16, 81:17,
83:18, 86:13, 87:5,
87:11, 87:20, 87:22,
87:25, 88:12, 90:16,
90:20, 90:22, 90:24,
91:1, 91:4, 91:5, 92:3,
93:2, 93:6, 94:1, 95:5,
95:16, 95:17, 95:18,
95:25, 96:3, 98:2,
98:6, 98:16, 98:18,
99:9, 99:10, 99:13,
99:21, 100:20, 105:2,
107:10, 114:6,
114:23, 115:1,
115:10, 115:13,
116:1, 116:3, 120:8,
120:22, 124:13,
125:11, 128:20,
129:2, 129:7, 130:19,
131:1, 131:5

**Vizi's** [23] - 6:14, 7:4,
7:20, 7:25, 13:15,
14:8, 31:11, 32:1,
43:16, 47:11, 59:2,
79:25, 86:10, 87:16,
88:2, 88:14, 94:1,
95:1, 95:12, 120:10,
128:2, 128:11, 129:20

**Vocations** [2] - 94:9,
94:19

**void** [1] - 134:1

**voiding** [2] - 134:12,
134:16

**voir** [4] - 19:25, 20:3,
20:4, 52:14

**VOIR** [1] - 20:7

**Voss** [4] - 2:13, 3:2,
3:3, 61:15

**VOSS** [3] - 1:19,
2:12, 3:4

**vote** [21] - 4:17,
53:22, 83:25, 100:8,
104:17, 105:2,
105:19, 107:5, 107:7,
108:7, 110:23, 116:7,
118:14, 118:16,
122:13, 123:6,
127:13, 127:15,
134:18, 136:3

**voted** [1] - 133:25

**voter** [1] - 60:15

**voting** [2] - 17:24,
123:12

**vs** [1] - 1:5

# W

**wade** [1] - 122:16

**walk** [1] - 86:1

**walked** [1] - 106:22

**wants** [6] - 28:25,
29:5, 118:8, 121:2,
128:18, 129:5

**warned** [1] - 125:8

**warranted** [1] - 81:7

**WAS** [13] - 18:7,
26:5, 30:17, 53:9,
54:15, 54:21, 55:2,
55:8, 55:18, 55:25,
56:4, 56:8, 71:16

**waste** [1] - 107:15

**ways** [4] - 11:18,
86:5, 101:20, 104:13

**wealth** [1] - 128:23

**wedded** [1] - 122:24

**week** [1] - 39:18

**WERE** [3] - 23:1,
63:8, 85:9

**Wetter** [1] - 134:2

**WETTER** [1] - 134:3

**Wharton** [1] - 59:10

**whatsoever** [4] -
68:3, 114:18, 128:2,
130:16

**whichever** [1] -
10:13

**whole** [10] - 19:10,
34:19, 48:19, 63:22,
73:13, 88:1, 88:13,
90:22, 114:24, 123:10

**wide** [1] - 82:17

**wife** [2] - 51:8,
123:16

**wild** [1] - 16:13

**willing** [4] - 62:18,
97:11, 111:15, 125:6

**win** [3] - 93:20, 105:3

**window** [1] - 75:8

**wins** [1] - 56:20

**wish** [1] - 107:13

**withdraw** [1] - 25:16

**withdrawn** [6] - 60:9,
68:9, 69:10, 70:20,
83:16, 110:24

**witness** [17] - 14:14,
15:5, 15:11, 19:24,
22:6, 27:11, 35:1,
42:11, 47:5, 51:11,
52:14, 54:9, 55:19,
61:4, 61:8, 71:2,
75:25

**WITNESS** [30] -
14:18, 14:22, 14:24,
15:2, 19:14, 19:16,

28:18, 28:22, 28:24,
29:3, 29:8, 29:13,
29:21, 29:24, 35:11,
37:21, 38:1, 38:6,
38:10, 39:5, 39:11,
39:19, 39:23, 64:22,
65:3, 65:14, 65:18,
68:20, 69:2, 103:20

**witnesses** [3] -
84:11, 84:20, 84:22

**Wolosky** [3] - 2:17,
2:20, 2:22

**WOLOSKY** [1] - 1:21

**wonder** [1] - 94:14

**wonderful** [1] - 7:7

**word** [3] - 88:15,
121:17

**words** [4] - 4:11,
6:15, 8:19, 115:4

**works** [1] - 28:12

**World** [1] - 134:3

**world** [4] - 16:13,
77:15, 77:16, 119:2

**worth** [1] - 115:15

**write** [27] - 34:11,
35:5, 35:9, 35:20,
36:2, 36:7, 36:15,
80:22, 81:10, 82:8,
82:12, 82:23, 83:2,
83:6, 83:11, 102:2,
102:4, 102:15, 103:6,
103:10, 103:11,
103:16, 119:14,
119:19, 132:1, 132:4

**write-off** [4] - 35:9,
36:7, 36:15, 119:19

**write-offs** [23] -
34:11, 35:5, 35:20,
36:2, 80:22, 81:10,
82:8, 82:12, 82:23,
83:2, 83:6, 83:11,
102:2, 102:4, 102:15,
103:6, 103:10,
103:11, 103:16,
119:14, 132:1, 132:4

**writing** [2] - 36:4,
95:16

**written** [2] - 111:4,
132:21

**wrote** [2] - 47:8,
126:21

# Y

**year** [24] - 16:17,
16:18, 16:19, 37:12,
38:22, 38:23, 48:10,
69:24, 70:11, 73:13,
74:15, 74:19, 75:15,

101:14, 116:14, 116:15, 120:16, 131:12, 131:13, 131:17, 131:19, 131:20, 131:21

**years** [46] - 3:3, 5:15, 15:20, 28:24, 29:5, 35:18, 35:19, 36:8, 37:11, 37:18, 38:2, 38:20, 39:5, 39:10, 39:15, 39:22, 49:5, 49:13, 63:17, 64:3, 66:14, 70:10, 70:11, 74:14, 74:17, 74:20, 74:23, 75:3, 75:6, 75:12, 82:19, 94:11, 101:15, 101:19, 102:2, 102:9, 103:17, 103:24, 104:5, 104:7, 104:9, 113:20, 114:12, 119:16, 132:2

**yesterday** [1] - 39:17

**yourselves** [1] - 126:10

## Z

**zero** [1] - 25:14